CP:RB:TK
F.#2010R00420

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 1 7 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

PEDRO ESPADA, JR. and
PEDRO GAUTIER ESPADA,

      Defendants,

- - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>10-985 (S-2)(FB)</u>
(T. 18, U.S.C., §§ 371,
666(a)(1)(A),
981(a)(1)(c), 982(a)(7),
982(b), 1001(a)(3),
1349, 2 and 3551 <u>et</u>
<u>seq</u>.; T. 21, U.S.C.,
§ 853(p); T. 26, U.S.C.,
§§ 7206(1) and 7206(2));
T. 28, U.S.C., § 2461(c)

THE GRAND JURY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

      At all times relevant to this Indictment, unless otherwise indicated:

I.   <u>The Defendants</u>

      1.   PEDRO ESPADA, JR. ("ESPADA") was the Chief Executive Officer and President of Comprehensive Community Development Corporation ("CCDC"), also known as Soundview Healthcare Network ("Soundview").  Beginning in January 2009, ESPADA was also an elected member of the New York State Senate, representing the 33rd Senatorial District in the Bronx, New York. Prior to representing the 33rd Senatorial District, ESPADA served several terms in the New York State Senate representing the 32nd Senatorial District and also ran for other elected positions.

2.   PEDRO GAUTIER ESPADA ("GAUTIER ESPADA"), ESPADA's eldest son, was the Director of Environmental Care at Soundview. GAUTIER ESPADA also held positions in Community Expansion Development Corporation ("CEDC") and Soundview Management Enterprises ("SME"), janitorial service companies founded and owned by ESPADA.

II.  The Relevant Companies

A. Soundview Healthcare Network

3.   ESPADA founded Soundview in 1978 as a charitable not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code.  Soundview was a network of health care clinics located in the Bronx.  Soundview received more than $1 million per year each year from 2005 through 2009 in grant money from the United States Department of Health and Human Services, which grant money was administered through the Health Resources and Services Administration ("HRSA").

4.   As a not-for-profit organization, Soundview had to meet several requirements to be granted and to maintain tax-exempt status.  Those requirements, under section 501(c)(3) of the Internal Revenue Code, included the following:

a.   the organization must be "organized and operated exclusively for exempt purposes set forth in section 501(c)(3)";

b.   the organization must not be organized or operated for the benefit of private interests;

-2-

> c.   "none of [the organization's] earnings may inure to any private shareholder or individual";
>
> d.   the organization "may not participate in any campaign activity for or against political candidates"; and
>
> e.   the organization's assets must be permanently dedicated to an exempt purpose.

5.   Soundview's amended Articles of Incorporation stated the following:

> The purposes for which this corporation is formed are exclusively charitable and are to establish, operate, maintain, and lease a diagnostic and treatment health care center for the prevention, diagnosis and treatment of human disease, pain, injury, deformity and other physical conditions.

6.   Further, Soundview's Articles of Incorporation expressly required that it operate in a manner that would not jeopardize its tax-exempt 501(c)(3) status.

7.   Soundview leased several properties, including 731 White Plains Road in the Bronx, where it maintained its headquarters, and several satellite clinics.

B.   Community Expansion Development Corporation

8.   CEDC was a for-profit janitorial services company incorporated by ESPADA in 1980 and owned by him.  From 1994 until 2002, CEDC provided Soundview with janitorial and maintenance services for all the Soundview facilities.  Soundview paid CEDC twice each month.

9.    In approximately 2003, CEDC employees were placed on the Soundview payroll.  As Soundview employees, those individuals were paid by Soundview and received full Soundview employee benefits.

10.    In January 2005, ESPADA transferred ownership of CEDC to Soundview, making it a subsidiary of Soundview.  In January 2006, notwithstanding this transfer, ESPADA declared to the Soundview Board of Directors that he was "donating" his purported remaining 49% interest in CEDC to Soundview.

C.    Soundview Management Enterprises

11.    SME was a for-profit janitorial services company incorporated by ESPADA in April 2007.  ESPADA was the sole owner of SME.  GAUTIER ESPADA managed SME on a daily basis, controlled the hiring and firing of all employees, issued checks to employees, decided who received bonuses, and, until 2009, collected the time sheets from SME employees.

III. The Defendants' Compensation

12.    Soundview provided for ESPADA to be paid a base salary ranging from approximately $235,000 in 2003 to $246,750 in 2009.  Soundview paid GAUTIER ESPADA a base salary and fringe benefits in amounts ranging from $94,678 in 2003 to $111,667 in 2009.  CEDC paid GAUTIER ESPADA a base salary in amounts ranging from $40,200 in 2005 to $65,100 in 2007, and SME paid him $50,840 in 2008.

-4-

IV.  The Conspiracy To Embezzle, Steal, Misapply and Defraud

13.  As set forth below, between January 2005 and February 2010, ESPADA and GAUTIER ESPADA conspired to embezzle, steal, misapply and obtain by fraud money and other property from Soundview significantly above and beyond that which they were entitled to as employees of Soundview.  To effectuate their conspiracy, they devised and executed the following schemes.

A.  Soundview American Express Card Scheme

14.  In or about 2002, at ESPADA's direction, the Chief Financial Officer ("CFO") of Soundview applied for a Soundview corporate American Express card (the "AMEX card").  Due to the poor credit history of Soundview and ESPADA, in order to obtain the AMEX card, the CFO served as the card's guarantor and assumed personal responsibility for payment of the account.  The only authorized users of the AMEX card were ESPADA and the CFO.

15.  According to ESPADA's employment contract with Soundview and the minutes of meetings of the Soundview Board of Directors, ESPADA was permitted to use the AMEX card for personal as well as business expenses, provided that he reimbursed Soundview for all personal expenses charged on the card. ESPADA's Soundview employment contract permitted him to reimburse Soundview for his personal AMEX card charges by deducting days from his accrued sick and vacation time to cover the total amount of his personal AMEX charges.  ESPADA's employment contract

-5-

provided him with eight weeks of paid vacation time and six weeks of paid sick time.

16.   Each month, the CFO provided ESPADA with the monthly AMEX statement so that ESPADA could identify which charges were his personal expenses.   Any AMEX charges not specifically marked "personal" by ESPADA on those statements were fully paid for by Soundview as business expenses.   When reviewing the monthly Soundview AMEX statements, ESPADA intentionally failed to identify more than $115,000 in personal charges as his personal expenses.   As a result, Soundview, rather than ESPADA, paid for those personal expenses.

B.   The CEDC Scheme

17.   As noted above, in January 2005 CEDC became a for-profit subsidiary of Soundview, a charitable not-for-profit corporation.   As such, CEDC's profits and assets were to inure to the benefit of Soundview, and not to the benefit of any private individual.   Nevertheless, ESPADA and GAUTIER ESPADA continued to control and operate CEDC as if it were still ESPADA's private company that existed for his and his family's personal benefit. During the period CEDC was a subsidiary of Soundview, ESPADA used CEDC funds to pay personal expenses, including expenses related to his political campaigns, and ESPADA and GAUTIER ESPADA transferred CEDC money to themselves, and for the benefit of their family members, at will.   Through this scheme ESPADA and GAUTIER ESPADA stole more than $175,000 from Soundview.

-6-

C.    The Rent Payment Scheme

18.    As the leaseholder of various properties,
Soundview subleased conference rooms and other facilities to
medical professionals, religious organizations and other
subtenants.  In or about and between 1999 and 2009, ESPADA and
GAUTIER ESPADA caused subtenants of Soundview to make rent
payments and other payments to themselves, to CEDC, and to SME,
rather than to Soundview.  Through this scheme, between 2005 and
2009, ESPADA and GAUTIER ESPADA stole more than $200,000 in
subtenant rent payments from Soundview.

D.    The Bid-Rigging Scheme

19.    In or about July 2007, Soundview began soliciting
bids for a janitorial services contract.  In order to ensure that
SME, the for-profit corporation founded by ESPADA in April 2007,
would win the contract, ESPADA and GAUTIER ESPADA orchestrated a
fraudulent scheme to subvert the bidding process (the "Bid-
Rigging Scheme").  In furtherance of this scheme, GAUTIER ESPADA
falsely informed janitorial services companies that submitted
bids for the contract, among other things, that (a) more janitors
were required to clean Soundview's facilities than actually were
required, and (b) Soundview's facilities needed to be cleaned
more frequently than actually was required.

20.    Based on the false information provided by GAUTIER
ESPADA, the janitorial service companies competing for the
contract submitted bids that were in excess of what they would

-7-

have been had they known of the true work specifications. As a result, when SME offered to perform the true work specifications, SME's price appeared to the Soundview Board to be lower than the lowest bid submitted by the other janitorial service companies.

21. In December 2007, the Executive Committee of Soundview's Board of Directors voted to award Soundview's janitorial contract to SME. The Executive Committee's decision was then ratified by the entire Board because the Board had been told that SME had submitted the lowest bid.

22. On January 15, 2008, Soundview and SME entered into a one-year contract for SME to provide janitorial services to Soundview for approximately $34,000 per month. SME then performed the contract based on Soundview's actual janitorial services needs, not on the false work specifications presented to the competing companies to fraudulently cause them to submit higher bids. Soundview paid SME approximately $389,700 in 2008 pursuant to this contract.

23. In furtherance of the Bid-Rigging scheme, GAUTIER ESPADA engaged in interstate telephone conversations with an employee of a janitorial service company that submitted a bid.

i)    Filing of a False 2008 Medicare Cost Report

24. Medicare reimburses hospitals and health centers such as Soundview for some costs associated with Medicare patients' care. In order to receive such reimbursements, health centers must submit Cost Reports to Medicare. In February 2010,

-8-

Soundview submitted a Cost Report to Medicare pertaining to the year 2008 that ESPADA signed and certified (the "2008 Medicare Cost Report").

25.  The 2008 Medicare Cost Report specifically asked about payments Soundview made to related parties, such as non-arms-length transactions with its own employees, and requested the amount of profit earned by the related party.  Medicare obtains this information so that it does not reimburse an entity for profits earned by that entity's own employees.

26.  Soundview reported that (1) it made a payment to SME of $363,000 in 2008, and (2) only $35,000 of that payment was profit to ESPADA, with the remainder representing the cost of providing cleaning services for Soundview.  ESPADA provided the information contained in the 2008 Medicare Cost Report concerning the profits he earned from SME and verified the veracity of that information by signing and certifying the report.  In fact, SME, and thereby ESPADA, earned profits in excess of $120,000 from Soundview's payments to SME during 2008.

E.    Other Theft

27.  From January 2006 through June 2009, ESPADA caused Soundview to pay for items and services that he purchased with official Soundview checks that directly benefitted ESPADA and his family but were unrelated to the conduct of official Soundview

-9-

business.  These expenses included over $1,000 for flowers that were sent to members of ESPADA's immediate family.

28.  ESPADA additionally submitted receipts to Soundview and obtained reimbursement for purported business expenses charged on the AMEX card that had already been paid directly by Soundview.  From January 2007 to June 2009, ESPADA caused Soundview to pay him over $2,500 in fraudulent reimbursements in this manner.

## COUNT ONE
### (Conspiracy to Commit Theft, Embezzlement and Misapplication of Federal Funds)

29.  The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

30.  In or about and between January 2005 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PEDRO ESPADA JR. and PEDRO GAUTIER ESPADA, agents of Soundview, did knowingly and willfully conspire to embezzle, steal, obtain by fraud, intentionally misapply, and otherwise without lawful authority knowingly convert to the use of a person other than the rightful owner, property of Soundview, an organization that received within a one-year period benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of Federal assistance,

-10-

which property was valued at $5,000 or more, and was owned by and under the care, custody, and control of Soundview, contrary to Title 18, United States Code, Section 666(a)(1)(A).

   31. In furtherance of the conspiracy, and to effect its objectives, within the Eastern District of New York and elsewhere, the defendants PEDRO ESPADA, JR. and PEDRO GAUTIER ESPADA committed and caused to be committed the following:

OVERT ACTS

   (a) In or about and between 2005 and 2007, ESPADA used CEDC funds to pay two different law firms for work they performed in connection with litigation related to ESPADA's political campaigns.

   (b) In or about and between May 2005 and August 2005, ESPADA used CEDC funds to pay for after-school tutoring for Family Member #2.[1]/

   (c) In or about February 2006, ESPADA used CEDC funds to pay a ghostwriter to work on a personal book project.

   (d) In or about June 2006, ESPADA used CEDC funds to pay a plumbing, heating and air conditioning service company in connection with servicing the air conditioning system at ESPADA's home in Mamaroneck, New York.

---

[1] Family Members #1 through #8, whose identities are known to the Grand Jury, are relatives of ESPADA and/or GAUTIER ESPADA by blood or affinity.

(e)   In or about June 2006, ESPADA used CEDC funds to pay an individual to cater Family Member #3's birthday party, held at ESPADA's home in Mamaroneck, New York.

(f)   In or about July 2006, ESPADA used CEDC funds to pay an individual to videotape the June 2006 birthday party held at ESPADA's home.

(g)   In or about June 2006, ESPADA used CEDC funds to pay the Bronx Equestrian Center to provide a petting zoo and pony for the June 2006 birthday party held at ESPADA's home.

(h)   In or about October 2006, at Bentley of Long Island, ESPADA presented a check from one of CEDC's bank accounts in the amount of $49,000 as a down-payment for a Bentley automobile worth $125,000.  Ultimately, the check was not negotiated because ESPADA's financing application was rejected.

(i)   In or about May 2007, ESPADA used CEDC funds to pay Profusion Management, a credit-repair company hired by ESPADA to improve his personal credit score.

(j)   In or about January 2008, ESPADA used CEDC funds to pay a printer for campaign materials produced for ESPADA's 2008 New York State Senatorial campaign.

(k)   In or about and between January 2008 and October 2008, ESPADA used CEDC funds to pay rent for ESPADA's campaign headquarters for the 2008 New York State Senatorial campaign.

(l)   In or about 2007, GAUTIER ESPADA caused CEDC to pay him approximately $5,200 for expenses purportedly incurred by him, but which expenses CEDC had already paid for through its corporate American Express card.

(m)-(jj)   In or about the months set forth below, ESPADA caused CEDC to pay funds via checks to himself, GAUTIER ESPADA and the following family members and associates, which funds were outright gifts, purported loans, "consulting fees" and false reimbursements:

| OVERT ACT | DATE | RECIPIENT | AMOUNT | MEMO | SIGNATURE |
|---|---|---|---|---|---|
| m | July 2005 | ESPADA | $1,500 | Loan | ESPADA |
| n | September 2005 | GAUTIER ESPADA | $1,500 | Loan | ESPADA |
| o | November 2005 | ESPADA | $5,000 | Loan | ESPADA |
| p | December 2005 | Family Member #4 | $499.50 | Blank | ESPADA |
| q | January 2006 | ESPADA | $5,000 | Loan | ESPADA |
| r | February 2006 | Family Member #5 | $5,000 | Loan | ESPADA |
| s | March 2006 | Family Member #4 | $500 | Loan | ESPADA |
| t | July 2006 | GAUTIER ESPADA | $4,234 | Loan | ESPADA |
| u | August 2006 | Family Member #6 | $2,999 | Blank | ESPADA |

| | | | | | |
|---|---|---|---|---|---|
| v | November 2006 | Family Member #7 | $1,000 | Loan | ESPADA |
| w | May 2007 | ESPADA | $952.50 | Reimbursement | ESPADA |
| x | May 2007 | ESPADA | $1,000 | Consulting Fee | ESPADA |
| y | June 2007 | GAUTIER ESPADA | $2,200 | Loan | ESPADA |
| z | June 2007 | ESPADA | $955 | Reimbursement | ESPADA |
| aa | July 2007 | ESPADA | $5,000 | Loan | ESPADA |
| bb | July 2007 | SME | $3,000 | Blank | ESPADA |
| cc | October 2007 | Family Member #8 | $500 | Gift | ESPADA |
| dd | November 2007 | GAUTIER ESPADA | $2,500 | Loan | ESPADA |
| ee | November 2007 | ESPADA | $1,500 | Consulting Fee | ESPADA |
| ff | March 2008 | ESPADA | $365.50 | Reimbursement | ESPADA |
| gg | March 2008 | ESPADA | $254 | Reimbursement | ESPADA |
| hh | May 2008 | GAUTIER ESPADA | $300 | Gift | ESPADA |
| ii | August 2008 | ESPADA | $4,300 | Loan | ESPADA |
| jj | April 2009 | ESPADA | $440 | Blank | ESPADA |

(kk) In or about and between 2007 and 2008, GAUTIER ESPADA caused an individual to pay him $500 per month in cash for the right to use a Soundview conference room to conduct Sunday religious services.

(ll) In or about and between late 2008 and mid 2009, ESPADA caused a tenant renting space inside of one of

Soundview's locations to pay rent in the approximate amount of $11,200 to SME rather than to Soundview.

(mm) In or about and between May 2005 and September 2008, ESPADA caused Weight Watchers to pay CEDC a total of approximately $16,000 in checks to rent a Soundview conference room for its weekly class, which checks were issued from Jericho, Long Island.

(nn) In or about and between February 2005 and November 2009, ESPADA charged, caused to be charged, and caused Soundview to pay charges for more than $100,000 in personal meals on the Soundview AMEX card.  Those charges included, but were not limited to, the following:

(i)  $4,260.29 in charges at Lum Yen Restaurant in Mamaroneck, New York between 2005 and 2009;

(ii) $20,155.89 in charges at Toyo Sushi in Mamaroneck, New York between 2006 and 2009;

(iii) $4,761.16 in charges at the Mamaroneck Diner in Mamaroneck, New York between 2006 and 2009;

(iv)  $4,013.08 in charges at the Nautilus Diner in Mamaroneck, New York between 2005 and 2009;

(v)  $7,700.34 in charges at Legal Sea Foods in White Plains, New York between 2005 and 2009; and

(vi)  $5,468.59 in charges at Seasons Japanese Cuisine in White Plains, New York between 2005 and 2009.

(oo) In or about and between 2007 and 2009, ESPADA charged, caused to be charged, and caused Soundview to pay charges for approximately $1,300 in purchases from Edible Arrangements on the Soundview AMEX card.

(pp) In or about 2008, ESPADA charged, caused to be charged, and caused Soundview to pay charges totaling $1,055.57 for home window treatments on the Soundview AMEX card.

(qq) In or about and between 2006 and 2009, ESPADA caused Soundview to pay over $1,000 to Park Florist for flowers that were delivered to members of ESPADA's immediate family.

(rr) In or about and between 2006 and 2009, ESPADA caused Soundview to reimburse him for over $2,500 in expenses that he charged on the Soundview AMEX card and for which he was not entitled to reimbursement.

(Title 18, United States Code, Sections 371 and 3551 <u>et seq</u>.)

<u>COUNTS TWO THROUGH SIX</u>
(Theft, Embezzlement and Misapplication of Federal Funds)

32. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

33. In the years listed below, within the Eastern District of New York and elsewhere, the defendants PEDRO ESPADA, JR. and PEDRO GAUTIER ESPADA, being agents of Soundview, did knowingly and intentionally embezzle, steal, obtain by fraud,

-16-

misapply and, without authority, knowingly convert to the use of
a person other than the rightful owner, property of Soundview, an
organization that received in excess of $10,000 involving grants,
contracts, subsidies, loans, guarantees, insurance, and other
forms of Federal funds assistance, which property was valued at
$5,000 or more and which property was owned by, and was under the
care, custody, and control of, Soundview:

| COUNT | YEAR | APPROXIMATE DOLLAR AMOUNT |
| --- | --- | --- |
| TWO | 2005 | More than $70,000 |
| THREE | 2006 | More than $130,000 |
| FOUR | 2007 | More than $150,000 |
| FIVE | 2008 | More than $130,000 |
| SIX | 2009 | More than $65,000 |

(Title 18, United States Code, Sections 666(a)(1)(A), 2
and 3551 et seq.)

## COUNT SEVEN
(Conspiracy to Commit Wire Fraud)

34. The allegations contained in paragraphs 1 through
28 are realleged and incorporated as if fully set forth in this
paragraph.

35. In or about and between July 2007 and October
2010, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants PEDRO
ESPADA, JR. and PEDRO GAUTIER ESPADA, together with others, did
knowingly and intentionally conspire to devise a scheme and

-17-

artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit: the Bid-Rigging Scheme, and for the purpose of executing such scheme and artifice to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, to wit: interstate telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT EIGHT
(False Statement)

36. On or about February 4, 2010, within the Southern District of New York, the defendant PEDRO ESPADA, JR. did knowingly and willfully make, and cause to be made, and use a false writing and document knowing the same to contain a materially false, fictitious and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the Department of Health and Human Services ("HHS"), in that ESPADA signed the 2008 Medicare Cost Report that was submitted to HHS, certifying that Soundview Management Enterprises ("SME") earned profits in the amount of $35,000 in 2008 as a result of its cleaning-services contract with Soundview Healthcare Network ("Soundview"), when, in fact, as he then and there well knew and believed, SME

-18-

profited in an amount greater than $35,000 as a result of its
cleaning-services contract with Soundview in 2008.

(Title 18, United States Code, Sections 1001(a)(3) and
3551 et seq.)

## COUNT NINE
### (False Statement)

37.   On or about and between January 7, 2009 and
January 9, 2009, both dates being approximate and inclusive,
within the Southern District of New York, the defendant PEDRO
ESPADA, JR., did knowingly and willfully make, and cause to be
made, and use a false writing and document knowing the same to
contain a materially false, fictitious and fraudulent statement
and entry in a matter within the jurisdiction of the executive
branch of the Government of the United States, to wit: the Health
Resources and Services Administration, in that ESPADA requested
the drafting of, and approved the submission of, a January 9,
2009 letter and attachments on behalf of Soundview Healthcare
Network, stating that for the period February 1, 2009 to January
31, 2010: (a) ESPADA'S salary of $246,750 had been reduced, when,
in fact, as ESPADA then and there well knew and believed, his
salary had not been reduced, and (b) ESPADA'S salary would be
$185,063, when, in fact, as ESPADA then and there well knew and
believed, his salary would be greater than $185,063.

(Title 18, United States Code, Sections 1001(a)(3) and
3551 et seq.)

-19-

<u>COUNT TEN</u>
(Conspiracy to Defraud the United States)

38.  The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

39.  On or about and between July 1, 2004 and December 31, 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PEDRO ESPADA JR. and PEDRO GAUTIER ESPADA, together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service of the United States Department of the Treasury in the ascertainment, computation, assessment and collection of revenue, to wit: corporate income taxes owed by CEDC and personal income taxes owed by the defendants.

40.  In furtherance of the conspiracy, and to effect its objectives, within the Eastern District of New York and elsewhere, the defendants PEDRO ESPADA, JR. and PEDRO GAUTIER ESPADA committed and caused to be committed the following:

<u>OVERT ACTS</u>

(a)  On or about August 9, 2005, ESPADA used a CEDC check in the amount of $3,000 to pay for after-school tutoring for Family Member #2.

-20-

(b) On or about August 30, 2005, ESPADA used a CEDC check in the amount of $2,600 to pay for after-school tutoring for Family Member #2.

(c) On or about and between August 1, 2007 and April 30, 2008, GAUTIER ESPADA caused the accountants for CEDC to be told that the $5,600 paid for after-school tutoring in August 2005 was for a business expense of CEDC.

(d) On or about February 1, 2006, ESPADA used a CEDC check in the amount of $5,000 to pay a ghostwriter to work on a personal book project.

(e) On or about and between August 1, 2007 and April 30, 2008, GAUTIER ESPADA caused the accountants for CEDC to be told that the $5,000 paid for ESPADA's book project was a business expense of CEDC.

(f) On or about July 18, 2006, ESPADA used a CEDC check in the amount of $500 to pay an individual to videotape the June 2006 birthday party of Family Member #3 held at ESPADA's home in Mamaroneck, New York.

(g) On or about and between August 1, 2007 and April 30, 2008, ESPADA and GAUTIER ESPADA caused the accountants for CEDC to be told that the $500 paid to the videographer of the June 2006 birthday party was a business expense of CEDC.

-21-

(h)   On or about August 28, 2006, ESPADA wrote a CEDC check in the amount of $2,999 to Family Member #6 for tuition at St. John's University in Queens, New York.

(i)   In or about and between August 1, 2007 and April 30, 2008, ESPADA and GAUTIER ESPADA caused the accountants for CEDC to be told that the $2,999 paid to Family Member #6 was a business expense of CEDC.

(j)   In or about October 2006, at Bentley of Long Island, ESPADA presented a check from one of CEDC's bank accounts in the amount of $49,000 as a down-payment for a Bentley automobile worth $125,000.

(k)   On or about May 11, 2007, ESPADA used a CEDC check in the amount of $400 to pay Profusion Management to repair ESPADA's bad credit rating.

(l)   On or about and between August 1, 2007 and April 30, 2008, ESPADA and GAUTIER ESPADA caused the accountants for CEDC to be told that the $400 paid to Profusion Management was a business expense of CEDC.

(m)   On or about July 30, 2007, ESPADA used a CEDC check in the amount of $400 to pay an individual to videotape the birthday party of Family Member #9 held at GAUTIER ESPADA's home in Connecticut.

(n)   On or about and between August 1, 2007 and April 30, 2008, ESPADA and GAUTIER ESPADA caused the accountants

-22-

for CEDC to be told that the $400 paid to the videographer of the birthday party was a business expense of CEDC.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNTS ELEVEN AND TWELVE
(Subscribing to a False and Fraudulent Tax Return)

41.    The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

42.    On or about and between March 18, 2008 and April 3, 2008, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendant PEDRO ESPADA, JR. did knowingly and willfully make and subscribe United States Corporation Income Tax Returns, Forms 1120, on behalf of CEDC, for the fiscal years set forth below, which returns were filed with the Internal Revenue Service on behalf of the corporation and contained a written declaration that they were made under the penalties of perjury, and which tax returns the defendant PEDRO ESPADA, JR. did not believe to be true and correct as to every material matter, in that ESPADA falsely reported CEDC's total business expenses for the years set forth below to be the amounts set forth below, when in fact, as ESPADA then and there well knew and believed, CEDC's actual business expenses in those years were substantially less.

-23-

| COUNT | FISCAL YEAR | BUSINESS EXPENSE REPORTED |
|-------|-------------|---------------------------|
| ELEVEN | 2004 | $102,587 |
| TWELVE | 2005 | $328,653 |

(Title 26, United States Code, Sections 7206(1) and Title 18, United States Code, 3551 et seq.)

COUNTS THIRTEEN AND FOURTEEN
(Aiding and Assisting in the Preparation and Presentation of a False and Fraudulent Tax Return)

43.   The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

44.   In or about and between September 2007 and April 2008, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendant PEDRO GAUTIER ESPADA did knowingly and willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the Internal Revenue Service, of United States Corporation Income Tax Returns, Forms 1120, on behalf of CEDC, for the fiscal years set forth below, which returns were false and fraudulent as to material matters, in that CEDC's total business expenses for the years set forth were falsely reported in the amounts set forth below, when in fact, as GAUTIER ESPADA then and there well knew and believed, CEDC's actual business expenses in those years were substantially less than the amounts Claimed.

-24-

| COUNT | FISCAL YEAR | BUSINESS EXPENSE REPORTED |
|---|---|---|
| THIRTEEN | 2004 | $102,587 |
| FOURTEEN | 2005 | $328,653 |

(Title 26, United States Code, Sections 7206(2) and Title 18, United States Code, 3551 et seq.)

COUNT FIFTEEN
(Subscribing to a False and Fraudulent Tax Return)

45. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

46. On or about and between October 27, 2006 and November 14, 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PEDRO ESPADA, JR. did knowingly and willfully make and subscribe a joint United States Individual Income Tax Return, Form 1040, for the 2005 tax year, which was verified by a written declaration that it was made under the penalties of perjury and which was filed with the Internal Revenue Service, which tax return the defendant PEDRO ESPADA, JR. did not believe to be true and correct as to every material matter, in that ESPADA reported falsely that his gross income was $297,630, when in fact, as he

then and there well knew and believed, his gross income was substantially greater than $297,630.

(Title 26, United States Code, Sections 7206(1) and Title 18, United States Code, 3551 et seq.)

### COUNTS SIXTEEN AND SEVENTEEN
(Subscribing to a False and Fraudulent Tax Return)

47.   The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

48.   On or about and between the dates set forth below, within the Southern District of New York and elsewhere, the defendant PEDRO ESPADA, JR. did knowingly and willfully make and subscribe joint United States Individual Income Tax Returns, Forms 1040, for the tax years set forth below, each of which was verified by a written declaration that it was made under the penalties of perjury and which were filed with the Internal Revenue Service, which tax returns the defendant PEDRO ESPADA, JR. did not believe to be true and correct as to every material matter, in that ESPADA falsely reported his gross income to be the amounts set forth below, when in fact, as he then and there well knew and believed, his gross income was substantially greater than the amounts reported.

-26-

| COUNT | DATE | CALENDAR YEAR | GROSS INCOME REPORTED |
|-------|------|---------------|------------------------|
| SIXTEEN | August 3, 2007 and September 22, 2008 | 2006 | $361,657 |
| SEVENTEEN | November 30, 2008 and January 23, 2009 | 2007 | $462,560 |

(Title 26, United States Code, Sections 7206(1) and Title 18, United States Code, 3551 et seq.)

### COUNT EIGHTEEN
(Subscribing to a False and Fraudulent Tax Return)

49. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

50. On or about and between the dates set forth below, within the Southern District of New York and elsewhere, the defendant PEDRO ESPADA, JR. did knowingly and willfully make and subscribe joint United States Individual Income Tax Returns, Forms 1040, for the tax years set forth below, each of which was verified by a written declaration that it was made under the penalties of perjury and which were filed with the Internal Revenue Service, which tax returns the defendant PEDRO ESPADA, JR. did not believe to be true and correct as to every material matter, in that ESPADA a) falsely reported his total capital loss to be $77,775, when in fact, as he then and there well knew and believed, his capital loss was substantially less than $77,775 and b) falsely reported his gross income to be the amounts set

-27-

forth below, when in fact, as he then and there well knew and believed, his gross income was substantially greater than the amounts reported.

| DATE | CALENDAR YEAR | GROSS INCOME REPORTED |
|------|---------------|------------------------|
| December 23, 2009 and January 13, 2010 | 2008 | $719,304 |

(Title 26, United States Code, Sections 7206(1) and Title 18, United States Code, 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH SIX

51. The United States hereby gives notice to the defendants charged in Counts One through Six of this Indictment that, upon their conviction of any such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of any such offense, and Title 18, United States Code, Section 982(a)(7), which requires any person convicted of any such offense to forfeit any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

-28-

52.   If any of the above-described forfeitable property, as a result of any act or omission of a defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property, which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c)(1) and Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Sections 981(a)(1)(c), 982(a)(7), 982(b); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT SEVEN

53.   The United States hereby gives notice to the defendants charged in Count Seven of this Indictment that, upon

-29-

their conviction of such offense, the government will seek

forfeiture in accordance with Title 18, United States Code,

Section 981(a)(1)(c) and Title 28, United States Code, Section

2461(c), which require any person convicted of such offense to

forfeit any property, real or personal, constituting or derived

from proceeds obtained directly or indirectly as a result of such

offense.

54.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due

diligence;

b.  has been transferred or sold to, or deposited

with, a third party;

c.  has been placed beyond the jurisdiction of

the Court;

d.  has been substantially diminished in value;

or

e.  has been commingled with other property,

which cannot be divided without difficulty; it is the intent of

the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c)(1), to seek forfeiture of any other property of

the defendants, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(c); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

-31-