

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JM:PSS
F.#2010RO0420

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 25, 2012

**By Hand and ECF**

The Honorable Frederic Block
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Pedro Espada, Jr. et al.
            Criminal Docket No. 10-985 (FB)

Dear Judge Block:

      On January 20, 2012, we advised the Court that we had discovered a problem with our efforts to shield the AUSAs, law enforcement agents and support staff prosecuting this case (the "Trial Team") from exposure to materials seized during a search of Soundview Health Clinic ("Soundview") that may be covered by the attorney-client privilege and attorney work product doctrine. We write now to advise the Court of the results of our investigation to date and to describe the steps we have taken to ensure that the Trial Team will not be exposed to any protected materials in the future.

      As described in more detail below, the government established a set of procedures (the "Taint Procedures") to prevent the Trial Team from viewing potentially privileged materials. We have found that breaches in the Taint Procedures resulted in the inclusion of 418 potentially privileged documents in databases to which the Trial Team had access.[1] However, our investigation to date has shown that the Trial Team has actually

---

    [1]  On August 26, 2011, the government identified for the defense documents that it believed to be potentially privileged. To date, the defense has not requested the return of any of these documents or done anything else to assert privilege over those documents.

seen only one such document.[2] That document did not contain any core attorney-client communications between any defendant and their counsel in this case or any information that relates directly to the subject matter of this case.

It is well established in this Circuit that where, as here, the prosecution potentially has been exposed to potentially privileged documents, the government has a burden to prove that its prosecution is derived from only legitimate sources and not privileged materials. See United States v. Schwimmer, 924 F.2d 443, 446 (2d Cir. 1991); United States v. Weissman, 1996 WL 751386 at *1 (S.D.N.Y. 1996). That burden is met here. There is no evidence that this prosecution was motivated, directed or derived from any of the potentially privileged materials. Indeed, we have confirmed that there are no potentially privileged documents referenced in the Trial Team's prosecution memorandum, witness folders, grand jury exhibits or other documents identified by the prosecution as pertinent to the case. Where, as here, that burden is met, the case law requires that a defendant show actual prejudice from the privilege breach in order to obtain any relief. Schwimmer, 924 F. 2d at 447. The defense cannot do so here because the 418 potentially privileged documents have nothing to do with the criminal charges pending before this Court or communications between the defendants and their counsel.

We have divided our report to Your Honor below in four parts. First, we describe the Taint Procedures we established in 2010 as part of our good faith effort to shield the Trial Team from the potentially privileged materials. Second, we describe what led to the inclusion of the 418 potentially privileged documents into the Trial Team's database. Third, we identify and summarize the relevant case law. Finally, we apply that case law in concluding that no relief is warranted here because the Trial Team's inadvertent potential exposure to the 418 documents had no impact on the government's decision to charge this case or the development of the Trial Team's strategies and because there is no prejudice to the defense.

I.   The Search Warrant and Taint Procedures

On April 21, 2010, agents of the Federal Bureau of Investigation ("FBI") and Internal Revenue Service ("IRS")

---

[2] For obvious reasons, as part of the investigation, we did not show the 418 documents to the Trial Team to confirm that they had not reviewed the documents.

executed a search warrant at the defendants' offices at Soundview. Consistent with the warrant, agents seized both paper documents and electronic data from computers. At the government's instruction, the agents did not search or seize any materials or computers from the offices of Soundview's in-house attorney in an effort to prevent any government exposure to privileged materials.

Following the search, our administrative staff worked with a third-party vendor for several months to copy, scan[3] and assign Bates labels to the seized paper documents. During the same time, the seized electronic data was imaged and information technology specialists at the FBI and IRS segregated all data files (e.g., Word files, Excel spreadsheets, pdfs, e-mails) from the executable files (i.e., the files, such as Windows, that govern the computer's operation). On approximately July 29, 2010, the data files from the seized electronic data were uploaded onto one computer at the IRS (the "master data computer.")

During the summer of 2010, as the seized paper documents were being scanned, the AUSAs then assigned to the case from the Office's Public Integrity Section and the agents began reviewing the seized paper documents. During the week of August 16, 2010, AUSA Todd Kaminsky discovered a bill from a law firm in a file belonging to Ken Brennan, Soundview's Chief Financial Officer. That document, Mr. Kaminsky discovered, had been in a file marked "Legal." Mr. Kaminsky immediately alerted his supervisor, and the Trial Team then immediately requested that a team of AUSAs, agents and support staff not assigned to the case review the as-yet unreviewed seized paper documents and all seized electronic data to remove all privileged materials before the Trial Team conducted any further review of those materials. A team consisting of supervisors and AUSAs drawn from the Business & Securities Fraud Section of the office, as well as agents and support staff not assigned to the case was set up (the "Review Team").

On August 23, 2010, the Review Team circulated a draft memorandum (the "August 23, 2010 Memo") that described the procedures it would follow. The August 23, 2010 Memo identified

---

[3]   "Scanning" the seized paper documents created electronic pdf copies of the documents that were eventually uploaded into an electronic database. The Trial Team then performed word searches on the documents in the database, much as an attorney performs searches on court opinions in Westlaw.

the members of the Review Team and the Trial Team (then called the "Investigation Team") and stated the following admonition in boldface:

> **During the pendency of the investigation and review, the members of both teams – i.e, the Review Team and the Investigation Team, shall not engage in any communication about the substance of the investigation or the review. The purpose of this prohibition is to avoid any privileged materials from being used by or considered by the Investigation Team in making its prosecutorial decisions.**

The August 23, 2010 Memo directed that the Office's Information Technology Department (the "Tech Team") would create two databases: one for the Review Team and one for the Trial Team. With respect to the seized paper documents, the August 23, 2010 Memo directed that:

> Once the documents have been uploaded into the Review Database (or paper copies of the same documents are received by the Review Team), the Review Team will review the materials and determine if there are any potentially privileged material contained therein. The Review Team will remove all paper copies of potentially privileged materials and create an index of the corresponding Bates-labels. The Review Team will provide an index of the Bates-labels of the potentially privileged materials and provide such index to the Tech Team. The Tech Team will then remove from the Electronic Copy Set [i.e., the database] those potentially privileged documents and populate the Investigation Database with only the Paper Copy Set documents less the potentially privileged documents.

With respect to the seized electronic data, the August 23, 2010 Memo directed an IRS agent on the Review Team to run search terms on all the data files on the master data computer to identify all attorneys' names, firms and e-mail addresses. It provided the following instructions:

> All documents without hits will be forwarded to the Tech Team to be uploaded into the Investigation Database. All documents with "hits" for the attorney names shall be sent to [a paralegal on the Review Team] and uploaded into the Review Database. Such documents will be reviewed by the Review Team attorneys to

>determine if they are privileged.  Any non-privileged
>materials will be directed to the Tech Team and
>uploaded into the Investigation Database.

The August 23, 2010 Memo also directed that any protected materials that were identified during the review would be identified for the defense team.

During the next two months, the Review team undertook a review of all the seized paper documents that the Trial Team had not already reviewed.  The review of Brennan's paper documents revealed 39 potentially privileged documents.  These potentially privileged documents were removed from the paper review sets of these documents, and the resulting sets were made available to the Trial Team.

II.  **Failures In Taint Procedures**

    A.  Technological Failures

In executing the Taint Procedures, there were three primary mistakes, all in the area of technology.

    1.  Key Word Searches

As described above, the master data computer contained all of the data files from all the seized electronic data.  The IRS organized the data files into electronic folders based on categories such as "spreadsheets," "text files," and "e-mails."  Emails were located in different locations on the master data computer.  All emails were contained in a master folder called "E-mail Containers."  All emails were also organized into three distinct electronic folders based on the type of e-mail (the "Three E-mail Type Folders").  Once the seized electronic data was organized, the IRS agent ran searches on it using terms designed to identify attorneys' names, firms and e-mail addresses.  As required by the August 23, 2010 Memo, the agent then segregated all of the documents with "hits" into an electronic folder labeled "Taint Folder."  The Taint Folder contained 6,459 documents.

While the search software ran searches on all the e-mails in the Three E-mail Type Folders, it did not search the same e-mails contained in the E-Mail Containers folder.  Accordingly, for every e-mail that was identified in the key word searches, and segregated by the agent, there was an identical copy of that same e-mail that was not identified and segregated out into the Taint Folder.  This error was not discovered until

6

we began our investigation last week. Rather, the Trial Team and the Review Team assumed that the master data computer contained two data sets – one set of 6,459 documents containing attorneys' names, firms and e-mail addresses (i.e., "Tainted Folder") and a second data set containing no such documents (the "Presumed Clean Folder").

2.  Failure To Create Separate Databases

In early November 2010, the IRS provided this Office with an electronic copy of the 6,459 documents in the Taint Folder. The Tech Team then created a database in which the Review Team could conduct a privilege review. By December 2, 2010, the Review Team determined that there were 412 documents that could be potentially privileged. On that day, the Review Team sent an e-mail to the Trial Team and the Tech Team stating that it had completed the privilege review and outlined "administrative steps that we need to complete to give the [Trial] team access to the full population of non-privileged documents."

The December 2, 2010 e-mail directed the Tech Team to "burn a set of documents that excludes the 41[2][4] privileged documents [and] provide this set of documents to the [Trial] team (i.e., [IRS Agent] Dan Schleyer) so that he can upload the no-longer potentially privileged documents[5] onto the [master data computer]." By separate e-mail that same day, the Review Team sent a list of the 412 documents to the Tech Team and requested the Tech team to "create a NEW database from the Espadabrennan one, which contains everything in that database EXCEPT all documents listed on the attached spreadsheet." (Emphasis in original.) Later that day, the Tech Team confirmed, "[w]e are indeed capable of creating this new db."

---

[4] The December 2, 2010 e-mails actually identified 413 documents. The one document difference arose because the first document in the database was inadvertently tagged as privileged even though it was not a privileged document. For clarity, this letter only recites the 412 figure in recounting the facts.

[5] The "no-longer potentially privileged documents" consisted of the 6,459 documents on which there were "hits" in the IRS agents' word searches -- which group was reviewed by the Review Team -- minus the 412 documents that were identified as potentially privileged.

The Tech Team, however, never removed the 412 documents from the database, and it never created a separate database. Rather, in the ensuing weeks, the Tech Team added scanned copies of the seized paper documents from the files of Soundview's CFO Brennan and Controller Valdez to the existing database. Notably, the scanned set of the Brennan paper documents were stripped of 36 documents that the Review team had identified as privileged. However, three documents that the Review Team had marked as potentially privileged during the review of those paper documents were inadvertently not removed from the scanned set and were uploaded into the database. That meant that the database now contained 415 potentially privileged documents. Beginning in April 2011, the Tech Team made this database available to the Trial Team. Accordingly, as of April 2011, the Trial Team was potentially exposed to 415 potentially privileged documents.

As set forth above, the evidence shows, however, that the Trial Team actually reviewed only one of the 415 documents.

3. Failure To Maintain the Segregation Between Taint Folder and Presumed Clean Folder

In February 2011, following the privilege review, the Trial Team took steps to create a database containing all the non-privileged materials. The IRS agent requested an IT specialist at the IRS to provide this Office with a copy of the Presumed Clean Folder -- the folder containing all electronic documents minus the 6,459 documents which were the subject of "hits" in the word searches described above. On February 11, 2011, AUSA Ilene Jaroslaw (then on the Trial Team) circulated an e-mail directing a paralegal on the Review Team to first confirm that this database did not contain any privileged materials. A member of the Review Team directed the paralegal to re-check the data once it was loaded into the database to "make sure that the privileged documents are still no longer in there. In an abundance of caution." Unbeknownst to anyone, the Presumed Clean Folder did indeed contain potentially protected materials due to the failure of the search software to search the E-Mail Containers folder as well as the Three E-Mail Type Folders as described above. Nevertheless, because of a series of technological challenges set forth below, the data was not loaded into a functioning database until almost two months later. When it was eventually available, the paralegal was on trial, and the requested checks were not completed.

The Presumed Clean Folder was large and had been encrypted by the IRS to transport the data to the USAO. For

these reasons, the Tech Team had difficulties processing the copied Presumed Clean Folder into a database.  The Tech Team requested that the IRS provide the full master data computer so that the database could be constructed directly from that source.  On approximately February 15, 2011, the IRS agent from the Trial Team requested an IRS IT specialist to delete the Tainted Folder from the desk top so that it could be provided to the USAO.  The IT specialist deleted the Tainted Folder from the master data computer by placing it in the master data computer's "Recycle Bin."  Notably, the IT specialist memorialized both the agent's request to delete the Tainted Folder and the fact that he, indeed, made the deletion.

      Nevertheless, despite all these good faith efforts, when the Tech Team began copying the master data computer into a database for the Trial Team, it also copied the Recycle Bin, which included the Tainted Folder.  Accordingly, the resulting database contained two copies of the 412 documents, which had been identified as protected – _i.e._, the copy from the E-Mail Containers and the copy from the Tainted Folder in the Recycle Bin.

      As a result of these technological failings, beginning in the second week of April 2011, the Trial Team had access to databases containing the 415 documents that were identified as potentially privileged materials (_i.e._, the 412 from the seized electronic data and the three from the Brennan seized paper documents).  Nevertheless, as set forth in greater detail in Section IV, _infra_, there is no evidence that these potentially privileged materials influenced the decision to prosecute the defendants or the course of the trial strategy.  Moreover, the evidence shows that the Trial Team actually saw only one of these documents.

   B.   Brennan Computer

      While preparing for trial in the fall of 2011, the Trial Team wanted to view the data as it actually appeared on Soundview CFO Brennan's computer, rather than just viewing the documents in the database.  To comply with the Trial Team's request, the IRS went back to the original set of seized electronic data and provided an image of Brennan's computer to the Office.  The hard drive was then uploaded onto a stand alone computer in this Office.  One FBI agent was charged with reviewing the data to determine:  (a) if there was any additional evidence on the hard drive; and (b) if there were materials on the computer that could be used to cross examine Mr. Brennan, who

the government expects will testify at trial.  Upon reviewing
Brennan's computer, the FBI agent selected 294 documents to pass
along to the prosecutors on the Trial Team.  Of these 294
documents, five documents are potentially privileged.[6]  Two of
these five documents had been identified as potentially
privileged during the Review Team's review back in 2010.[7]
Accordingly, combined with the 412 protected documents that were
contained in the databases as set forth above and the three
documents from Brennan's paper files, the Trial Team was then
potentially exposed to three additional documents for a total of
418 protected documents.[8]

***

The cumulative effect of these errors is that the Trial
Team had the potential to be exposed to 418 documents that may be
protected by the attorney-client privilege or the attorney work
product doctrine.  As set forth in Section IV, infra, however,
the government can demonstrate conclusively that any potential
exposure to these documents did not influence the government's
decision to bring the charges in this case.

III. Discovery of the Problems and Remedial Actions

The composition of the Trial Team has changed since the
tainted databases first became available in April 2011.  Since
August 2011, the Trial Team has consisted of AUSAs Carolyn
Pokorny and Roger Burlingame, as well as original member Todd
Kaminsky.  Last week, in preparing for the upcoming trial in the
case, Ms. Pokorny and Mr. Kaminsky were searching for documents

---

[6]   In December 2011, the copy of the hard drive containing
the Brennan computer became corrupted.  Of the 294 documents
tagged by the agent, 45 have become corrupted and cannot be
reviewed by the government from the hard drive located in this
Office.

[7]   The other three documents were not identified by the
keyword searches because the e-mail address for the law firm of
Genova Burns & Veronia (@gbvlaw.com) was inadvertently identified
as (@hbvlaw.com).  Genova Burns & Veronia was engaged to deal
with campaign finance issues, which have nothing to do with the
prosecution in this case.

[8]   The Trial Team was also provided with the PST files of
Soundview employee Ida Bauer but never viewed them.

Case 1:10-cr-00985-FB   Document 50   Filed 01/25/12   Page 10 of 14 PageID #: 348

10

in databases.  Both prosecutors independently came across a draft affirmation reflecting comments from an attorney at Hafetz and Necheles.  Mr. Kaminsky then contacted the Review Team to determine how this potentially privileged document came to exist in the Trial Team's database.

The evidence gathered to date reveals that this single document is the only document that any prosecutor on the Trial Team actually reviewed.  Notably, this document is a draft of an affirmation that was submitted in New York Supreme Court in response to a motion by the New York Attorney General to compel the production of documents by Soundview Management Enterprises.[9]  The draft affirmation appears to have been prepared by an attorney at Hafetz and Necheles (then acting as Soundview's counsel) for submission by Richard St. Paul, who was acting as Soundview Management Enterprise's attorney.

Upon reviewing the document, the Review Team determined that it had been marked as "potentially privileged" during the 2011 review of the seized electronic data and immediately began its investigation into how the document came to be in the Trial Team's database.  The Trial Team was immediately quarantined from all databases and documents in the case until the Review Team resolved the problem.

The ensuing investigation revealed the breaches set forth above.  The government has also identified solutions to these problems.  The IRS has been able to isolate the Presumed Clean Folder and remove the Email Containers Folder from it.  This provides the government with a set of seized electronic data void of any of the 6,459 documents containing attorneys' names,

---

[9]  Beginning in early 2009, the New York State Attorney General's Office ("NYAG") began investigating fraud and misconduct with the management of Soundview Management Enterprises.  This investigation culminated in the filing of a lawsuit against Pedro Espada, Ken Brennan and Soundview's Board of Directors in April 2010 and a suit against Pedro Espada and Pedro Gautier Espada in the same month alleging labor law violations at Soundview Management Enterprises, a for-profit company owned by Espada.  Each of those law suits is still pending.  In addition, during 2009 and 2010, the Medicaid Fraud Unit at the NYAG also was investigation billing practices at Soundview.  To date, no charges have resulted from this investigation.

11

firms and e-mail addresses -- of which the 412 potentially privileged documents is a subset.  The government plans to retain an outside firm to process this data into a clean database that may be used by the Trial Team.[10]

The government has also put into place new protocols to ensure that any additional seized electronic data to which the Trial Team may have access is first screened by the Review Team to remove any protected materials.  Going forward, the Trial Team may only obtain any additional electronic data -- in the form of the Brennan computer or otherwise -- through the Review Team. The Review Team will then process that data and review it to determine if it contains any protected materials.  Then, and only then, will the additional requested data be made available to the Trial Team.

IV.   <u>Analysis</u>

Under Second Circuit case law, the burden is on the government to prove that its prosecution is based on non-privileged information when it is exposed to privileged materials.  <u>See</u> <u>United States v. Schwimmer</u>, 924 F.2d 443, 446 (2d Cir. 1991); <u>United States v. Weissman</u>, 1996 WL 751386 at *1 (S.D.N.Y. 1996).  The government can meet this burden of proof by demonstrating that the prosecutorial decision to bring a criminal case in the first place was not derived from the privileged materials.  <u>See</u> <u>United States v. Skeddle</u>, 989 F. Supp. 890 (N.D. Ohio 1997)(suppression of non-privileged materials unnecessary where exposure to privileged materials did not give the prosecutors "insight to the strategies, theories, and tactics" of the defense); <u>Weissman</u>, 1996 WL 751386 at *1 (government's prosecution memo setting forth its theories of the case pre-dated exposure to any privileged materials, thus demonstrating that decision to charge case was free of taint from privileged materials).  In meeting its burden of proof, the government need not dispel every subtle possibility that its thoughts and mental impressions were impacted by any limited exposure to privileged materials.  <u>See</u> <u>United States v. Schwimmer</u>, 739 F. Supp. 654 (E.D.N.Y. 1990).  The government need not demonstrate that each and every piece of evidence to be used at trial is derived from non-privileged sources.  <u>Weissman</u>, 1996 WL 751386 at *10-11.

---

[10]   We will also run a search on this data  for the correct Genova Burns & Veronia e-mail addresses and remove any potentially privileged documents.

12

A. The Prosecution Does Not Arise From Privileged Materials

There is no evidence that any potential or fleeting exposure to the potentially privileged materials caused the prosecution in this case. The formal recommendation to bring theft and fraud charges in this case was first made in a memorandum dated December 9, 2010. That memorandum also contemplated bringing tax charges upon the completion of the IRS' investigation. As of December 9, 2010, no member of the Trial Team had ever accessed any database nor had they been exposed to any potentially privileged documents. The December 9, 2010 memorandum makes reference to numerous documents, witness statements and other evidence, none of which derived from or relates to any potentially privileged materials. When the grand jury returned the Indictment in this case on December 14, 2010, the Trial Team still had not been exposed to any potentially privileged materials.

Moreover, in the past few days, the Review Team has undertaken a review of all documents in the Trial Team's witness folders, attorney trial preparation folders and grand jury exhibits used by the Trial Team to seek the charges in this case and to prepare for the upcoming trial. None of the 418 potentially privileged documents are among those critical documents being used by the Trial Team.

B. There Is No Prejudice to the Defendants

Once the government has demonstrated that its decision to bring charges was free of taint, the burden shifts to the defense to show prejudice. <u>Schwimmer</u>, 924 F. 2d at 447.

The defendants cannot meet their burden of demonstrating prejudice. None of the 418 potentially privileged documents relates to the prospective federal charges in the case. The majority of these documents relate to routine legal issues that arise in the course of running a not-for-profit health care facility. Generally, topics discussed in the potentially privileged materials include employment litigation matters, disputes with landlords over rent collection, training in compliance programs, malpractice claims, and routine interactions with the Department of Labor. In fact, the privilege in these documents actually belongs to Soundview itself and not the defendants.

13

Unlike the facts in the leading cases in this area, the 418 documents here do not reflect communications between these defendants and their counsel. None of the documents relate to communications between the defendant Pedro G. Espada and his attorney, Russell M. Gioiella or his law firm of Litman, Asche & Gioiella, LLP. Similarly, none of the 418 documents are confidential conversations between the defendant Pedro Espada and his attorneys at the Hafetz and Necheles firm.[11] Even where a prosecution team has been exposed to direct confidential communications between a defendant and his lawyer, courts have declined to find any prejudice. See e.g., United States v. Schwimmer, 924 F. 2d 443, 445 (2d Cir. 1991) (government exposed to work papers created by accountants hired by two defendants to assist in their defense of a criminal matter); United States v. Stewart, 294 F. Supp. 2d 490, 492 (government exposed to e-mail from Martha Stewart to her lawyer and forwarded to her daughter containing Stewart's account of the facts surrounding her sale of ImClone stock); United States v. Weissman, No. S2 94 CR 760 (CSH), 1996 WL 751386, at *2 (S.D.N.Y. 1996) (government exposed to interview memoranda protected by a joint defense agreement wherein the defendant discussed his role in the underlying criminal conduct). Here there was no such exposure.

Notably, as of August 26, 2011, the government had produced and identified to the defense all of the documents that it considered potentially privileged. The defense failed to request the return of a single privileged document. Nevertheless, in an abundance of caution, today the government is providing to the defense a full set of the 418 potentially privileged documents.

---

[11] Of the 418 documents 254 (60%) have nothing to do with communications with the defendant Pedro Espada's attorneys at Hafetz and Necheles and nothing to do with an investigation by the New York State Attorney General's Office. Accordingly, 148 documents (35%) relate to either communications between employees of Soundview (though neither of the defendants) and attorneys at Hafetz and Necheles related to the NYAG's investigation.

14

      For the reasons set forth herein, the government believes that it has satisfied its burden of demonstrating that this prosecution is not tainted by any exposure of its Trial Team to any materials intruding on the defendant's Sixth Amendment right to counsel. To the extent that there has been any exposure to privileged materials, neither defendant has been prejudiced. Accordingly, no relief is warranted.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

                By:     /s/
                              Patrick Sean Sinclair
                              Assistant United States Attorney
                              (718) 254-6402

cc:   Defense counsel (via Hand with enclosures)