**U.S. Department of Justice**



*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

February 6, 2012

Hon. Frederic Block
United States District Court
Brooklyn Federal Courthouse
225 Cadman Plaza, East
Brooklyn, New York 11201

     Re: United States v. Espada, et al.
       <u>Cr. No. 10-985 (S-1)(FB)</u>

Dear Judge Block:

   The government submits this letter as a motion <u>in limine</u> to preclude at trial, any arguments about, references to or evidence of: (1) the defendants' vendetta theories; (2) the defendant Pedro Espada, Jr.'s ("Espada") prior acquittal in New York State court on unrelated charges; (3) the possible consequences that the instant prosecution may have on either the defendants, their nonprofit organization, Soundview Healthcare Network ("Soundview"), or its patients and employees; (4) any "blame the victim" defenses, and with respect to the 18 U.S.C. § 1001 charges, that the government agencies knew or should have known that Espada was lying; and (5) claims that Espada's promise to sell his janitorial company to Soundview was invalid for lack of consideration.  In addition, the government moves to compel the defense to provide reciprocal discovery and inform the government if it intends to purse any advice of professionals defense and, if so, to provide discovery.

  A. <u>Background</u>

   Espada, the CEO and President of Comprehensive Community Development Corporation ("CCDC"), also known as Soundview, and his son Pedro Gautier Espada, Director of Environmental Care and Operations Network and Compliance Officer for Soundview, are charged in an eighteen-count superseding indictment with conspiracy to embezzle federal funds and embezzlement of federal funds in violation of 18 U.S.C. §§ 371 and 666(a)(1)(A) (Counts One through Six), wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count Seven), false statements, in violation of 18 U.S.C. § 1001

(Counts Eight and Nine), conspiracy to defraud the government, in violation of 18 U.S.C. § 371 (Count Ten) and filing false and fraudulent tax returns, in violation of 26 U.S.C. §§ 7206(1) and 7206(2) (Counts Eleven through Eighteen).

The indictment was the result of a joint investigation between the government, the New York State Attorney General's Office ("NY AG"), the Federal Bureau of Investigation and the Internal Revenue Service. At trial, the government will prove that the defendants (1) embezzled over $100,000 from Soundview, a federally funded not-for-profit, for themselves and their family through various schemes; (2) lied to government agencies about Espada's earnings in an effort to conceal their embezzlements; and (3) evaded taxes by not declaring the money that they had embezzled.

B. The Government's Motions to Preclude

1. The Court Should Preclude Any Vendetta Theories

Because of certain remarks that Espada has made publicly, it appears that the defense may present arguments or evidence that would invite the jury to speculate about the government's motives for investigating and charging the defendants.[1] Any argument or attempts to offer evidence that the above-indictment is part of a vendetta against him is baseless and irrelevant, and should be precluded.

Such arguments are claims of selective prosecution. "In this Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings." United States v. Sun Myung Moon, 718 F.2d 1210, 1229 (2d Cir. 1983) (citing United States v. Taylor, 562 F.2d 1345, 1356 (2d Cir. 1977)). The motives of law enforcement officers conducting an investigation, even if they constitute or result in some form of misconduct -- which did not occur here -- are irrelevant to the question of whether a defendant is guilty of the crimes with which he is charged. See, e.g., United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (upholding the district court's decision to preclude a defense based on a claim that the government, by targeting and investigating the defendant, had acted with improper motives

---

[1] For example, in an August 10, 2011 Daily News article, Espada was quoted as accusing Governor Andrew Cuomo of a "personal obsession to take on and dominate my world and my manhood" dating back to when Governor Cuomo was the New York State Attorney General.

amounting to "outrageous governmental conduct," because that claim was "ultimately separate from the issue of [the defendant's] factual guilt"); United States v. Reyes, 18 F.3d 65, 71 (2d Cir. 1994)(noting that the state of mind of the investigating agent and the "history of the investigation" were "not relevant to the guilt or the innocence of the defendant"); United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984)(observing, and expressing regret, that the defendants had been permitted to turn the focus at trial "away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); see also United States v. Donahue, 2010 WL 503072, *4 (M.D.Pa. 2010)(precluding evidence that indictment resulted from AUSA's ill will toward defendant as irrelevant to whether defendant actually committed the crimes charged); United States v. Stewart, 2004 WL 113506, *1 (S.D.N.Y. 2004)(precluding defense from arguing that the government's motives in prosecuting defendant were improper, and barring defense from using "their ability to impeach [government] witnesses to introduce impermissible evidence of prosecutorial motive."); James v. United States, 2002 WL 1023146 at *21 (S.D.N.Y. 2002) (prosecution's motives in bringing charges is logically irrelevant to whether defendant is guilty or innocent).  A selective prosecution claim must be directed to the Court, not the jury, because it raises an issue that is independent of the question of the defendants' guilt or innocence.  Therefore, the defendants may not argue to the jury that the government's motives in prosecuting them are improper.

Accordingly, any evidence or argument regarding the defendants' vendetta theories, or attacks on the government's motives, is inadmissible and should be precluded.

> 2.  The Court Should Preclude Any Reference to Pedro Espada's Prior Acquittal in New York State Court

The government seeks to preclude any evidence or argument referencing the fact that in 2000, Espada was tried and acquitted of state charges that he had misappropriated Soundview money to pay off campaign expenses.

"In general, evidence of a prior acquittal is only relevant in determining whether the prosecution is barred by double jeopardy or collateral estoppel." United States v. Kerley, 643 F.2d 299, 300-01 (5th Cir. 1981).  Otherwise, the Second Circuit and other courts have held that a prior acquittal is hearsay and not relevant evidence since it does not prove innocence but merely shows that the government previously did not prove beyond a reasonable doubt at least one element of the crime.  United States

3

v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979)("[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted."). On the question of an acquittal's status as hearsay, the Second Circuit has noted that the "Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal." Viserto, 596 F.2d at 537. Moreover, the probative value of such evidence is ordinarily outweighed by the danger of unfair prejudice and confusion. United States v. Jones, 808 F.2d 561, 566-67 (1986). Also, a prior acquittal typically is not a proper basis for cross-examination. See, e.g., United States v. Lyons, 403 F.3d 1248, 1254-55 (11th Cir. 2005)(in felon-in-possession case, district court properly excluded evidence of defendant's prior acquittal on a related disorderly conduct charge; acquittal was not relevant impeachment of arresting officer, since officer had sufficient probable cause to arrest the defendant, notwithstanding ultimate acquittal; defendant's claim that prior acquittal was relevant to officer's bias against defendant was of marginal relevance at best and was outweighed by need to avoid confusing the jury); United States v. Smith, 145 F.3d 458, 462-63 (1st Cir. 1998) (district court properly precluded cross-examination of government witnesses, who were friends of defendant, on the grounds that they were willing to testify because they knew defendant was now facing lesser sentence due to his prior acquittal on more serious charges).

Accordingly, the Court should preclude the defense from referring to Espada's prior state court acquittal.

> 3. The Court Should Preclude Any References to Consequences that the Conviction May Have on the Defendants and Soundview

The government moves to preclude the defense from making any references at trial to the possible consequences of the prosecution, as well as any punishment the defendants may receive if they are convicted, including any impact their prosecution or conviction may have on Soundview, its patients and employees.

It is firmly established law that the jury has a limited function — to determine guilt or the lack thereof — and that the jury has no role in sentencing with the exception of certain types of cases, such as capital cases, that are not relevant here. In Shannon v. United States, 512 U.S. 573 (1994), the Supreme Court stated the following about a jury's role at trial and whether jurors should hear evidence of the possible consequences of a defendant's convictions:

4

> It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed. The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. **Information regarding the consequences of a verdict is therefore irrelevant to the jury's task**. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

Id. at 579 (emphasis added) (internal citations and quotation marks omitted).

Applying Shannon, which held that a district court is not required to instruct the jury regarding the consequences to the defendant of an acquittal by reason of insanity, the Second Circuit found that Shannon "makes clear that defendant had no legal right to a charge informing the jury of the sentencing consequences of its decisions." United States v. Pabon-Cruz, 391 F.3d 86, 94 (2d Cir. 2004)(holding that defendant was not entitled to a jury instruction on the sentence he could receive). More recently, the Second Circuit reaffirmed that Shannon and Pabon-Cruz remain controlling precedent and reversed a district court's finding that the defendant had a Sixth Amendment right to have the jury instructed on the applicable mandatory minimum sentence. United States v. Polouizzi, 564 F.3d 142, 160-61 (2d Cir. 2009).

Because of the jury's limited role in fact-finding, the possible consequences of a defendant's conviction are irrelevant and potentially confusing and misleading to the jury. See United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences." (citation omitted)).

While the Second Circuit has left open the possibility that "in some, albeit limited, circumstances it may be appropriate to instruct the jury regarding th[e] consequences" of its verdict, Polouizzi, 564 F.3d at 161, the Court should find that this is not

5

one of those limited circumstances.[2]

"Because of the established precedent that jurors should not be informed about the possible consequences of their verdict and the potential prejudice, unfairness, and confusion that could result from allowing defense counsel to refer to [such consequences,] the court [should] grant[] the government's motion to exclude." United States v. Dupree, --- F.Supp.2d ----, 2011 WL 5884219 (E.D.N.Y. Nov. 23, 2011)(KAM)(granting government's motion to preclude "any references to the possible consequences of defendants' convictions").

   4. The Court Should Preclude Any "Blame the Victim" Defenses

The Court should preclude the defendants from arguing, eliciting on cross-examination, or offering evidence, concerning wrongdoing or negligence on the part of Soundview's board, officers or employees, or the government agencies to whom Espada lied and who administered the funds the defendants stand accused of embezzling. Such a defense is impermissible, as explained below.

   a. The Legal Standard

It is well-settled that the negligence of the victim in failing to discover a fraudulent scheme is not a defense to a defendant's criminal misconduct. See United States v. Coyle, 63 F.3d 1239, 1244 (3rd Cir. 1995). Similarly, a victim's failure to exercise ordinary prudence is not a defense to the instant charges. United States v. Ciccone, 219 F.3d 1078, 1083 (9th Cir. 2000). "A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." United States v. Svete, 556 F.3d

---

[2] The Supreme Court in Shannon provided one example of when it may be appropriate to instruct the jury regarding the consequences of its verdict: "If ... a witness or prosecutor states in the presence of the jury that a particular defendant would 'go free' if found [not guilty by reason of insanity], it may be necessary for the district court to intervene with an instruction to counter such a misstatement." Shannon, 512 U.S. at 587. The Second Circuit recognized, however, that "[t]he Shannon Court's reasoning suggests that an instruction might be appropriate in such circumstances because the jury's attention already has been drawn in an unfair and misleading way 'toward the very thing — the possible consequences of its verdict — it should ignore.'" Polouizzi, 564 F.3d at 162 (quoting Shannon, 512 U.S. at 586).

1157, 1165 (11th Cir. 2009). "If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts." United States v. Colton, 231 F.3d 890 (4th Cir. 2000)(quoting United States v. Brien, 617 F.2d 299, 311 (1st Cir. 1980)).

The Second Circuit consistently has held that the "foolish victim" standard is not a defense to fraudulent conduct. United States v. Thomas, 377 F.3d 232, 242-243 (2d Cir. 2004); United States v. Amico, 486 F.3d 764, 780 (2d Cir. 2007). In other words, the negligence of a victim in failing to discover a fraudulent scheme is not a defense to criminal conduct. The legality of the defendant's conduct cannot be dependant on his choice of a gullible victim. United States v. Benson, 548 F.2d 42, 46 (2d Cir. 1977).

Similarly, a criminal fraud can be perpetrated against an entity even though some, or even all, of the entity's officers are participants in the scheme. See United States v. Wallach, 935 F.2d 445, 464 (2d Cir. 1991).

Courts, realizing that inquiries into the negligence or corruption on the part of a victim organization are irrelevant and potentially prejudicial, have taken measures to preclude such arguments. See Thomas, 377 F.3d at 243-44 (affirming restrictions on cross-examination of victim; rejecting defendant's argument that victim's foolishness vitiated defendant's fraudulent intent); United States v. Davis, 226 F.3d 346, 358-59 (5th Cir. 2000) (affirming jury instruction that "the naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of a defendant . . . Even the monumental credulity of a victim does not excuse a defendant's fraud, if any"); see also United States v. Allen, 201 F.3d 163, 167 (2d Cir. 2000) (noting that "[t]he victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offenses); Thomas, 377 F.3d at 241 (same).

    b. The Victim are Soundview and the Funding Agencies, Not Those Entities' Officials, Board or Employees

The defense should be precluded from arguing that (1) Soundview officials, board members or employees were negligent for failing to uncover and stop the defendants from lying and using federal funds to pay for their personal expenses; (2) there is no real victim, because Soundview's officers and board, were

7

incompetent for not discovering the defendants' lies and embezzlements; and (3) Soundview's board and officers were complicit in the defendants' schemes. None of these theories would constitute a defense to fraud, because the victim is Soundview itself, not its officials or board. See United States v. Jimenez, 513 F.3d 62, 74 (3d Cir. 2008)("[T]he defendants argue that they could not have defrauded [the bank] because the bank was aware of the numerous and sizable overdrafts and consented to them. However, it is not a defense to the charge that an account holder colluded with a bank officer to commit bank fraud.  It is the financial institution itself – not its officers or agents – that is the victim of the fraud § 1344 proscribes."); United States v. Winkle, 477 F.3d 407, 414 (6th Cir. 2007) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank officer does not relieve a defendant of liability for bank fraud."). "[A]n institution may be defrauded even if its employees allow or participate in the fraudulent practices." United States v. Yarmoluk, 993 F.Supp 206, 209 (S.D.N.Y. 1998)(citing United States v. Rackley, 986 F.2d 1357, 1361 (10th Cir. 1993) ("Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors.... Thus, even if [a bank officer] knew the true nature of the loan transactions, the institutions could nevertheless be defrauded.")).

Accordingly, any such argument or evidence "confuses the notion of defrauding a . . . [nonprofit] with the idea of defrauding its [officers, board] or directors . . . . Thus even if [Soundview officers or board members] knew the true nature of the [] transactions the institution[] could nevertheless be defrauded." Id.; see also United States v. Joslyn, 206 F.3d 144, 154 n. 10 (1st Cir. 2000)(a corporation can be a victim of a fraudulent scheme even if the management itself is corrupt); United States v. Weiss, 752 F.2d 777, 783-84 (2d Cir. 1985) (upholding mail fraud conviction where defendant argued that the illegal scheme was "presumptively used for the benefit of the corporation."); see also Benson, 548 F.2d at 44 (victim's "gullibility or his own criminal background is not relevant to the inquiry" of guilt).

### c. Alleged Negligence By the Agencies Administering the Grant Funds is Irrelevant

The above authority also should preclude the defendants from arguing that the Heath Resources and Services Administration ("HRSA") and other government entities charged with administering the federal grants to Soundview were negligent in failing to detect and stop the fraud.  The defendants similarly should be precluded from arguing that such a failure constituted government approval of the practices by which the theft was carried out.  Thus, for the

8

same reason that the defendants cannot claim that they could not have stolen from Soundview because the board did not object to the theft, they should not be able to claim that HRSA's negligence or lack of action sanctioned the thefts. See United States v. Nekritin, 2011 WL 2462744, *6-7 (E.D.N.Y. June 17, 2011)(KAM)(in Medicare fraud prosecution, court granted the government's motion to preclude defendants from arguing that Medicare should not have paid their claims or that by paying their claims, Medicare led the defendants to believe that their bills were justified, because "Medicare's negligence in failing to discover the fraud at that time is not a defense and therefore such evidence is neither 'exculpatory' nor relevant to the issues in the instant case.")

        d.    It Is Not a Defense to the § 1001 Charges That the Government Knew or Should Have Known Espada Was Lying

Similarly, it is not a defense to the 18 U.S.C. § 1001 charges that the government agencies knew or should have known that Espada was lying. To prove a Section 1001 charge, the government must prove beyond a reasonable doubt is that the defendant's statement was material - meaning that it could have influenced the government's decisions or activities. However, proof of actual reliance on the statement by the government is not required. See Leonard B. Sand, et al., Modern Federal Jury Instructions, Instr. 36-4 and 36-9; United States v. Gaudin, 515 U.S. 506, 509 (1995) (concluding that a false statement is material under § 1001 if it has a "natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it is addressed"); United States v. Stewart, 433 F.3d 273, 318 (2d Cir. 2006) (concluding that a false statement can be material if it is "capable of distracting investigators" from pursuing and broadening their investigation).

Further, even if the government knew or should have known that the statements were false when they were made, that is irrelevant to their materiality. United States v. Foxworth, 334 Fed. Appx. 363, 366-67 (2d Cir. 2009) ("That the FBI knew that the statements were false when they were made is irrelevant to their materiality.") (unpublished); see also United States v. McBane, 433 F.3d 344, 350 (3d Cir. 2005) ("It is also clear that a statement may be material even if no agency actually relied on the statement in making a decision."); United States v. Turner, 551 F.3d 657, 664 (7th Cir. 2008) (holding that defendant's "statements to the FBI probably had very little actual influence on the agents because there were already in possession of incriminating [information]" ... but, because "statements were aimed at misdirecting the agents, ... [it was] enough to satisfy the materiality requirement of §

9

1001"); United States v. White, 270 F.3d 356, 365 (6th Cir. 2001) ("If the false statements are received by an agency, they may be material even if the receiving agent or agency knows that they are false.").

In sum, the defendants should be precluded from raising a defense that blames the victim Soundview or the government agencies that administered Soundview's grants. Similarly, Espada should be precluded from raising a defense to the § 1001 charges that is based on the premise that the government officials knew or should have known that Espada was lying.

### 5. Attacks on the Consideration for Espada's Transfer of CEDC to Soundview are Legally Wrong

Next, the government moves to preclude the defendants from attacking the validity of Espada's agreement to transfer his janitorial company, Community Expansion Development Corporation ("CEDC"), to Soundview. That is a legal question for the Court, not a factual question for the jury.

One of the schemes with which the defendants are charged concerns their embezzlement of funds from Soundview's janitorial company, CEDC, after Espada transferred controlling ownership of CEDC to Soundview in 2005 for $1. At trial, the government will show that once Soundview owned CEDC, the defendants looted it to pay for such personal items as: (1) "loans" to Espada and family members that were never repaid or documented; (2) hiring a ghostwriter to work on Espada's book project; (3) throwing a lavish birthday party for Espada's grandchild, including a petting zoo; (4) Espada's political campaign expenses; (5) monetary gifts to family members; (6) after-school tutoring for a family member; (7) an air conditioning system at Espada's home; (8) paying a company to repair Espada's credit score; and (9) attempting to buy a Bentley.

The government has reason to believe that the defendants may seek to argue that CEDC was never validly transferred to Soundview, and therefore they were free to use CEDC's funds as they saw fit.[3] It appears that the defendants intend to argue that CEDC

---

[3] We believe that the defense may seek to raise this issue because in an August 26, 2011 motion to compel production of documents against auditors of Soundview, Espada claimed that CEDC is "a company which the government alleges was owned by [Soundview]." Similarly, in a July 12, 2011 letter to the IRS, Soundview's CFO asserted there was an issue as to whether "a

10

was never "sold" to Soundview because there was no evidence that Soundview paid the $1.00 purchase price to Espada, and therefore the agreement lacked consideration.

Whether consideration was adequate to support the contract to sell CEDC to Soundview is a legal issue for the Court to resolve, not the jury. As shown below, the defense should be precluded from raising this argument in front of the jury as that would usurp the Court's role and lead to jury confusion.

    a.    Background

CEDC was a for-profit janitorial company that Espada founded and owned, and which obtained lucrative contracts to clean Soundview. In or about 2003, HRSA expressed concern that Espada's ownership of CEDC posed a conflict of interest and possible violation of federal regulations.

Thereafter, Soundview cancelled the contract with CEDC and put CEDC's employees on Soundview's payroll. In early 2005, Espada and Soundview decided to return the janitorial employees back to CEDC's payroll, again raising the specter that HRSA would find there was a conflict of interest. Accordingly, that same year, Espada agreed to transfer a controlling ownership interest in CEDC to Soundview for $1, which is documented in numerous writings, including Soundview's Board minutes and elsewhere. For example, the minutes for Soundview's Board of Directors meeting of January 31, 2005, which Espada attended, state that the Board unanimously passed a motion to "purchase Community Expansion [CEDC] for $1" from Espada, and to award CEDC a $270,000 janitorial contract.

    b.    Discussion

The Court should preclude any argument that there was inadequate consideration for Espada's agreement to transfer CEDC to Soundview because it is legally wrong.

Whether Soundview paid the $1.00 to Espada for acquisition of CEDC, or whether $1 was an adequate "price" makes no difference as to whether the transfer of the company was valid. Under New York law, "parties are free to make their own bargains, and, absent a claim of fraud or unconscionability, it is 'enough that something of real value in the eye of the law was exchanged.'" Ferguson v. Lion Holdings, Inc., 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) (quoting Apfel v. Prudential-Bache Sec. Inc., 81 N.Y.2d 470,

---

legal transfer transpired between" Soundview and CEDC.

476 (1993)); see also Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464 (1982)("Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promise. Thus, courts have not hesitated to find sufficient consideration not only in what is now the proverbial peppercorn, but in 'a horse or a canary, or a tomtit if [the promisee] chose'")(internal citations omitted); AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co., 10 A.D.3d 293, 295 (N.Y. App. Div. 2004) ("the issue of inadequacy of consideration is for the parties to resolve upon entering into the contract, not for the court to consider when the contract is to be enforced").

Moreover, consideration is not necessary to enforce an agreement to make a gift to a non-profit organization, like Soundview. In Woodmere Academy v. Steinberg, the New York Court of Appeals took for granted the enforceability of a charitable pledge without proof of consideration, stating that "as a matter of public policy, pledge agreements calculated to foster eleemosynary enterprises are enforceable. Indeed, courts, in the enforcement of such agreements, seek to resolve doubtful questions so as to avoid their repudiation." Woodmere Academy, 41 N.Y.2d 746, 749-50 (1977)(citations omitted). Viewed another way, charitable pledges are enforceable because they constitute an offer of a unilateral contract that — when accepted by the non-profit by incurring liability in reliance thereon — becomes a binding obligation. See Matter of Versailles, 202 A.D.2d 334, 610 N.Y.S.2d 2 (App. Div. 1st Dept. 1994). Here, Soundview relied on the donation from Espada in its financial planning, in its dealings with HRSA, and in its decision to award the $270,000 janitorial contract to CEDC. These circumstances made Espada's pledge to transfer CEDC to Soundview binding.

In sum, as a matter of New York law and public policy, no consideration need be shown in order to make Espada's transfer of CEDC to Soundview an enforceable contract. Thus, counsel should be precluded from arguing that the transfer of CEDC to Soundview was invalid for lack of consideration.

    C.    The Government's Demand For Reciprocal Discovery

        1.    Defense Evidence

To date, the government has not received any discovery from the defendants. The government reiterates its request for reciprocal discovery, pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

### 2. Advice of Professionals Defense

The government asks the Court to direct the defendants to disclose whether they intend to offer a defense that they relied on the advice of professionals, such as attorneys, auditors and accountants. The defendants should be required to make such a disclosure, including all documents concerning their intended advice of professionals defense. See United States v. Cooper, 283 F.Supp.2d 1215, 1225 (D.Kan. 2003) (defendant ordered to provide advice of counsel discovery two weeks before trial). "This disclosure should include not only those documents which support [the defendants'] defense, but also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense." United States v. Hatfield, 2010 WL 183522, *13 (E.D.N.Y. 2010)(Seybert, J).

We ask the Court to direct the defendants to disclose whether they intend to rely on an advice of professionals defense, and if so to direct that they provide the government with the discovery to which we are entitled. Alternatively, if the defense produces no discovery, the government moves to preclude any possible advice of professionals defense. See also United States v. Quinones, 417 F. App'x 65, 67 (2d Cir. 2011)(FB)(unpublished) (upholding decision to preclude defense attorney from arguing an advice-of-counsel defense that had no factual basis in the record).

### Conclusion

For the foregoing reasons, the government respectfully requests that the Court preclude: (1) vendetta theories; (2) Espada's prior acquittal; (3) possible consequences that the prosecution may have on the defendants, Soundview or its patients and employees; (4) "blame the victim" defenses, and with respect to the § 1001 charges that the government agencies knew or should have known that Espada was lying; and (5) claims that Espada's promise to sell CEDC to Soundview was invalid for lack of consideration. Further, the government moves to compel the defense to provide reciprocal discovery and inform the government if it intends to purse an advice of professionals defense.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:      /s/
Carolyn Pokorny
Assistant U.S. Attorney
(718) 254-6291

cc: Defense counsel (by ECF)

13