

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CP:RB:TK
2010R00420

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

February 7, 2012

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>Re:   United States v. Pedro Espada, Jr. et al.
>      Criminal Docket No. 10-985 (S-2)(FB)

Dear Judge Block:

The government respectfully submits this letter to notify the Court of several significant conflicts of interest concerning Susan Necheles, Esq., counsel for defendant Pedro Espada, Jr. ("Espada").  <u>First</u>, Ms. Necheles served as outside counsel for Soundview Healthcare Network, the not-for-profit from which Espada is charged with embezzling.  <u>Second</u>, in her capacity as both Soundview's and Espada's attorney, Ms. Necheles has interacted with several witnesses who may be called to testify for the government at trial, and discussed with them matters that would be the subject of trial testimony.  Her interactions with them risk making Ms. Necheles a sworn or unsworn witness at trial.

These issues crystalized for the government as it prepared for trial and drafted its motions in limine.  We raise these issues, as we must under Second Circuit law, so that the Court may conduct an inquiry pursuant to <u>United States v. Curcio</u>, 680 F.2d 881 (2d Cir. 1982).

1. **Background**

Espada, the CEO and President of Soundview Healthcare Network ("Soundview") and his son, Pedro Gautier Espada ("Gautier Espada"), an employee at Soundview, are charged in a eighteen-count indictment with conspiracy to embezzle federal funds and embezzlement of federal funds, wire fraud conspiracy, false statements, conspiracy to defraud the government, and filing and assisting in the preparation of false and fraudulent tax returns.

At trial, the government will prove that the defendants siphoned over $100,000 from Soundview, a federally funded not-for-profit health care provider, for themselves and their family

through various schemes. To cover-up their theft, the defendants lied on corporate federal tax returns by casting the income they derived from their embezzlement as tax-deductible business expenses. Espada also failed to report the income he earned through these schemes on his personal federal tax returns and lied about his income to government agencies.

A.  <u>Prior Representation of Soundview</u>

For many years, Ms. Necheles has represented Soundview at various times as its outside counsel. Ms. Necheles represented Soundview in 2009 and 2010 in connection with the New York Attorney General's Office ("NYAG") investigation of Espada's misallocation of Soundview funds, which preceded, and was eventually taken over by, the United States Attorney's Office for the Eastern District of New York ("USAO/EDNY"), resulting in the instant indictment.[1] In 2009 and 2010, Ms. Necheles represented Soundview in its dealings with the Health Resources and Services Administration ("HRSA"), the federal agency responsible for awarding Soundview funds on an annual basis, in connection with HRSA's investigation of Soundview's compliance with federal regulations governing federally-funded health centers. This investigation involved questions concerning Espada's misallocation of Soundview's funds, among other issues.

With respect to NYAG and USAO/EDNY investigations, Ms. Necheles, as Soundview's attorney, played an active role in obtaining counsel for Soundview employees, many of whom declined to speak with investigators without counsel present. When the NYAG's investigation commenced, Ms. Necheles sent a letter to Soundview employees telling them that if they were approached by law enforcement personnel, they could contact her and that she would arrange legal representation for them.

Ms. Necheles also told law enforcement personnel that she represented several key Soundview employees. Specifically, when NYAG investigators attempted to interview and serve a subpoena at Soundview's main health clinic on Ken Brennan, Soundview's chief financial officer at the time, the investigators were stopped at Soundview's front desk and eventually placed on the telephone with Ms. Necheles, who told them she represented Mr. Brennan and that they should leave the subpoena at the front desk for him. Although Mr. Brennan eventually retained his own attorney, Ms. Necheles

---

[1] The NYAG filed a civil suit against Soundview's Board of Directors and Espada for violations of state regulations governing the conduct of not-for-profit organizations.

participated in joint defense meetings with Mr. Brennan and his attorney.

Further, when a federal law enforcement agent asked a witness questions concerning Soundview employee Maria Cruz, Ms. Necheles called the agent shortly thereafter and left him a voicemail message stating that the agent should contact her if he wished to speak with Ms. Cruz.  When NYAG investigators attempted to interview Edwin Miranda, Soundview's maintenance supervisor, Miranda told them that Susan Necheles was his attorney.

Ms. Necheles had extensive dealings with other Soundview employees, including Philip Valdez and Norma Ortiz, both discussed below.

B.   Interactions with Possible Government Witnesses

In Ms. Necheles's capacity as counsel for both Soundview and Espada, she has had extensive conversations with Soundview officers and employees, including several who may be called to testify for the government at trial.  These conversations concerned topics directly relevant to the charges at issue or subjects likely to arise during their testimony.

i)   Philip Valdez

Philip Valdez is the CFO of Soundview and previously served as controller.  As controller, Mr. Valdez helped oversee Soundview's finances, which included the recording and reconciliation of Soundview's disbursements.  Among other things, Mr. Valdez is a possible government witness as to Espada making many charges to Soundview's American Express card, which the government will demonstrate were personal in nature and not business-related.

An important issue at trial will be the payments that Soundview made to Community Expansion Development Corp. ("CEDC"), a janitorial company that cleaned Soundview's facilities.  At one time, CEDC was a privately-held company that Espada founded and owned.  According to numerous documents, many of which Espada signed, Espada transferred ownership of CEDC to Soundview, making CEDC a subsidiary of Soundview.[2]  Espada made this transfer after HRSA raised questions about the conflict the Soundview-CEDC

---

[2] For example, the minutes for Soundview's Board meeting of January 31, 2005, which Espada attended, state that the Board unanimously passed a motion to "purchase Community Expansion [CEDC] for $1" from Espada, and awarded CEDC a $270,000 contract.

3

business relationship posed for Espada.  Once CEDC was Soundview's subsidiary, the two companies entered into a maintenance-services contract which required Soundview to make regular payments to CEDC. During the period CEDC was Soundview's subsidiary, CEDC earned hundreds of thousands of dollars – the vast majority of its income – from its contract with Soundview.

Once CEDC was Soundview's subsidiary and no longer Espada's privately-held company, the defendants nevertheless treated CEDC as a slush fund, using CEDC's money to pay for personal expenditures without Soundview's approval.  For example, the defendants used CEDC checks to pay for lavish parties for family members, to repair the heating and air-conditioning units in Espada's home in Mamaroneck, New York, and to pay rent for Espada's campaign headquarters.  In addition, the defendants wrote CEDC checks to themselves, indicating on the checks that the payments were "consulting" expenses, "gifts" or "loans," among other things.

Following Espada's December 2010 arrest, in the spring of 2011, Ms. Necheles telephoned Mr. Valdez and told him that despite the fact that Soundview's tax returns stated that CEDC was Soundview's wholly-owned subsidiary, she believed that the premise warranted reexamination.[3]  She stated that the historical record was unclear as to whether Espada actually effectuated a legal transfer of CEDC to Soundview.  She additionally told Mr. Valdez that he should look into whether there was any conclusive "proof" of this transfer.[4]  Ms. Necheles also suggested that a meeting be held between Mr. Valdez, herself, and the accountant charged with preparing Soundview's 2008 tax return, which had not been filed at the time.  In the grand jury, Mr. Valdez testified that he had not considered the idea that CEDC could have been anything other than Soundview's subsidiary until that conversation.

Shortly after that conversation, in accord with Ms. Necheles's wishes, Mr. Valdez attended a meeting at the accountant's office at which Ms. Necheles was present. During this meeting, Ms. Necheles revisited the issue of CEDC ownership and urged those present to investigate whether Soundview had really owned CEDC, to consider whether the then-unfiled 2008 tax return should reflect the "discrepancy" concerning CEDC ownership, and to

---

[3] According to Mr. Valdez, Ms. Necheles specifically told Mr. Valdez, with whom she had previously interacted in her role as Soundview's counsel, that she was calling him in this instance in her capacity as Espada's attorney.

[4] The implication is that if Espada, not Soundview, owned CEDC, he could not be guilty of stealing from it.

4

consider whether past Soundview tax returns stating that CEDC was its subsidiary needed to be amended. After these conversations, Mr. Valdez attached a letter to Soundview's 2008 tax return, filed in July 2011, stating that Soundview was currently investigating the CEDC ownership issue and might have to amend the 2008 return, as well as others, if it later determined that CEDC was in fact not Soundview's subsidiary.

  ii. Norma Ortiz

Ms. Ortiz served as Espada's executive assistant for over five years before retiring in 2009. Ms. Ortiz is a possible government witness to Espada's use of the Soundview American Express card to charge personal expenses, among other things.

In 2004, Ms. Ortiz and three other Soundview employees were indicted by the NYAG for diverting state funds intended for Soundview to Espada's political campaign. We have reason to believe that Ms. Necheles recruited defense attorneys to represent the charged employees, and participated in joint defense meetings. Both Espada (who had not been indicted) and others present at the meetings generally agreed that the employees should plead guilty, which Mr. Ortiz did in 2005, after which she was sentenced to probation. Ms. Ortiz has since stated that she had done nothing wrong and was in fact not guilty of the crime to which she pled.

  iii. <u>Ken Brennan</u>

We have reason to believe that Ms. Necheles attended joint-defense meetings with Ken Brennan, formerly Soundview's CFO, during the recent NYAG investigation. Mr. Brennan is a possible government witness as to the acts charged in the indictment.

2. **Argument**

  a. <u>The Applicable Legal Standard</u>

To determine if the defendant's counsel is burdened by a conflict of interest, the court "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." <u>United States v. Levy</u>, 25 F.3d 146, 153 (2d Cir. 1994). An actual conflict exits "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." <u>United States v. Jones</u>, 381 F.3d 114, 119 (2d Cir. 2004)(internal quotation marks and citations omitted). A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the

5

future." Id. (emphasis and citations omitted). If the attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation, the court must disqualify that attorney. See United States v. Lussier, 71 F.3d 456, 461-62 (2d Cir. 1995). If it is a lesser conflict, the court must conduct a Curcio hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation. United States v. Leslie, 103 F.3d 1093, 1098 (2d Cir. 1997).

b. Ms. Necheles Owes a Duty of Loyalty to Soundview

The Second Circuit has held that an "actual conflict arises [if] the attorney's and the defendant's interests 'diverge [because] the attorney's representation of the defendant is impaired by loyalty owed to a prior client.'" United States v. Pizzonia, 415 F.Supp.2d 168, 176-77 (E.D.N.Y. 2006) (quoting Jones, 381 F.3d at 119). "The divergence of interest that signals an actual conflict may arise from . . . the lawyer's professional interest, resulting from [her] obligation to protect the interest of . . . [a] former client when the interest of that other client diverges from the interest of the client in question." United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994) (citing United States v. Levy, 25 F.3d at 155-57).

Not only might an attorney's duty of loyalty to a former client interfere with his/her representation of a current client, but, conversely, the zealous representation of a current client might prevent an attorney from preserving his/her duty of loyalty to a former client. See e.g., Levy, 25 F.3d at 156 (holding that an attorney's continuing obligations to his former client "necessarily meant" that his interests diverged from his current client "especially since [the defendant's] most likely defense was to shift blame to [the former client].)." The New York Rules of Professional Conduct preclude an attorney "who has formerly represented a client in a matter" from "thereafter represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." N.Y. Rules of Prof. Conduct 1.9(a). Similarly, an attorney generally may not "use confidential information of the former client . . . to the disadvantage of the former client," subject to several exceptions. N.Y. Rules of Prof. Conduct 1.9(c).

Accordingly, Ms. Necheles owes a duty of loyalty to Soundview to which she must remain faithful. That duty has the potential to limit the zealousness with which she defends Espada.

6

For example, it may be in Espada's interest to argue at trial that Soundview's Board of Directors consented to or approved several of his acts that the government allege constitute embezzlement. However, that same argument may have adverse consequences for the Board of Directors in light of the NYAG's civil suit accusing it of violating state not-for-profit regulations. Similarly, it may also be in Espada's interest to argue that the Board of Directors and various Soundview employees were at times incompetent, sloppy or themselves responsible for illegal or immoral acts. Ms. Necheles's duty of loyalty to Soundview might preclude her from making such arguments absent a waiver from Soundview.

According to the New York Rules of Professional Conduct, a waiver from Soundview is not only needed to permit Ms. Necheles to make arguments inimical to Soundview's interest, but as a prerequisite to Ms. Necheles representing Espada in any capacity in this matter. Because Ms. Necheles represented Soundview with respect to the NYAG investigation, Soundview must consent to Ms. Necheles's representation of Espada if the Court finds that the instant matter is the "same or a substantially related matter in which [Espada's] interests are materially adverse to the interests of [Soundview]." N.Y. Rules of Prof. Conduct 1.9(a). Because the NYAG's investigation and resulting civil suit concern some of the same conduct referenced in the government's indictment, and because the government's investigation was initiated by the NYAG, the NYAG's investigation and civil suit, and the instant criminal matter, are "substantially related." Moreover, Soundview's and Espada's interests appear to be materially adverse to one another because, in addition to the reasons just discussed, Soundview has an interest in rooting out corruption in its organization and ensuring that its officers do not misallocate its funds.[5] Therefore, the Court must obtain Soundview's consent of Ms. Necheles's representation of Espada in the instant matter.

However, even if the Court obtains such a waiver, there still remains a risk that Ms. Necheles's duty to her former client could affect the vigorousness of her advocacy on behalf of Espada. Moreover, this problem would be particularly acute if Soundview was

---

[5] Espada's contract contains a severance clause that permits him to be paid one year's salary for every year of his employment with Soundview. Since Espada founded Soundview in 1978, Soundview's liability for the severance provision stands at millions of dollars and could bankrupt Soundview if Espada ever made a claim upon it. Thus, in future litigation, Soundview may stand to benefit from Espada's conviction, if such a conviction would invalidate the severance clause.

currently paying for Ms. Necheles's representation of Espada. Such a relationship might provide Ms. Necheles with a financial incentive to try to preserve good relations with Soundview.[6]

In light of the conflict posed by Ms. Necheles's prior representation of Soundview, the Court should insist that Espada seek independent counsel (or appoint such counsel if Espada cannot afford to do so), pursuant to Curcio, so that Espada can properly contemplate the risks associated with this conflict and seek advice accordingly. United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir. 1986). Once Espada is aided by independent counsel, the Court should conduct a Curcio hearing to ensure that Espada understands that his defense may be limited in light of Ms. Necheles's continuing duty of loyalty to Soundview.

    c.    Ms. Necheles May Not Act as a Sworn or Unsworn Witness at Trial

A Curcio hearing is required whenever a defendant would forgo important testimony by his attorney because of his attorney's continued representation of him. United States v. Kliti, 561 F.3d 150, 155 (2d Cir. 1998). In Kliti, the Second Circuit held that it was error for the court not to hold a Curcio hearing when the defense attorney, who was present when a government witness made a statement exculpating the defendant, did not continue to pursue questioning the witness about the conversation after the witness denied it had occurred. Id. at 156-57. When it became clear that the attorney's testimony was necessary to rebut the witness's account, the Second Circuit held that the court should have, at the very least, satisfied itself that the defendant understood that he was limiting his defense by continuing on with his current counsel and forgoing the use of his counsel's testimony. Id.

Moreover, an attorney who has conversed with a witness concerning topics that will be raised during that witness's testimony risks becoming an unsworn witness at trial. See e.g., United States v. Reale, 1997 WL 225829 at * 5 (S.D.N.Y. May 6, 1997) ("[E]ven in situations where it appears that the attorney will not be called as a witness, the attorney can still be disqualified because his performance as an advocate can be impaired by his relationship to the events in question."). The Second Circuit has stated that "[a]n attorney acts as an unsworn witness

---

[6] While the government does not know how Ms. Necheles is currently being paid, Soundview's publicly-filed tax returns reveal that Soundview has paid significant fees to Ms. Necheles's firm in prior years.

8

when his [or her] relationship to the client results in his [or her] having attained first-hand knowledge of the events presented at trial." United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993).

>   Indeed, the Second Circuit in Locasio stated:

>   when an attorney is an unsworn witness, the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the fact-finding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced.

Id. at 934; see also Ciak v. United States, 59 F.3d 296, 304-05 (2d Cir. 1995) ("Standing alone, becoming an unsworn witness is a basis for disqualification of an attorney."). Therefore, it is incumbent upon a district court to determine the extent to which defense counsel might act as a sworn or unsworn witness at trial.

Here, Ms. Necheles's relationship to both Soundview and Espada has resulted in her "attain[ing] first-hand knowledge of the events presented at trial." Locascio, 6 F.3d at 933.

>   i)   Philip Valdez

During the conversations between Ms. Necheles and Mr. Valdez, the two touched upon a key subject — i.e., the propriety of Espada using CEDC funds for personal expenses without approval. Based on these conversations, it is reasonable to infer that Ms. Necheles intends to argue that CEDC's ownership status remains in doubt. It seems difficult, however, to raise this topic with Mr. Valdez without referencing his and Ms. Necheles's conversations. This is especially true because Mr. Valdez states that he never considered the subject prior to his conversations with Ms. Necheles. Should Ms. Necheles raise this topic with Mr. Valdez, he may reference the conversations. Further, should he simply testify that CEDC's ownership status is in doubt or is something he is "looking into," (as is apparent from the letter he attached to Soundview's 2008 tax return), the government would be entitled to ask him on redirect examination whether he had any doubt about the issue prior to his conversations with Ms. Necheles.

In light of these scenarios, there exists a risk that these conversations – and thus Ms. Necheles herself – might be injected into the facts of the case. This highlights the risk that

9

Ms. Necheles may be forced into a position of having to consider testifying on her client's behalf.  In addition, any reference to the conversations would make her an unsworn witness.  It is clear, then, that the Court should ensure that Espada consult with independent counsel concerning the ramifications of this conflict.  Independent counsel should be made aware that 1) Espada will have to waive his right to call Ms. Necheles as a witness if she continues to represent him, and 2) the Court may limit Ms. Necheles's cross-examination of Mr. Valdez to ensure that she is not directly referenced in testimony before the jury.  Further, the Court can achieve this goal by employing remedies as varied as instructing the parties and Mr. Valdez not to use Ms. Necheles's name when referencing their conversations, or by precluding Ms. Necheles from cross-examining Mr. Valdez on the subject of CEDC ownership, if it finds that direct reference to Ms. Necheles before the jury is unavoidable.  See <u>Kliti</u>, 156 F.3d at n.8 (an agreement to limit inquiry to avoid the problem of counsel as an unsworn witness may be appropriate in some instances).  The Court should then ensure that Espada understands the scope of the conflict caused by Ms. Necheles's prior conversations with Mr. Valdez and determine whether he can knowingly waive his right to call Ms. Necheles as a witness and to pursue an unrestricted cross-examination of Mr. Valdez.

       ii) Ms. Ortiz

       Ms. Necheles's access to information concerning Ms. Ortiz's 2005 conviction also present conflict issues, as Ms. Necheles appears to have personal knowledge of circumstances surrounding this conviction.  Because Ms. Ortiz presumably discussed the issue with Ms. Necheles at joint defense meetings, and because Ms. Necheles presumably learned about other aspects of the 2004-2005 NYAG investigation from her proximity to other defendants and their attorneys in her role as Soundview's or Espada's counsel, Ms. Necheles has direct, personal knowledge of the matter.  This creates a situation where inquiry of Ms. Ortiz about her past conviction risks either Ms. Ortiz or Ms. Necheles referencing their interactions, which in turn creates a risk that Ms. Necheles may be forced into a position of having to consider testifying on her client's behalf.  Ms. Necheles's knowledge of any joint-defense communications also would permit her to act as an unsworn witness, subtly imparting to the jury that she possesses factual information undercutting the credibility of Ms. Ortiz's testimony.  These conflicts are particularly acute because we expect Ms. Ortiz's account of her criminal conduct at issue in the 2004-2005 investigation to differ from what she told the judge before whom she pled guilty.  Such testimony would create a rich line of cross-examination for a non-conflicted attorney.  Moreover,

because Ms. Ortiz may claim that she felt pressured to plead guilty and reference her interactions with her co-defendants and their counsel at joint defense meetings in connection with that pressure, there is an additional risk that reference to this topic will interject Ms. Necheles into the facts of the case.

We suggest that the Court should, outside the presence of the government, confer with the attorney for Ms. Ortiz, Jeremy Guttman, and Ms. Necheles, to determine the nature and extent of the information revealed at any joint defense meetings.  Once that is determined, both independent counsel and the Court will be in a position to assess whether and to what extent Ms. Necheles will be able to cross-examine Mr. Ortiz, and what defenses — including any use of Ms. Necheles as a witness — Espada may have to waive.

Based on the above, independent counsel should be made aware that 1) Espada will have to waive his right to call Ms. Necheles as a witness if she continues to represent him, and 2) the Court may limit Ms. Necheles's cross-examination of Ms. Ortiz with respect to her prior conviction to ensure that Ms. Necheles is not directly referenced in testimony before the jury.  Further, the Court can achieve this goal by employing remedies ranging from instructing the parties and Ms. Ortiz not to use Ms. Necheles's name when referencing their conversations, or by precluding Ms. Necheles from cross-examining Ms. Ortiz on the subject of her prior conviction, if it finds that direct reference to Ms. Necheles before the jury is unavoidable.  The Court should then ensure that Espada understands the scope of the conflict caused by Ms. Necheles's prior conversations with Ms. Ortiz and determine whether he can knowingly waive his right to call Ms. Necheles as a witness and to pursue an unrestricted cross-examination of Ms. Ortiz.

Further, Ms. Necheles should be precluded generally from using any information she learned during the joint defense meetings with Ms. Ortiz and her attorney when questioning government witnesses.  <u>See</u> <u>Beras v. United States</u>, 2007 WL 195352 at * 2 (S.D.N.Y. Jan. 24, 2007) ("[A] joint defense agreement is a mechanism designed to provide confidentiality for communications made during joint defense strategy sessions.").  This means that Ms. Necheles must be precluded from sharing such confidential information with Russell Gioiella, counsel for Espada's co-defendant, and that Mr. Gioiella avoid referencing such information during his questioning if it has already come to his attention.

iii) Ken Brennan

Because Ms. Necheles attended joint-defense meetings with Mr. Brennan during the most recent NYAG investigation, it appears

11

that she has learned confidential information with respect to Mr. Brennan that she may not reveal. She therefore should be precluded from cross-examining Mr. Brennan concerning information she learned during these meetings. While the government possesses no knowledge as to what information Mr. Brennan revealed to Ms. Necheles — or the nature of the joint defense agreement — it is reasonable to infer that the information is relevant to the instant charges and would be the subject of Mr. Brennan's testimony. Therefore, the Court should, outside the presence of the government, confer with the attorney for Mr. Brennan, Louis Freeman, and Ms. Necheles, to determine the nature and extent of the information revealed at the joint defense meetings. Once that is determined, both independent counsel and the Court will be in a position to assess whether and to what extent Ms. Necheles will be able to cross-examine Brennan, and what defenses — including any use of Ms. Necheles as a witness — Espada may have to waive. Mr. Gioiella also should not use any information Ms. Necheles gained during joint defense meetings.

3. **Conclusion**

For the foregoing reasons, the Court should notify Espada of the conflicts of interest raised above and direct Espada to retain (or alternatively the Court should appoint) independent counsel to advise him accordingly. Subsequently, the Court should conduct an appropriate inquiry pursuant to Curcio.

Specifically, the Court should 1) obtain Soundview's consent of Ms. Necheles's representation of Espada in this case; 2) ensure that independent counsel advises Espada about the conflicts, including a) Ms. Necheles's continuing duty of loyalty to Soundview; b) the potential benefit of calling Ms. Necheles as a witness at trial; c) the possibility that Ms. Necheles's cross-examination of witnesses might be impaired because of her prior conversations with them; and d) additional conflicts, some of which cannot be foreseen at this time; 3) determine, outside the government's presence, the nature and extent of the information Ms. Necheles learned during any joint-defense meetings with Mr. Brennan and Ms. Ortiz, then conduct a Curcio hearing, if necessary, as to that issue; and 4) preclude Ms. Necheles and Mr. Gioiella from using any information that Ms. Necheles learned during joint defense meetings when cross-examining those witnesses.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                    By:       /S/
                              Carolyn Pokorny
                              Roger Burlingame
                              Todd Kaminsky
                              Assistant U.S. Attorneys

cc: Susan Necheles, Esq. and Russell Gioiella, Esq.