UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -

                                        10 CR 985 (S-2)(FB)

PEDRO ESPADA, JR., and
PEDRO GAUTIER ESPADA

           Defendant.

- - - - - - - - - - - - - - - - - - X


THE  GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' MOTION FOR SEVERANCE


                                          LORETTA E. LYNCH
                                          United States Attorney
                                          Eastern District of New York


CAROLYN POKORNY
ROGER BURLINGAME
TODD KAMINSKY
Assistant U.S. Attorney
     (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

Between 2005 and 2009, PEDRO ESPADA, JR. ("ESPADA") and his son PEDRO GAUTIER ESPADA ("GAUTIER ESPADA") embezzled hundred of thousands of dollars from Soundview Healthcare Network ("Soundview"), a federally-funded, not-for-profit health care provider they managed through various schemes.  To cover-up their theft, the defendants lied on corporate federal tax returns by casting the income they derived from their embezzlement as tax-deductible business expenses.  In addition, ESPADA failed to report the income he earned through these schemes on his personal federal tax returns and further tried to conceal his embezzlement by lying to the Department of Health and Human Services ("HHS") on two occasions.

Counts One through Seven of the indictment directly concern the defendants' efforts to embezzle, steal, misapply and obtain by fraud, money and other property from Soundview. Specifically, Count One charges the defendants with conspiring to steal $5,000 or more from Soundview, in violation 18 U.S.C. § 371, and Counts Two through Six charge the defendants with stealing $5,000 or more from Soundview for each of years 2005 through 2009, in violation of 18 U.S.C. § 666.  Count Seven charges the defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, pertaining to their efforts to carry-out one of the schemes that resulted in their theft of more than $5,000 from Soundview.

The remaining counts of the indictment concern the defendants' efforts to either effectuate or cover-up their schemes, or ESPADA's failure to report the proceeds he derived from these schemes on his personal income taxes.  Specifically, Counts Eight charges ESPADA with lying to HHS, in violation of 18 U.S.C. § 1001(a)(3), about the extent to which he profited from one of the defendants' embezzlement schemes.  Similarly, Count Nine charges ESPADA with lying to a subdivision of HHS, in violation of 18 U.S.C. § 1001(a)(3), about the income he earned from Soundview, in an effort to prevent federal officials from inquiring into the extent of his embezzlement.

The remaining counts of the indictment relate to the defendants' tax fraud, and concern either the corporate tax returns of Community Expansion Development Corp. ("CEDC"), a subsidiary of Soundview's that the defendants used as a conduit to siphon funds away from Soundview, or ESPADA's personal tax returns.  With respect to CEDC, the defendants' use of that entity as a means to embezzle from Soundview constituted a sizeable portion of the money they stole.  To conceal their actions, the defendants mischaracterized the funds they wrongfully obtained from CEDC as tax-deductible business expenses on the CEDC corporate tax returns.  In addition, ESPADA failed to report those same expenditures as income on his personal tax returns.  As a result, Count Ten charges the defendants with

conspiring to defraud the United States, in violation of 18 U.S.C. § 371 (commonly referred to as a "Klein Conspiracy"), with respect to their treatment of CEDC expenditures, and concerns both CEDC's corporate returns and ESPADA's personal tax returns. Counts 11 and 12 charge ESPADA with subscribing to false and fraudulent corporate tax returns, which he filed on behalf CEDC, for the years 2004 and 2005.  Counts Thirteen and Fourteen charge GAUTIER ESPADA with aiding and assisting in the preparation of those returns.  Counts Fifteen through Eighteen charge ESPADA with subscribing to false and fraudulent personal tax returns for the years 2005 through 2009.

The defendants move to sever Counts One through Seven from the remaining eleven counts of the indictment.  The government submits this memorandum of law in opposition to the defendants' motion.  Since each count of the indictment grew out of, or relates to, the defendants' schemes to embezzle from Soundview, they are properly joined and the motion should be denied.

STATEMENT OF FACTS

ESPADA is the founder, president, and chief executive officer of Soundview, a series of federally-funded health care clinics in the Bronx, New York that serve low-income patients. ESPADA founded Soundview in 1978 as a charitable, not-for-profit organization under § 501(c)(3) of the Internal Revenue Code. GAUTIER ESPADA is ESPADA's eldest son and also helped manage Soundview as its Director of Environmental Care.

ESPADA and GAUTIER ESPADA used their leadership positions at Soundview to steal its funds, siphoning hundreds of thousands of dollars that either went into their pockets or to pay for personal expenses for themselves or family members such as birthday parties, home repairs, luxury automobiles and expenses related to one of ESPADA's political campaigns.  The defendants executed a series of schemes that enabled them to wrongfully obtain Soundview's money, which are set forth below and constitute the actions that comprise Counts One through Seven of the indictment.

A.   The Scheme to Defraud and Embezzle

i.   The Soundview American Express Card Scheme

In 2004, ESPADA received a Soundview corporate American Express Card (the "AMEX card") that, according to the terms of his employment contract, he was permitted to use for personal expenses provided that he reimbursed Soundview.  As a means of

reimbursement, ESPADA was permitted to deduct time from the sick and vacation leave he had accrued at Soundview since 1978.[1] Soundview's chief financial officer regularly provided ESPADA with a monthly AMEX statement so that ESPADA could mark the charges that were his personal expenditures.  Any AMEX charges not specifically marked "personal" by ESPADA were considered by Soundview to be legitimate business expenses and did not affect ESPADA's leave balance.  In annotating the statements, ESPADA identified some charges as personal, flagging them on the AMEX bill.  However, ESPADA intentionally failed to mark as personal a large number of expenses that were in-fact personal in nature and unrelated to Soundview business.

        Examples of such charges included: thousands of dollars spent on campaign mailings related to ESAPDA's 2008 bid for New York State Senate; tens of thousands of dollars spent on personal meals; thousands of dollars spent on spa treatments enjoyed by ESPADA, his wife and daughters-in-law; and thousands of dollars spent on improvements to ESPADA's home in Mamaroneck, New York. Between 2005 and 2009, ESPADA intentionally declined to identify approximately $100,000 in personal charges he incurred on Soundview's AMEX card.

---

[1] ESPADA's contract provided him with eight weeks of paid vacation time plus six weeks of paid sick time.

ii.  The Janitorial Schemes

a.  The CEDC Scheme

CEDC was a for-profit janitorial services company incorporated and owned by ESPADA.  From approximately 1994 until 2003, Soundview paid CEDC to clean its facilities.  In 2003, the Health Resources and Services Administration ("HRSA"), a subagency of HHS that administered the federal grant Soundview received each year, expressed concern about the conflict of interest this arrangement posed for ESPADA.  HRSA told Soundview that if the arrangement was not altered, Soundview would be in jeopardy of losing its federal funding.  Shortly thereafter, Soundview cancelled its contract with CEDC and brought CEDC's janitors onto Soundview's payroll.

According to the minutes from a meeting of Soundview's Board of Directors, in January 2005, ESPADA "sold" 51 percent of CEDC to Soundview for $1.  Following this transaction, in February 2005, Soundview entered into a new contract with CEDC — this time its subsidiary — to clean its facilities. Approximately one year later, ESPADA donated his remaining 49-percent interest in CEDC, making the janitorial outfit Soundview's wholly-owned subsidiary.  During the period CEDC was Soundview's subsidiary, CEDC earned hundreds of thousands of dollars from its contract with Soundview.  CEDC did not have

7

outside clients and did not clean facilities that were outside of the Soundview Healthcare Network.

Although CEDC was Soundview's subsidiary and no longer ESPADA's privately-held company, the defendants nevertheless treated CEDC as a slush fund, liberally using CEDC's money to pay for personal expenditures without approval.  For example, the defendants used CEDC checks to pay for lavish parties for family members, to repair the heating and air-conditioning units in ESPADA's home in Mamaroneck, New York, and to pay rent for ESPADA's campaign headquarters.  In addition, the defendants wrote CEDC checks to themselves, indicating on the checks that the payments were either "consulting" expenses, "gifts" or "loans," among other things.  The defendants were able to carry-out this fraud undetected because they maintained exclusive control over CEDC's finances, including its checks, books and financial records.  Between 2005 and 2008, the defendant looted approximately $150,000 from Soundview in this manner.

b.   The Rent Payment Scheme

With the aim of diverting additional dollars into CEDC's bank accounts — over which the defendants had exclusive control — the defendants improperly collected rent from subtenants leasing space inside of Soundview's facilities by instructing subtenants to make their rent checks payable to CEDC. As the leaseholder of these properties and the entity that paid

8

rent to the owners of the properties, Soundview, not CEDC, should
have collected these subtenant-rents.[2]

To make these payments appear as something other than
a naked theft, the defendants sometimes dressed them up as
"maintenance fees" that subtenants purportedly paid to CEDC to
have their spaces cleaned.  However, the subtenants themselves
considered the payments to be rental payments, whose monthly
amounts grossly exceeded any reasonable estimate of janitorial
costs. In addition, several of the subtenants were not asked to
make payments to Soundview at all, but merely monthly payments to
CEDC.

In January 2008, Soundview entered into a new
maintenance-services contract with a company known as Soundview
Management Enterprises ("SME"), a for-profit corporation founded
and owned by ESPADA.  As they had done with CEDC, in 2008 and
2009, the defendants required subtenants to make monthly payments
to SME instead of Soundview.  In total, from 2005 to 2009, the
defendants improperly diverted more than $200,000 in rental
payments to CEDC and SME.

c.   The Bid-Rigging Scheme

In the summer and fall of 2007, the defendants
carried out a scheme to ensure that SME, ESPADA's private

_____

[2] Of course, even payment made to CEDC should have inured to
Soundview, its owner, but the defendants instead treated CEDC's
income as their own.

janitorial company, would succeed CEDC as the recipient of Soundview's lucrative maintenance contract.  Specifically, in or about July 2007, GAUTIER ESPADA began soliciting bids for the Soundview maintenance contract from outside vendors.  In soliciting the bids, he falsely informed the bidders that (a) more janitors were required to clean Soundview's facilities than actually were required, and (b) Soundview's facilities needed to be cleaned more frequently than actually was required.  Based on the false information provided by GAUTIER ESPADA, the janitorial service companies competing for the contract submitted bids that were far in excess of what they would have been had they known of the true work specifications.  SME was then awarded the contract without submitting a bid, and set its price slightly lower than that of the cheapest bid submitted by the outside vendors.

In awarding the contract to SME, Soundview's Board of Directors (the "Soundview Board" or the "Board") was deceived into thinking that (a) SME submitted a bid, and (b) SME's price was appropriately set based on bids submitted for the true work specifications.  Based on these falsehoods, in December 2007, Soundview's Board voted to award its janitorial contract to SME at the falsely inflated price.  Soundview paid SME approximately $389,700 in 2008 pursuant to this contract.

The AMEX Scheme, the CEDC Scheme, the Rent-Payment Scheme and the Bid-Rigging Scheme were the means by which the

defendants stole from Soundview.  Their agreement to engage in

those schemes and actions in furtherance of them constitute the

conspiracy to embezzle, commit wire fraud and actual embezzlement

charged in Counts One through Seven.

      B.    <u>Counts Eight and Nine</u>

         i)   Count Eight

      Count Eight pertains to the Bid-Rigging Scheme which

resulted in the SME-Soundview maintenance contract.  Medicare, a

division of HHS, reimburses hospitals and healthcare centers such

as Soundview for some costs associated with Medicare patients'

care.  In order to receive such reimbursements, health centers

must submit Cost Reports to Medicare.  In February 2010,

Soundview submitted a Cost Report to Medicare pertaining to the

year 2008 that ESPADA signed and certified (the "2008 Medicare

Cost Report").  Questions contained in the 2008 Medicare Cost

Report asked about payments Soundview made to related parties,

such as non-arms-length transactions with its own employees, and

requested the amount of profit earned by the related party.

Medicare obtains this information so that it does not reimburse

an entity for profits earned by that entity's own employees.

      Soundview reported that (1) it made a payment to SME of

$363,000 in 2008, and (2) only $35,000 of that payment was profit

to ESPADA, with the remainder representing the cost of providing

cleaning services for Soundview.  ESPADA provided the information

contained in the 2008 Medicare Cost Report concerning the profits he earned from SME and verified the veracity of that information by signing and certifying the report.  In fact, SME, and thereby ESPADA, earned profits in excess of $120,000 from Soundview's payments to SME during 2008.  As a result, ESPADA is charged with lying to HHS about the amount of profit he earned from the SME-Soundview contract, in violation of 18 U.S.C. § 1001(a)(3).

       ii)  Count Nine

       In 2008, ESPADA was elected to the New York State Senate, and, as a result, could no longer dedicate 100 percent of his time to running Soundview.  Accordingly, HRSA wanted to ensure that ESPADA's salary was lowered commensurately.  On January 5, 2009, a HRSA official informed ESPADA of this concern and ESPADA ensured him that his salary would be lowered accordingly.  Following the call, ESPADA directed a Soundview employee to draft a letter to HRSA, which the employee did, stating that, pursuant to a resolution passed by the Soundview Board (which was attached to the letter), ESPADA's pay would be decreased by 25 percent in light the decreased percentage of time he could devote to Soundview.  Also attached to the letter was a schedule reflecting that ESPADA's salary would be $185,063 during the period February 1, 2009 to January 31, 2010, approximately $61,000 less than it had been the previous year.

ESPADA's salary in 2009, was not, however, $185,063 but remained unchanged at approximately $246,000.  ESPADA intentionally omitted from the letter to HRSA an additional Board resolution that increased his salary by approximately $61,000. As a result, while ESPADA may have worked fewer hours at Soundview, he earned a higher hourly rate, compensating for the diminished hours.  Therefore, the letter inaccurately and falsely claimed to HRSA that ESPADA's salary would be diminished in 2009, in violation of 18 U.S.C. § 1001(a)(3).

C.    The Tax Counts (Counts Ten through Eighteen)

i)   CEDC

As was discussed above, the defendants treated CEDC's bank accounts as if they were their own, and used CEDC checks to pay for personal expenditures or to simply generate cash for themselves.  When it came time to explain these expenditures to their accountants from the firm Marks, Paneth, and Shron ("MPS"), the defendants lied and passed the expenditures off as legitimate, deductible expenses made in furtherance of CEDC's maintenance business.  As a result, CEDC's corporate tax returns for the 2004 and 2005 fiscal years contain a number of false deductions that resulted in CEDC paying less tax than it was required to pay.

The defendants perpetrated this fraud by providing MPS accountants with false or misleading explanations of the

underlying expenses.  For example, ESPADA used CEDC funds to purchase a bank check that he used to rent a vacation villa in Puerto Rico.  Because neither the bank statements nor the check itself provided the accountants with any insight into the nature of the expense, they asked for further clarification.  In response, the accountants received a photocopy of the cancelled check, next to which GAUTIER ESPADA had written "legal fees.[3]" As a result, the multi-thousand dollar expense was deducted as a legal expense on the 2004 CEDC tax return.

There are a host of other, similar examples, including several in which ESPADA lied to the MPS accountants about the nature of CEDC's expenses.  One example involves a birthday party for a family member of ESPADA's that ESPADA paid for with CEDC funds.  Specifically, ESPADA used CEDC checks to, among other things, pay a woman to videotape the party.  When the accounts inquired into the nature of that expense so that they could determine whether it was deductible, the accountants received a photocopy of the cancelled check, next to which ESPADA had written "consultant service."

Because ESPADA signed the 2004 and 2005 CEDC returns, he is charged with subscribing to false tax returns, in violation of 26 U.S.C. § 7206(1), in Counts 11 and 12.  GAUTIER ESPADA is

---

[3] The government will call a handwriting expert at trial to identify the handwriting of both defendants on documents that MPS provided to the government.

charged with assisting in the preparation of those returns, in
violation of 26 U.S.C. § 7206(2), in Counts Thirteen and
Fourteen.

ii.  ESPADA's Personal Income Tax Returns

ESPADA additionally lied on his personal tax returns by
failing to report the income he embezzled from Soundview.
Despite the fact that ESPADA wrote thousands of dollars worth of
CEDC checks to himself and used CEDC checks to pay for personal
expenditures — such as the rent for his campaign headquarters —
not a single dollar of income from CEDC is reported on any of
ESPADA's returns from 2005 through 2009.  Additionally, although
ESPADA used the Soundview AMEX card to pay for personal
expenditures such as home improvements and expensive meals that
served no business purpose, he did not have to reimburse
Soundview for those expenses and they did not appear on his W-2
because ESPADA did not mark them as personal.  As such, he
derived income from Soundview that he did not report on any of
his personal tax returns for the years 2005 - 2009.  For his
subscription to these four false returns, ESPADA is charged with
26 U.S.C. § 7206(1) in Counts Fifteen through Eighteen.

ESPADA's 2005 tax return is fraudulent for another
reason.  In preparation of that return, ESPADA lied to his
accountant by claiming that a rental property he sold in the
Bronx was his primary residence for which he was entitled to a

special deduction for the sale of one's primary home.  In fact,
that house was not ESPADA's primary residence and he was not
entitled to the deduction of which he availed himself.

ARGUMENT

I.

COUNTS ONE THROUGH SEVEN OF THE INDICTMENT SHOULD NOT BE SEVERED
FROM THE REMAINING COUNTS

A.   Applicable Law

Multiple offenses may be charged in the same indictment
where the counts at issue are based on "the same act or
transaction, or . . . series of acts or transactions." Fed. R.
Crim. P. 8(b); see United States v. Turoff, 853 F.2d 1037, 1042-
43 (2d Cir. 1988); United States v. Treadwell, 566 F. Supp. 80,
86 (D.D.C. 1983) ("The term 'transaction' has been interpreted to
comprehend a series of many occurrences, depending not so much
upon the immediateness of their connection as upon their logical
relationship").[4]

---

[4] Rule 8 governs the joinder of counts in a single proceeding and
is comprised of two parts.  Rule 8(a) pertains to the joinder of
offenses and permits joint trials where charges relate to the
same act or transaction or arise out of similar criminal
activities. Fed. R. Crim. P. 8(a).  Rule 8(b), which is a
narrower standard, governs the joinder of defendants and permits
joint trials only where charges relate to the same act or
transaction.  Unlike Rule 8(a), Rule 8(b) does not permit the
joinder of defendants charged with crimes of the same or similar
character. See Turoff, 853 F.2d at 1043.  As the Second Circuit
has noted, Rule 8 does not provide a standard that governs when
multiple offenses and multiple defendants are joined in the same
indictment.  Id.  The Court has refrained from ruling definitively
on whether Rule 8(a), 8(b), or some combination of the two
applies to these situations. See United States v. Shellef, 507

Joinder is appropriate where acts are "unified by some substantial identity of facts or participants" or "arise out of a common plan or scheme."  See United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (finding joinder of counts to be appropriate where disparate tax-evasion schemes had common purpose — to conceal loansharking proceeds — and involved common participants); United States v. Feyrer, 333 F.3d 110, 114 (2d. Cir 2003) (finding joinder of wire fraud and securities fraud conspiracies proper where the conspiracies occurred during the same time period, shared participants, and had a common plan of "generat[ing] income for [the participants] through fraudulent stock transactions.").  The Second Circuit has applied a common sense approach to joinder, stating that a court should look to whether "a reasonable person would easily recognize the common factual elements that permit joinder."  Feyrer, 333 F.3d at 114.

Importantly, there is no requirement that a defendant be named in a particular count with his co-defendant, and that only one defendant is named in a particular count has little bearing on whether the acts at issue in the indictment are "unified by some substantial identity of facts or participants"

---

F.3d 82, 97, n.12 (2d Cir. 2007) (describing the question as "not well-settled").  However, the Court need not resolve this ambiguity to decide the matter at bar.  As discussed below, the Government asserts that joinder is proper because the defendants' criminal offenses are based on "the same act or transaction." Joinder satisfies the narrower 8(b) standard and is therefore proper whether the Court applies Rule 8(a) or Rule 8(b).

or "arise out of a common plan or scheme."  See Feyrer, 333 F.3d
at 114 (upholding joinder despite the fact that "[a]ppellant . .
. points out that neither he nor Goldenberg was charged in the
conspiracy counts of the other, and that Feyrer, the only
defendant charged with participating in both conspiracies, pled
guilty prior to trial."); United States v Saad, 380 F.Supp.2d
286, 288 (S.D.N.Y. 2005) (Rakoff, J.) (securities fraud charges
against CEO and CFO for falsely inflating company's revenues
properly joined with charges against CEO alone for underreporting
her compensation in SEC filings.  "The proxy fraud and the other
securities frauds are . . . connected by the common motivation to
mislead shareholders for the purpose of improving the financial
and professional position of those participating in the fraud.")

     The Second Circuit has also found joinder to be
appropriate when the same set of facts demonstrate the
defendant's guilt of the different counts at issue.  United
States v. Blakney, 941 F.2d 114, 116 (2d Cir. 1991) ("Joinder is
proper where the same evidence may be used to prove each count");
United States v. McGrath, 558 F.2d 1102, 1106 (2d Cir. 1977)
(joinder of extortion and tax charges proper because the evidence
presented in support extortion charges would "largely overlap"
with that used to prove tax charges); United States v. Gomez-
Reynoso, No. 95 Cr. 402, 1995 WL 542455, at *3 (S.D.N.Y. Sept.
12, 1995) (joinder of drug and gun charges proper because the

testimony of the same undercover police officers and confidential informants was needed to prove both offenses).  Similarly, courts have found that "counts are properly joined if proof of one act constitues[s][ ] or depend[s] upon proof of the other." <u>United States v. Halper</u>, 590 F.2d 422, 429 (2d Cir. 1978)).

When overlapping facts and witnesses are argued in support of joinder, the Second Circuit has stated that courts should "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice." <u>United States v. Rittweger</u>, 524 F.3d 171, 178 (2d Cir. 2008).  Generally, where such overlap is substantial, courts prefer joinder because "[t]he government should not be put to the task of proving what is essentially the same set of facts more than once." <u>United States v Halper</u>, 590 F.2d 422, 430 (2d. Cir 1978).  <u>See also</u> <u>United States v. Nekritin</u>, 2011 WL 1674799 at * 3 (E.D.N.Y. May 3, 2011) (Rejecting severance motion on grounds that, "[s]everance  . . . would require the government to prove the same conspiracy twice.").  Indeed, joinder is normally appropriate "to [conserve] judicial resources, [alleviate] the burdens on citizens serving as jurors, and [avoid] the necessity of having witnesses reiterate testimony in a series of trials." <u>United States v. Lyles</u>, 593 F.2d 182, 191

(2d Cir. 1979) (quoting United States v. Borelli, 435 F.2d 500,
502 (2d Cir. 1970).

  For these reasons, courts have repeatedly found joinder
of § 1001 counts and other offenses to be appropriate where the
underlying offense gave rise to the false statement or the false
statement itself constitutes evidence of the underlying offense.
See United States v. Ferrarini, 9 F.Supp.2d 284, 291-92 (S.D.N.Y.
1998) (finding joinder of securities fraud and false statement
charges proper because "[The Counts] . . . which allege false
statements . . . are . . .not unrelated to the activities at the
heart of the conspiracy, but stem directly from the defendants'
efforts to cover up those activities."); United States v. Valone,
1988 WL 55143, at *1 (W.D.N.Y., May 12, 1988) ("The false
statements . . . [were] directly related to concealment of the
transfer of currency . . . and no convincing reason to sever
these latter counts from the conspiracy count has been
presented."); United States v. Finley, 705 F.Supp 1272, 1296
(N.D.Ill. 1988) ("The false statement counts concern statements
made by defendants in attempts to exculpate themselves with
respect to the other charges in the indictment.  The tax counts
concern the failure to report income obtained through the other
acts charged in the indictment. These types of charges have
repeatedly been held proper for joinder."); United States v.
Gilpin, 678 F. Supp. 1361, 1364 (N.D. Ill. 1988) ("Counts one

through five and [the § 1001 count] will require common elements of proof, making a strong case for joinder.").

Similarly, tax and non-tax offenses are properly joined where the tax offenses "[arise] directly from the other offenses charged."  Turoff, 853 F.2d at 1043.  For example, the Second Circuit has held that where a defendant profits from an illegal act, his failure to report its proceeds is properly tried alongside the substantive offense.  See United States v. Biaggi, 909 F.2d 662 (2d Cir. 1990) (joinder of extortion and tax fraud charges proper where tax charges stemmed from the defendant's failure to report income he derived from extortion plot on personal tax returns); see also United States v. King. 2011 WL 1630676 (S.D.N.Y. Apr. 11, 2011) (joinder of embezzlement and tax fraud charges proper where charges stemmed from defendant's failure to report income she embezzled on personal tax returns).

Even where a defendant's unreported income is derived from multiple sources, some of which do not form the basis of a charged offense, joinder is appropriate as long as a portion of the unreported funds stems from a charge in the indictment.  United States v. Biaggi, 909 F.2d 662 (2d Cir. 1990) (joinder of extortion and tax evasion charges proper where defendant's unreported income derived from his extortion plot as well as free repair work performed on his home that was not declared as income); United States v. McGrath, 558 F.2d 1102 (2d Cir. 1977) (holding joinder of extortion and tax charges proper where

defendant's unreported income derived from his extortion plot as well as unrelated interest income).

Notably, a tax count relating to a particular year "deals with all unreported income for a single tax year." United States v. Biaggi, 705 F. Supp. 852, 856 (S.D.N.Y. 1988), aff'd 909 F.2d 662 (1990).  A court cannot try a tax count over multiple proceedings simply because a defendant makes multiple misstatements on a single return.  See McGrath, 558 F.2d at 1106, n. 6 ("[B]ecause the tax counts each deal with a single year, it would have been impossible to split the tax counts into those related and unrelated to the Hobbs Act violations").  All of a defendant's misrepresentations must be tried together. Id.

Courts have also repeatedly held that where a defendant profits from an illegal act, subsequent attempts to hide his earnings by lying on federal tax returns establish his consciousness of guilt.  See United States v. Hatfield, 685 F. Supp. 2d 320, 342 (E.D.N.Y. 2010) (defendants' misrepresentations on federal tax returns demonstrated their knowledge that the income derived from their fraud was illegitimate); see also United States v. Hogan, 886 F.2d 1497, 1507 (7th Cir. 1989) (defendant's failure to report income on personal tax return "suggests that he knew that the payments were unlawful"); United States v. Garcia-Pastrana, 584 F.3d 351, 378 (1st Cir. 2009) (evidence that defendants failed to report income derived from their embezzlement helped to establish that they acted knowingly

and willfully); <u>United States v. Latysheva</u>, No. 03-50004, 2006 WL 44782, at *3 (9th Cir. 2006) (evidence of defendants' tax fraud held admissible in a money laundering action because it "provided circumstantial support for the knowledge element of the money laundering offense"); <u>see</u> <u>generally</u> <u>Ashcraft v. Tennessee</u>, 327 U.S. 274, 278 (1946) ("Wilful concealment of material facts has always been considered evidence of guilt.").

B.   <u>Application of Law</u>

The defendants raise a host of individual arguments as to why counts Eight through Eighteen should be severed from the indictment, but essentially argue three points: 1) the government is attempting to try four unrelated conspiracies in one case; 2) a trial of the charges contained the indictment as presently constituted would be too large and unwieldy; and 3) charges related to the CEDC Scheme should not only be severed, but removed from the indictment entirely because theft from CEDC is not theft from Soundview and therefore should not be tried alongside the other allegations of embezzlement in the case. Defendant's Memorandum of Law in Support of Severance ("Def. Mem.") at 2,3, 15-20.  Each of these arguments is without merit.

Counts One through Seven and Eight through Eighteen are properly joined because the acts that underlie each of the counts arose from a common scheme or plan.  Simply put, each of the counts centers around the defendants' efforts to embezzle money from Soundview and concerns a particular criminal act or acts

committed directly in furtherance of that goal.  While Counts One through Seven concern the conspiracy to embezzle and actual embezzlement of Soundview funds, Counts Eight through Eighteen concern the defendants' efforts to conceal this embezzlement so that they could continue to steal Soundview's money unchecked. Without the acts charged in those counts, the defendants embezzlement schemes would have amounted to little, because their crimes would have been widely exposed.  Moreover, both sets of counts share more than a unity of purpose, but also a substantial overlap of participants, facts and witnesses.  Indeed, the evidence for each set of counts constitutes critical proof of the defendants' guilt with respect to the other.

The symmetries between the counts is found in the indictment itself.  While the Second Circuit has not yet decided whether a district court should determine whether joinder is appropriate based solely on the language contained in the indictment, or whether other pre-trial representations may be taken into account, it has "caution[ed] that the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for consideration of evidence at trial." United States v. Rajaratnam, 753 F. Supp. 2d 299, 306 (S.D.N.Y. 2010) (citing United States v. Rittweger, 524 F.3d 171, 178 n.3 (2d Cir. 2008)).  Accordingly, claims as to "substantial identity of facts or participants" or "common scheme

or plan" must "be ascertainable — either readily apparent or reasonably inferred —  from the face of the indictment." Rajaratnam, 753 F. Supp. 2d at 306 (quoting United States v. Jawara, 474 F.3d 565, 578 (9th Cir. 2007)); Jawara, 474 F.3d at 578 ("Courts should not have to engage in inferential gymnastics or resort to implausible levels of abstraction to divine similarity [between counts].").  Here, no such gymnastics are required to understand why the counts at issue are properly joined, as their unity of purpose and overlapping facts and characteristics are readily apparent or reasonably inferred from the language of the indictment itself.

> i.   Counts Eight and Nine (The § 1001 Charges) Should Not Be Severed from Counts One Through Seven

> a) Count Eight

Count Eight, which concerns ESPADA's false statement to HHS that he only earned $35,000 in 2008 from the contract between Soundview and SME, grew directly out of the Bid-Rigging Scheme that the defendants perpetrated to win the contract in the first place.  In February 2010, when ESPADA made the false statement, he and GAUTIER ESPADA were entering the third year of the SME-Soundview contract from which they had improperly earned hundreds of thousands of dollars.  They had a motive to protect this lucrative source of income, which would have been threatened had federal authorities been aware of the amount of money they had made — and were continuing to make — from a contract with a

health center that provided care for the most indigent of
citizens.[5]  Viewed this way, both the lie to HHS and the Bid-
Rigging Scheme share the common purpose of ensuring that the
defendants' profited handsomely from the SME-Soundview contract.
While the Bid-Rigging Scheme permitted the defendants access to
those profits in the first instance, the lie to HHS permitted
them to retain control of those profits, unmolested.  See
Attanasio, 870 F.2d at 815 (finding joinder of counts to be
appropriate where disparate tax-evasion schemes shared common
purpose).

         In addition, Count Eight should not be severed because
it reflects ESPADA's efforts to conceal the Bid-Rigging Scheme
and also reflects his consciousness of guilt with respect to that
scheme.  If ESPADA thought that the SME-Soundview contract rested
on legitimate underpinnings, he would not have underreported the
income he earned from it in 2008 by nearly $100,000.  This was a
clear attempt to avoid drawing HHS's attention to the ill-gotten

---

[5] As the indictment makes clear, HHS is primarily interested in
asking health centers about non-arms-length contracts so that it
does not reimburse a health center for profits earned by one of
its employees.  See Second Superseding Indictment ("Ind.") at
¶ 25.  It thus does not require mental gymnastics to understand
that ESPADA would not want to tell the same agency that
administers Soundview's federal funding (Ind. ¶ 3) that he is
reaping hundreds of thousands of dollars from Soundview annually,
apart from his salary.  At bottom, the indictment states that the
Big-Rigging Scheme resulted in the SME-Soundview contract (Ind.
¶¶ 19-23) and goes-on to state in the next paragraph that ESPADA
lied about the profit he earned from that contract (Ind. ¶ 26).
His motive to lie to HHS to conceal the Big-Rigging Scheme can
thus easily be discerned from the face of the indictment.

contract.  See Ferrarini, 9 F.Supp2d. at 291-2 ("[Those Counts] . . . which allege false statements . . . are . . .not unrelated to the activities at the heart of the conspiracy, but stem directly from the defendants' efforts to cover up those activities; United States v. Valone, 1988 WL 55143, at *1 ("The false statements . . . [were] directly related to concealment of the transfer of currency to the Bahamian accounts.").

        This same point also suggests the futility of severance in this instance, because evidence of the lie to HHS would be introduced at any trial concerning the Bid-Rigging Scheme as evidence of ESPADA's consciousness of guilt.  His hiding of the proceeds from the contract is direct evidence that ESPADA did not want anyone to investigate the contract's origins and learn of the Bid-Rigging Scheme.  See United States v. Schusell, 2009 WL 413605 at * 2 (S.D.N.Y. Feb 11, 2009) ("A rational jury could infer that Defendant made false statements on his application for appointed counsel regarding his employment and income in order to distance himself from the debt-collection agency, which was directly linked to the alleged fraud.  A rational jury could further infer that these false statements indicate Defendant's consciousness of guilt and are therefore probative of his actual guilt.")

        Conversely, in a trial concerning the false statement alone, ESPADA's motive to lie to HHS would be in question and some of the most compelling evidence the government would offer

involves his role in the Bid-Rigging Scheme.  Based on this
evidence, the government would argue that ESPADA had a strong
motive to keep the ill-gotten contract off the government's
radar.  Thus, the overlapping facts and evidence concerning both
the Bid-Rigging Scheme and the false statement in Count Eight
counsel against severance.  See Nekritin, 2011 WL 1674799 at * 3
("Severance  . . . would require the government to prove the same
conspiracy twice.").

       In sum, the case for severing Count Eight is
particularly weak because the false statement and the underlying
embezzlement schemes share a common scheme or plan, involve
overlapping facts and participants, and "proof of one act
constitutes[s] or depend[s] upon proof of the other."  United
States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)).

              b) Count Nine

       Like Count Eight, Count Nine also involved a lie that
ESPADA told federal authorities in hopes of warding off their
scrutiny.  Here, ESPADA told HRSA, a subdivision of HHS, that his
salary in 2009 was lower than it actually was.  The indictment
states that 1) HRSA administered the federal funding upon which
Soundview relied and that was the object of the defendants'
schemes (Ind. ¶¶ 3, 13), and 2) ESPADA did not want HRSA to know
that his salary was as high as $246,740 in 2009. (¶ 37).  From
this it can be readily discerned that ESPADA did not want HRSA to
arrive at the impression that he derived unreasonably high income

from Soundview, and that if HRSA knew the truth about his salary,
it would react in a negative way toward him.  These rather
obvious inferences take on even more salience considering the
indictments' allegations that some of the schemes the defendants'
perpetrated were contemporaneous with the false statement ESPADA
made to HRSA (See e.g.,Ind. ¶¶ 18, 27, 31(nn)).  As such, there
is a direct relationship between the false statement in Count
Nine and the underlying embezzlement schemes in that the false
statement was intended to keep HRSA from inquiring into ESPADA's
compensation at Soundview.  From ESPADA's perspective, such a
probe carried with it the scary potential that HRSA might review
the sources of his income, which would necessarily include his
use of Soundview's AMEX card and his relationship with CEDC and
SME, among other things.  Perpetrating the schemes charged in
Counts One through Seven required that ESPADA not draw HRSA's
attention to what was taking place at Soundview, and the lie
charged in Count Nine was in furtherance of that goal.

        At the same time, ESPADA had an equally strong motive
to placate HRSA in furtherance of ensuring the continuous flow of
federal dollars into Soundview.  In light of the fact that the
defendants' continued to perpetrate their schemes into 2010 (Ind
¶ 30), ESPADA's false statement appears to have had the desired
effect.

        Therefore, Counts One through Seven and Count Nine
share the common purpose of furthering the defendants' efforts to

steal Soundview's money.  Once again, Counts One through Seven concern the defendants efforts to improperly convert Soundview's money in the first instance, while Count Nine represents ESPADA's effort to continue those schemes, unmolested.

Further, Count Nine should not be severed because the acts charged in Count One help establish the motives for the lie charged in Count Nine.  Were a trial to be held on the false statement count alone, the government would have to prove that ESPADA's statement concerning his salary was not a mistake on either his part or on the part of one of his employees.  The best evidence the government can point to in support of ESAPDA's intent to mislead HRSA, is the fact that he was committing large-scale fraud at the time and did not want HRSA looking too closely at him or Soundview.  This would mean that evidence of the underlying schemes would be introduced at that trial, unncessarily duplicating the presentation of evidence.

Similarly, the lie charged in Count Nine is also direct evidence of ESPADA's cover-up of, and consciousness of guilt with respect to, the acts charged in Counts One though Seven.  Severance of Count Nine then makes little sense because ESAPDA's false statement to HRSA would come into evidence pursuant to Federal Rule o Evidence 404(b) since courts have consistently held that false statements demonstrating a consciousness of guilt with respect to charged crimes should be admitted into evidence.  See Schusell, 2009 WL 413605 at * 2;  (United States v. Vargas,

2008 WL 2180816 at * 2 (2d Cir. May 27, 2008)([the district court properly allowed evidence regarding defendant's false statements to his probation officer for the purpose of establishing the disputed issue of his consciousness of guilt); United States v. Wilson, 2011 WL 5121098 at * 4 (S.D.N.Y. July 11, 2011) ("[E]vidence relating to Wilson's use of a false name to avoid arrest is admissible to prove not only the false statement charge, but also her fraudulent intent with respect to the access device fraud counts because it constitutes evidence of consciousness of guilt."); United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) ("We have upheld the admission of various kinds of evidence on the ground that it demonstrated consciousness of guilt.").

         The case for severance here is thus weak because proof of the false statement is evidence of the embezzlement schemes, and the embezzlement schemes constitute proof of the false statement.  See United States v. Reynolds, 503 F. Supp. 56, 59 (D. Ohio 1980) ("On the one hand, the accumulated evidence of defendant's HUD activities tends to establish a motive for the counts of obstructing justice, and on the other the evidence of obstruction tends to establish guilty consciousness of the HUD offenses.").  This would mean a duplication of proof at separate trials if the counts were severed.  See United States v. McGrath, 558 F.2d 1102 (2d Cir. 1977) (joinder of extortion and tax

charges proper because the evidence presented in support

extortion charges would "largely overlap" with that used to prove

tax charges).

In addition, both the embezzlement schemes and the

false statement involve similar participants (Soundview, HRSA and

ESPADA), take place at the same time (2009), and at their core

involve ESPADA's relationship with money provided to Soundview by

the federal government.  A jury hearing both charges would

clearly understand the relevance of the evidence at issue and,

having familiarity with the participants and institutions, would

not wonder what one charge had to do with the other.  Simply put,

"a reasonable person would easily recognize the common factual

elements that permit joinder."  <u>United States v. Feyrer</u>, 333 F.3d

110, 114 (2d Cir. 2003).

> ii.  Counts Ten Through Fourteen (The CEDC-Related Tax
>       Charges) Should Not Be Severed from Counts One
>       <u>Through Seven</u>

>> a)  The CEDC-Scheme Constitutes a Violation of 18
>>      U.S.C.§ 666

The defendants argue that the CEDC Scheme is cut from

wholly different cloth than the other embezzlement schemes

because CEDC was its own corporate entity.  Def. Mem. at 17-18.

As a corporate subsidiary separate and distinct from Soundview,

they posit, theft from CEDC is not the same as theft from

Soundview, and in fact, does not even constitute the crime of 18

U.S.C. § 666, because unlike Soundview, CEDC did not receive

federal funds.  Def. Mem. at 17-19.  Thus, they conclude, the
CEDC-related fraud is not a fraud on Soundview, constitutes a
separate scheme from the others alleged in the indictment, and
should not be tried alongside offenses alleging theft from
Soundview.  Id.  In light of these differences, the defendants
ask the Court not only to sever the tax charges related to CEDC
from the indictment, but to remove *all* language concerning CEDC
from the indictment, even that which pertains to the defendants'
underlying schemes.  Id.

These arguments are without merit, ignore ample case
law and constitute a thinly-veiled attempt to remove the most
damning evidence of the defendants' crimes from the jury's view.[6]
Not only was the CEDC Scheme a clear violation of Section 666,
but the defendants' actions with respect to the CEDC-tax returns

---

[6] Without explicitly saying so, the defendants are requesting
that the Court extinguish a central part of the government's case
in alleging that the CEDC Scheme does not constitute a crime and
asking that any reference to it be stricken from the indictment.
Def. Mem. at 19.  This goes beyond a mere request for severance
and is far more akin to a motion to dismiss a count of an
indictment.  As a result, the government should not be limited to
defending the inclusion of the CEDC scheme in the indictment by
reference to language in the indictment alone.  See United States
v. Hogan. 2009 WL 3817006 at * 3 (S.D.N.Y. Nov. 12, 2009) ("On a
motion to dismiss an indictment the Court must take the
allegations of the indictment as true, including facts amplified
by a government affidavit.").  While the government will limit
itself to referencing the language of the indictment when arguing
why the CEDC-related tax counts should not be severed from the
indictment, that is a different argument entirely from whether
one of the main embezzlement schemes at issue constitutes a
violation of Section 666.

33

constitute proof of their knowledge that their treatment of CEDC's funds was improper.

At trial, the government will demonstrate that every dollar in CEDC's bank accounts was a dollar that either Soundview or one of Soundview's subtenants provided to it. CEDC did not have outside clients and did not clean facilities that were outside of the Soundview Healthcare Network. To say that it had its own funds, independent of Soundview, is a fiction, since it was dependent on Soundview for *all* of its funds. In order to obtain these funds for themselves, the defendants orchestrated the CEDC Scheme, where they used CEDC as a conduit to funnel money out of Soundview and into their pockets.

The government will prove that CEDC was a sham entity that the defendants put in place so that they would have access to Soundview's funds to which they were not otherwise entitled. Soundview paid CEDC well in excess of what it cost CEDC to run its business. Having no business outside of Soundview, there was no reason for CEDC to have generated a profit other than as a means for the defendants to funnel as much as they could out of Soundview and into CEDC, which they exclusively controlled. Once money was funneled into CEDC's bank accounts, the defendants spent from them freely on things such as lavish gifts and luxury automobiles, or, simply withdrew thousands of dollars at a time.[7]

---

[7] Indeed, it is worth noting that since CEDC was Soundview's subsidiary, there <u>could</u> be no purpose in it making a profit since

34

The defendants concealed this activity from Soundview employees
by exclusively controlling CEDC's bank accounts and financial
records.

At bottom, such a crime is no different than if they
had simply taken Soundview's money out of its bank account
without authorization.  While the means they used to achieve the
theft involved a subsidiary corporation, it is nevertheless a
classic violation of 18 U.S.C. § 666, for an insider with access
to federal funds to take advantage of such access to funnel those
funds to himself.  This case does not present a novel issue.
There are numerous examples of cases under 18 U.S.C. § 666 where
insiders have used shell corporations to funnel money to
themselves and away from the entity receiving federal funds.  See
Abreu v. United States, 2010 WL 2483993, at *3 (S.D.N.Y. June 15,
2010) (In motion for relief pursuant to 18 U.S.C. § 2255,
defendant employee of New York City Office of the Chief Medical
Examiner ("OCME") challenged sentencing enhancement for
committing 18 U.S.C. § 666 through sophisticated means, after she
and her supervisor, on behalf of the OCME, contracted with
companies they and other co-conspirators owned and that performed
no work or that over-billed OCME.  Defendant and her supervisor
then withdrew money from these corporations and used the money

_____

all its profits, by law, inured to Soundview.  This money, of
course, was required to go to Soundview's not-for-profit mission.

for their personal benefit.[8]); See also United States v. Young,
266 F.3d 468, 471 (6th Cir. 2005) (upholding Section 666
conviction of city manager who set-up shell corporations, billed
city for non-existent work performed by those corporations, and
then withdrew funds from bank account of corporations and
deposited them into his personal bank account); United States v.
Sanderson, 966 F.2d 184, 186 (6th Cir. 1992) (upholding Section
666 conviction of defendant sheriff whose department contracted
with defendant's private contracting company where defendant
billed department for supplies defendant used on his private
projects and used department employees, while on duty, to work on
defendant's private construction projects).

These cases fully comport with the Supreme Court's
"expansive view" of 18 U.S.C. § 666, "both as to the [conduct]
forbidden and the entities covered." United States v. Salinas,
522 U.S. 52, 56 (1997) (emphasis added). See also Fischer v.
United States, 529 U.S. 667, 681-82 (2000) (applying Section 666
to municipal hospital authority that received Medicare payments,
stating, "the Government has a legitimate and significant
interest in prohibiting financial fraud or acts of bribery being
perpetrated upon Medicare providers.  Fraudulent acts threaten
the program's integrity.  They raise the risk participating

---

[8] See City of New York v. Venkataram, 2009 WL 1938984 at *3
(S.D.N.Y. July 7, 2009) (providing additional facts concerning
the OCME embezzlement scheme).

organizations will lack the resources requisite to provide the level and quality of care envisioned by the program."). As in Fischer, there exists "a legitimate and significant interest in prohibiting financial fraud" at grantee health centers like Soundview, and courts should look to protect both the integrity of the federal program at issue and recipients of federal funding.[9] Because the CEDC Scheme targeted and converted

---

[9] The defendants' reliance on United States v. Bennett, 621 F.3d 1131, 1136 (9th Cir. 2010) for the proposition that one cannot steal from a parent corporation by stealing from its subsidiary is unavailing. First, that case did not concern 18 U.S.C. § 666 or involve an insider of a charity using a subsidiary as a conduit to siphon money from the charity. Second, courts in the Second Circuit have ruled that one can defraud a parent corporation by defrauding its subsidiary. See United States v. Mavashev, 2009 WL 4746301 at * 4 (E.D.N.Y. Dec. 7, 2009) (rejecting defendant's motion for dismissal of indictment charging bank and wire fraud, stating "[the] defendant has defrauded several federally-insured banks through their wholly-owned subsidiaries."); United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (Upholding wire fraud conviction, stating "[t]he evidence presented to the jury was sufficient to allow it to conclude that, by defrauding the wholly-owned subsidiary . . . [the defendant] did affect the [parent corporation]."). United States v. Cartwright, 632 F.2d 1290, 1292 (5th Cir 1980), is instructive. There, the defendant siphoned funds from a savings and loan institution to a wholly-owned subsidiary that he controlled and used the funds of the subsidiary for his personal use. The Court upheld his conviction for defrauding the savings and loan institution and rejected his argument that the property of the subsidiary was the not the property of the parent, stating "it is perhaps true that under principles of corporations law the assets of a wholly-owned subsidiary do not "belong" to the sole shareholder in a legal sense. That, however, is merely a byproduct of the corporate fiction, a fiction readily abandoned when used to defeat public convenience, justify wrong, protect fraud, or defend crime." Id. Similarly, in a case such as this, where a subsidiary was used as a vehicle for embezzlement, the Court is in no way bound by corporate law doctrines torn from context that have not previously been applied in similar scenarios.

Soundview's funds, it falls well within § 666's ambit and
constitutes a violation of that statute.

> b)   The CEDC-Related Tax Counts Should Not be
>      Severed

Given that the CEDC Scheme is included as one of the
underlying embezzlement schemes, the defendants' fraud with
respect to the CEDC corporate tax returns is inextricably
intertwined with that scheme.  Here, the tax and non-tax offenses
are two sides of the same coin — the crime and the cover up —
and, as such, both frauds "[arose] out of a common plan or
scheme." Attanasio, 870 F.2d at 815. ]

In order to hide their improper usage of CEDC funds,
the defendants disguised the nature of their CEDC expenditures as
legitimate business expenses.  This concealment ensured that an
outsider reviewing CEDC's books and records would be blind to the
fact that the defendants spent CEDC's funds on themselves and
family members.  While the direct result of the defendants' phony
explanations of these expenditures was that they were improperly
deducted as business expenses on CEDC tax returns, the indirect,
and arguably more beneficial result, was the concealment of the
improper usage of CEDC's funds.  See United States v. Butler,
2004 WL 2274751 at *3 (S.D.N.Y. Oct. 7, 2004) (rejecting
severance motion, stating "[w]hile the commission of the offense
and the subsequent cover-up are distinct offenses, they form an

integrally connected whole as a series of acts or transactions having a logical relationship.").

Further, proof of the defendants' tax fraud establishes the defendants' consciousness of guilt with respect to the CEDC Scheme.  At trial, the government must prove that the defendants *knowingly* and *intentionally* converted Soundview's property.  See 18 U.S.C. § 666(a)(1)(A) ("Whoever . . . being an agent of an organization . . . knowingly converts to the use of any person other than the rightful owner or intentionally misapplies property [commits a federal offense]").  The defendants' gross mischaracterizations of their CEDC expenditures provide the government with direct and compelling evidence of the defendants' knowledge that their use of CEDC funds was improper.  It will be difficult for the defense to argue that the defendants thought they were entitled to spend CEDC's money when they told CEDC's accountants that the check they paid to a woman to videotape a family members's birthday party was a legitimate consulting expense. (Ind. ¶ 40(f)).  Thus, the CEDC-related tax counts should not be severed because the very acts that constitute those crimes would be introduced into evidence regardless as proof of the defendants' consciousness of guilty with respect to the CEDC Scheme.  See Hatfield, 685 F. Supp. 2d at 324 ("If, as the Defendants claim, they were legally entitled to all the

compensation they received . . . they would have reported this
compensation as income to the IRS").

Moreover, considerations of judicial economy militate
against severance of the CEDC-related tax counts.  The
accountants to whom the defendants lied about the nature of the
CEDC expenditures would necessarily be called to testify at a
trial concerning the misuse of CEDC funds.  In addition, a large
number of witnesses that will testify at a trial concerning the
CEDC Scheme would also be called to testify at a trial solely
concerning the defendants' tax crimes.  At trial, the government
intends to call numerous witnesses who received CEDC checks to
testify about the personal nature of the expenditures at issue.
Were there to be a trial solely concerning the tax counts, those
same witnesses would still need to testify in order to prove that
the business deductions the defendants took were in fact personal
in nature and therefore phony.  In light of this unity of
evidence, a severance would result in wasted judicial resources.
See United States v. McGrath, 558 F.2d 1102 (2d Cir. 1977)
(joinder of extortion and tax charges proper because the evidence
presented in support extortion charges would "largely overlap"
with that used to prove tax charges); United States v. Ferrarini,
9 F.Supp2d. 284, 291-2 (S.D.N.Y. 1998) (finding joinder of
securities fraud and false statement charges, stating "[e]ven if
the false statement charges were severed, the statements

themselves would be admissible at the conspiracy trial as admissions of the defendants.").

In sum, the Court should not sever the CEDC-related tax counts because the defendants' tax fraud arose out of a common plan or scheme with the CEDC Scheme, provides damning evidence of the defendants' consciousness of guilt with respect to that scheme, and the evidence used to prove the underlying embezzlement and the tax fraud largely overlaps.

iii) Counts 15 Through 18 (ESPADA's Personal Tax Returns) Should Not be Severed from Counts One Through Seven

It is settled law in the Second Circuit that where a defendant profits from an illegal act, his failure to report its proceeds is properly tried alongside the substantive offenses. Turoff, 853 F.2d at 1043 ("The most direct link possible between non-tax crimes and tax fraud is that funds derived from non-tax violations are or produce the unreported income").  Moreover, as the Second Circuit instructed in McGrath, tax and non-tax charges are properly joined as long as a portion of the unreported income arises out of the conduct charged elsewhere in the indictment. 588 F.2d at 1106.  See also Biaggi, 705 F. Supp. at 856 ("Even if income alleged unreported in a tax count derives from a wide variety of sources, the tax count deals with all unreported income for a single year.") (emphasis in original).  Because ESPADA failed to report the income he embezzled, joinder of the

counts concerning ESPADA's personal tax returns and those
directly concerning his embezzlement is appropriate.[10]

   The defendants argue, however, that the majority of the
tax fraud at issue has "nothing to do with the theft from and
fraud on Soundview alleged in Counts One through Seven.[11]"  Def.
Mem. at 22.  They posit that language in United States v. Biaggi
suggests that tax charges unrelated to the underlying substantive
crimes may not predominate a tax case such that they dwarf in
scope those acts of tax fraud that are so related.  Def. Mem.
n.3.  Contrary to the defendants' assertions, dictum in Biaggi

---

[10] The CEDC-related tax fraud charges and those concerning
ESPADA's personal returns are also inextricably intertwined.
This is because the false business expenses indicated on the CEDC
corporate tax returns should have instead been declared as income
by ESPADA on his personal tax returns for the corresponding
years.  Thus, a given CEDC expenditure, wrongfully classified,
impacts the validity of both corporate and personal tax returns.
Viewed this way, the same evidence demonstrating tax fraud with
respect to the corporate tax returns will also demonstrate fraud
with respect to the personal tax returns.  The charges are two
side of the same coin.

[11] The defendants also argue that "there is no allegation in the
indictment that the money that Espada allegedly failed to report
was money that he stole . . . as alleged in Counts One through
Seven." Def Mem. at 20.  That is no so.  Count Ten, alleging a
Klein Conspiracy, specifically states that the defendants' failed
to report the income they generated from CEDC on their "personal
tax returns." (Ind. ¶ 40).  Thus, the indictment makes clear that
ESPADA's personal tax charges are directly related to the schemes
charged in Counts One through Seven.  Moreover, the fact that the
tax years at issue, 2005 - 2008 (ESPADA did not file a 2009
return), track the years during which the embezzlement schemes
took place also allows one to readily infer that the tax charges
and the embezzlement schemes are intimately related.

does not cast doubt on the application of McGrath to the matter
at hand.  See 909 F.2d at 676.

Like McGrath, Biaggi dealt with the propriety of
joining tax and non-tax charges where the defendant's alleged tax
evasion encompassed multiple sources of income.  After affirming
the holding in McGrath, the Court went on to suggest that it
might be a "different case" if joinder were sought where the
income derived from the non-tax charges played only a small part
in the charged tax offenses.  Id.  The Court quickly qualified
its statement, however, stating that "where, as here, the
[charged offenses are] central to the trial and income from
[them] forms the core of the tax count," severance cannot be
justified.  Id.; cf. United States v. Emond, 935 F.2d 1511 (7th
Cir. 1991) (severance of tax and non-tax charges is appropriate
only if "the income derived from the acts charged in the non-tax
counts plays . . . a very small part in the tax charges, or where
the evidence presented on the tax counts is insignificant
compared to the evidence presented on the non-tax charges."); see
also United States v. Anderson, 809 F.2d 1281 (7th Cir. 1987)
(denying severance of tax and non-tax charges despite the fact
that the non-tax violations were only one of three sources of
income underlying the tax count); United States v. Delle Donna,
552 F. Supp. 2d 475 (D.N.J. 2008) (denying severance of tax and

non-tax charges where other sources of income purportedly "dwarf[ed]" the money earned from non-tax offenses).

This case is readily distinguishable from the hypothetical situation posed in Biaggi. ESPADA failed to report the income he embezzled in all four personal tax returns at issue, and, the 2006 and 2007 tax returns are *only* fraudulent because of his failure to report such income.[12]  As the indictment explicitly mentions, ESPADA embezzled over $300,000. His failure to report this amount of income cannot be considered de minimis.  (Ind. ¶ 33).

While ESPADA's failure to accurately report the gain from the sale of a rental property in 2005 is unrelated to the underlying charges, this is a small island in a sea of embezzlement-related tax fraud.  This is hardly evidence of "bootstrapping," and it cannot seriously be argued that the government brought tax charges pertaining to the years 2006, 2007 and 2008 just to be able to introduce evidence relating to the improper reporting of the sale of a home in 2005.  Rather, the government's tax case represents a classic example, contemplated

---

[12] The defense notes that the government provided the defense with discovery suggesting that ESPADA's failure to "report as income the monetary value of a donation of vacation time he made to other employees at Soundview" was one of the tax crimes at issue.  Def. Mem at n.3.  The government will not allege at trial that such a failure was evidence of tax fraud and will not argue to the jury that this act makes the tax return at issue fraudulent.

in McGrath, of the government bringing core tax charges related to the underlying crimes at issue, but that also contain a relatively small amount of additional tax fraud that the government has no choice but to address because it pertains to a tax return already at issue in the case.[13]

Counts 15 through 18 should also not be severed because, much like the misstatements on CEDC's corporate tax returns, ESPADA's personal income tax fraud establishes his consciousness of guilt with respect to his embezzlement.  If ESPADA "were legally entitled to all the compensation [he] received[,] [he] would have reported this compensation as income to the IRS.  The fact that [he] allegedly did not demonstrates the [defendant's] consciousness of guilt."  Hatfield, 685 F. Supp. 2d at 324.  This evidence is also plainly admissible to

_____

[13] The defense cites various percentages of the amount of tax loss that the fraud-related tax crimes comprise each year to demonstrate that the ratio of tax loss for the "other" tax crimes exceeds the amount for the fraud-related tax crimes.  Def. Mem. at 22.  First, the percentages the defendants assert are unreliable, because they do not account for the amount of unreported income from the CEDC Scheme and they take into consideration ESPADA's failure to report his donation of vacation time, which the government is not alleging constitutes an act of tax fraud.  At any rate, reference to the amount of tax loss is unhelpful on its own because it distorts the picture of what will be central at trial.  While ESPADA's failure to accurately report the sale of his rental property constitutes a relatively large amount of tax loss, it is but a fraction of the government's tax case, pertaining to only one of the tax returns at issue.  The failure to report the instances of embezzlement, on the other hand, is covered in all of the personal tax returns at issue, will be relevant to the testimony of each of the accountants who prepared the four tax returns, and will thus constitute the core of the tax case.

establish that ESPADA acted knowingly and willfully when he diverted Soundview funds, meriting the joinder of tax and non-tax offenses. See Shellef, 507 F.3d at 98.

Further, proof of the tax fraud related to ESPADA's personal returns and the non-tax offenses rest on the same evidence.  For example, to prove the Soundview AMEX Card Scheme, the Government intends to elicit the testimony of vendors who received payment for their services via the Soundview AMEX card and Soundview employees who will testify that ESPADA was required to reimburse the company for any personal charges he incurred on the card.  Each of these witnesses would also testify at a trial solely concerning the tax charges to demonstrate that the expenditures at issue were personal in nature, not reimbursed, and therefore income to ESPADA.  Severing the charges would force these witnesses to testify in two proceedings, undermining the kind of efficiency joinder is intended to foster.

### iv)   The Trial Will Not be Too Complex or Unwieldy

In a thinly-veiled effort to scare the Court into severing the indictment, the defendants repeatedly assert that a trial on the indictment in its current form would be too long, unwieldy and "raise complex issues of accounting and tax treatment" too difficult for the Court to handle.  See e.g. Def. Memo at 3, 7, 16, n.3.).  The effort is but a smokescreen.  The government has stated to the Court that it will try its case in

three to four weeks and that remains true.  More important, the
defendants' concerns are misplaced.  Because of the overlap in
witnesses and evidence between the embezzlement-related counts
and those counts the defendants want severed, granting the
defendants' motion would exacerbate the problem of which they
complain.  Indeed, such severance would treat the Court to two
nearly identical three to four week trials, with the only notable
differences being the identity of the jurors and the number of
counts on the verdict sheet.

II.

JOINDER IS PROPER UNDER RULE 14 AS GAUTIER ESPADA IS NOT
SUBSTANTIALLY PREJUDICED

       In the event the Court finds that joinder is
appropriate under Rule 8, GAUTIER ESPADA moves in the alternative
for severance of Counts Eight and Nine and Fifteen through
Eighteen from the indictment pursuant to Rule 14 of the Federal
Rules of Criminal Procedure.  Def. Mem. at 23.  Rule 14 permits
the partition of charges "if it appears that a defendant or the
government is prejudiced by a joinder of offenses." Fed. R. Crim.
P. 14(a); United States v. Feyrer, 333 F.3d 110, 114 (2d Cir.
2003).  GAUTIER ESPADA alleges that the joinder of the charges at
issue prejudices him because he played no role in the acts
referenced by those counts and their inclusion at his trial will
unfairly increase his perceived culpability.  This claim is
insufficient to mount a challenge pursuant to Rule 14.

A.   Applicable Law

A district court may only grant a request for severance under Rule 14 if it appears that the joinder of offenses would result in "substantial prejudice" to the defendant. United States v. Stewart, 433 F.2d 273, 314-15 (2d Cir. 2006).  Substantial prejudice exists only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Feyrer, 333 F.3d at 114 (quoting Zafiro v. United States, 506 U.S. 534, 549 (1993)).  "Such motions are rarely granted.  The interests of efficiency and consistency of outcome generally favor joint trials of defendants indicted together. . . . A severance is only appropriate where joinder would cause prejudice so severe as to risk denial of a constitutionally fair trial." United States v. Butler, 2004 WL 2274751 at *3.   Concerns about "spillover bias" resulting from joinder are therefore best addressed through limiting instructions.  Feyrer, 333 F.3d at 114 (quoting Zafiro, 506 U.S. at 539).

Moreover, the "admission of evidence of other crimes committed by co-defendants is usually insufficient to justify severance, and a limiting instruction will generally protect against any potential prejudice.  This is particularly true where the evidence applicable to the co-defendant does not implicate

the defendant who is claiming prejudice." <u>United States v. Catapano</u>, 2008 WL 2222013 at *22 (E.D.N.Y. May 22, 2008). Further, "when a co-defendant is charged with a tax-related crime, the risk of unfair prejudice is minimal, because the responsibility for filing the return is clear." <u>Id</u>.

   B.  <u>Application of Law</u>

   GAUTIER ESPADA cannot demonstrate that inclusion of the counts at issue will deprive him of a "constitutionally fair trial."  The Court will make clear to the jury that evidence pertaining to those counts in which he is not charged cannot be considered against him. <u>See</u> <u>Feyrer</u>, 333 F.3d at 114 (even where risk of prejudice is high, "less drastic measures – such as limiting instructions – often suffice as an alternative to granting a Rule 14 severance motion").  Juries are "presumed to be capable of following a judge's instructions in sorting out what evidence bears on the guilt of any single defendant," and GAUTIER ESPADA provides no basis as to why that would not be the case here. <u>United States v. Urso</u>, 369 F. Supp. 2d 254, 269 (E.D.N.Y. 2005).

   Further, the efficiencies the Court would generate by holding only one trial are substantial.  As detailed above, were there to be another trial held on the false statement counts and those related to ESPADA's personal tax return, nearly all of the same evidence admitted at the first trial would have to be

49

admitted in the second.   Without a substantial claim as to why the prejudice he would suffer would be so overwhelming, the Court should reject GAUTIER ESPADA's Rule 14 claim.

CONCLUSION

For the following reasons, the Government respectfully submits that the defendants' motion should be denied.

Dated:      February 13, 2012
            Brooklyn, New York


                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York

                        By:  _____/s/_____
                              Carolyn Pokorny
                              Roger Burlingame
                              Todd Kaminsky
                              Assistant United States Attorneys