```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X


UNITED STATES OF AMERICA

     - against -                              10-CR-985 (S-2)(FB)

PEDRO ESPADA, JR. and
PEDRO GAUTIER ESPADA,

          Defendants.

- - - - - - - - - - - - - - - - -X
```

GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION FOR
<u>RELIEF FROM PROSECUTORIAL MISCONDUCT</u>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

Carolyn Pokorny
Roger Burlingame
Todd Kaminsky
Assistant U.S. Attorneys
(718) 254-7000

Josh Goldfoot
Senior Counsel
Computer Crime & Intellectual Property Section
Criminal Division
United States Department of Justice
(202) 514-1026

PRELIMINARY STATEMENT

The government submits this memorandum in response to the defendants' pre-trial motion, captioned "Motion for Relief From Prosecutorial Misconduct." That motion requests that the Court exercise its supervisory power and hold an evidentiary hearing regarding "how the government conducted the search and seizure in this case and how it has used and continues to use the files and other documents that it illegally seized." (Defendants' Brief ("Def. Br.") at 18). The defendants also ask for an "appropriate remedy," id., such as "to possibly dismiss this case." Id. at 6.

The Court should deny this motion. To prevail, the defendants must show that the government's conduct is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction. The defendants' sole complaint concerns the government's examination of data taken from the Soundview Health Clinic ("Soundview"). The examination of documents cannot possibly rise to the level of outrageous conduct, no matter how egregious. Regardless, the government's examination here was consistent with the law and with the warrant. Because there

is no material disputed issue of fact, a hearing would be inappropriate.

STATEMENT OF FACTS

A.  Search Warrants

FBI agents searched certain offices within Soundview, pursuant to search warrants, as part of a investigation into whether the defendants stole from and defrauded Soundview, a federally-funded, not-for-profit health care provider, in violation of 18 U.S.C. §§ 666, 1341 and 1343.

The search warrants were supported by a detailed affidavit setting forth probable cause that (i) the defendants stole from and defrauded Soundview through a number of criminal schemes, and that they lied to the Internal Revenue Service ("IRS") in order to conceal their theft;[1] and (ii) the areas to be searched contained items, records and information that would constitute evidence, fruits and instrumentalities of these crimes.

The affidavit informed the magistrate judge that much of the evidence on the premises was likely to take the form of computer files, and provided detailed information to the

---

[1] The schemes detailed in the affidavit -- the Amex Scheme, the CEDC Scheme, the Rent Scheme and the Bid Rigging Scheme – were later charged in the indictment and are described therein. See Superseding Indictment (S-2) at ¶¶ 13-23.

3

magistrate judge about computer examinations. Among other things, the affidavit stated that "a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment." (Ex. B to Def. Br. at 27-28).

B.  Off-site Examination

Agents executing the warrants did, in fact, copy and seize computer storage media that was "searched later in a controlled environment." Specifically, agents seized various CD-ROM discs and memory cards, and created mirror images of certain Soundview employee's computers and portions of Soundview's on-site servers.

Following the search, information technology specialists with the Federal Bureau of Investigation and the IRS segregated all data files (e.g., Word files, Excel spreadsheets, PDFs, e-mails) from the executable files (i.e., the files, such as Windows operating system software, that govern the computer's operation) and uploaded the data files onto a computer at the IRS. To preserve the defendants' attorney-client privilege, members of a "taint team" then ran searches on the data files to identify and filter out privileged materials before they were to be provided to the agents and attorneys conducting the

4

investigation. Following this process, and after the initial superseding indictment was returned, in April 2011 information technology specialists who were part of the taint team provided the U.S. Attorney's Office with what they believed to be a database free of privileged documents.[2] From that point until the discovery of a privileged document in the database halted the process in January 2012, the agents and attorneys responsible for investigating and prosecuting this case reviewed the material using word searches.

## ARGUMENT

I. Copying Entire Storage Media and Reviewing Them, As Provided for by the Search Warrants, Was Not Outrageous Government Misconduct in Violation of the Fifth Amendment

      The electronic storage media at Soundview were seized, and subsequently reviewed, completely in compliance with the Constitution. Because the defendants challenge that review under the Fifth Amendment's Due Process Clause they face a very heavy burden of proving that the examination was not just improper, but so outrageous that it offends common notions of fairness and decency. The defendants utterly fail to meet that burden.

---

[2] As detailed in the government's January 25, 2012 letter to the Court, a number of errors resulted in the inclusion of privileged documents in this database.

> A. Even If True, the Defendants' Allegations Would Fail to Constitute Outrageous Government Conduct That Shocks the Conscience

The defendants' motion argues only that the government's off-site examination of the seized data was not just misconduct, but misconduct so outrageous as to effectively deny the defendants due process of law. Such an argument requires a significant demonstration: "To establish a due process violation on this ground, a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" United States v. Al Kassar, 660 F.3d 108, 121 (2d Cir. 2011) (quoting United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997)). "[O]nly Government conduct that 'shocks the conscience' can violate due process." United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999) (quoting United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991)). "This is a 'very heavy' burden in light of our 'well-established deference to the Government's choice of investigatory methods.'" Al Kassar, 660 F.3d at 121 (quoting Rahman, 189 F.3d at 131). "Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." Id. (quoting Schmidt, 105 F.3d at 91).

6

The defendants fall far short of meeting this "very heavy" burden. The defendants identify no crime in which the government was involved, no crime involving coercion or the violation of anyone's person, and no offense to common notions of fairness and decency——let alone an offense that shocks the conscience. Instead, the defendants complain about the procedures used to review computer files.

Even if every assertion, assumption, characterization, and guess in the defendants' motion were true, the worst that could be said of the government's conduct would be that the government examined the wrong computer files. While the defendants argue that the government's actions did not comply with the warrant and with "promises," they make no effort to argue that the resulting misconduct is "outrageous," that it "shocks the conscience," or that "common notions of fairness and decency" would be offended if the prosecution continued. By comparison, the Second Circuit has <u>declined</u> to find outrageous misconduct when government agents or informants were involved in potentially dangerous crimes such as escape attempts, <u>see</u> <u>Schmidt</u>, illegal weapons deals, <u>see</u> <u>Al-Kassar</u>, and lending "direction, technical expertise, and critical resources" to jihadists who had previously bombed the World Trade Center,

7

Rahman, 189 F.3d at 131. Indeed, not one case cited by the defendants, or cited above, held the government's conduct so outrageous as to deny due process; courts "have almost never found such a violation." United States v. Berkovich, 168 F.3d 64, 68-69 (2d Cir. 1999); see United States v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994) (finding only one case since 1976 where a circuit court has sustained an "outrageous conduct" due process claim). In the last (and perhaps only) case where the Supreme Court found outrageous conduct in violation of the Due Process Clause, it did so only in the face of what it called "methods too close to the rack and the screw to permit constitutional differentiation." Rochin v. California, 342 U.S. 165, 172 (1952).

      B.    The Off-Site Examination of Computer Data Taken From Soundview Was Consistent With the Warrant and the Constitution

Normally, when defendants argue the government improperly searched or seized, they argue that search or seizure violated the Fourth Amendment. But the defendants here do not ask the Court to find their Fourth Amendment rights were violated. They cannot because, as they readily concede, they were not aggrieved by an unlawful search or seizure and thus do not have standing. (Def. Br. at 13 n.5) (". . . the defendants

8

do not have standing under Rule 41(g) to request the return. . ."); see Rule 41(g) (limiting the right to move for the return of seized property to "a person aggrieved by an unlawful search and seizure"); United States v. Baxter, 492 F.2d 150, 164 n.12 (9th Cir. 1974)(defendants possessed no standing to challenge seizure under Fourth Amendment because they were not "aggrieved persons" under Rule 41) (citing Alderman v. United States, 394 U.S. 165 (1969)).

     Instead, the defendants attempt to challenge the search by characterizing the government's review of documents as outrageous conduct. The defendants argue that when the government copies an entire computer hard drive and then examines that hard drive for evidence, that subsequent examination must be performed as part of a formal "sorting process" divorced from investigation or trial preparation—that there must be a "government team" that reviews "the seized imaged data to determine what data fell within Attachment A to the search warrant and therefore could be turned over to the government's trial team." (Def. Br. at 9-10). The defendants also argue that the government promised it would follow this procedure. (Id. at 2-4, 6, 10, 11-12, 14).

9

The defendants are wrong. The defendants cite no cases supporting any of those propositions—no cases holding that the review of seized data must be done by a review team isolated from the trial team, and no cases holding that the sorting process and investigation cannot occur at the same time. The defendants cite Guest v. Leis, 255 F.3d 325 (6th Cir. 2001), which held that "[b]ecause of the technical difficulties of conducting a computer search in a suspect's home, the seizure of the computers, including their content, was reasonable in these cases to allow police to locate the offending files." Id. at 331. Contrary to the defendants' characterization of Guest, it did not hold that the same "police" who locate the files may not thereafter participate in investigation. Similarly, while United States v. Heldt, 668 F.2d 1238, 1267 (D.C. Cir. 1982) and United States v. Ochs, 595 F.2d 1247, 1258 (2d Cir. 1979) discuss the procedures for the off-site review of paper files, they nowhere require that off-site review be done by a team isolated from the trial team.

Moreover, the Ninth Circuit's opinion in United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010), does not support the defendants' position. The Comprehensive Drug Testing ("CDT") case involved search warrant

language that, the court held, required that "any seized items not covered by the warrant be first screened and segregated by computer personnel."[3] Id. at 1168.  The district court held that officers failed to comply with that provision; the circuit court held that the government did not preserve the issue for appeal. Id. at 1170.  While the Ninth Circuit criticized what it saw as "an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause," it pointedly did not hold that the government violated the Fourth Amendment, or that warrants must contain a screen-and-segregate requirement.  Id. at 1172; see also United States v. King, 693 F.Supp.2d 1200, 1229-30 (D. Hawaii 2010) (holding that the CDT opinion was not Fourth Amendment law).

     Indeed, courts have repeatedly endorsed the government's copying entire disks and later examining them off-site, and those courts have not criticized using the same officers to perform the review, conduct the investigation, or prepare for trial.  "The federal courts are in agreement that a warrant authorizing the seizure of a defendant's home computer equipment and digital media for a subsequent off-site electronic search is not unreasonable or overbroad, as long as the

---

[3] As detailed below, the warrant here contained no such language.

probable-cause showing in the warrant application and affidavit demonstrate a 'sufficient chance of finding some needles in the computer haystack.'" United States v. Evers, No. 08-5774, --- F.3d ----, 2012 WL 413810, *4 (6th Cir. Feb. 10, 2012) (quoting United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999)).  As for that "subsequent off-site electronic search," the Seventh Circuit explicitly rejected an invitation to require search warrant protocols that would "prevent[] agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown." United States v. Mann, 592 F.3d 779, 785 (7th Cir. 2010).  The Sixth Circuit noted that "the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis." United States v. Richards, 659 F.3d 527, 538 (6th Cir. 2011).  The Fourth Circuit and Tenth Circuit have said the sorting process may be done by generic "officers," making no note of any segregation from the trial team.  See United States v. Williams, 592 F.3d 511, 521 (4th Cir. 2010) ("the warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization");

United States v. Brooks, 427 F.3d 1246, 1251-53 (10th Cir. 2005) (approving "a warrant that authorized officers to search through computer files for particular items specifically related to child pornography"). With so many courts endorsing the search strategy employed here, it is untenable to suggest that the strategy is so "outrageous" as to offend "common notions of fairness and decency." Al Kassar, 660 F.3d at 121.

The defendants' claim that there was "a promise by the government agent that the government would conduct a search later in the isolated environment of a government office" is also completely unsupported and incorrect. (Def. Br. at 3). The defendants point to no oral statement, and no part of the search warrants' supporting affidavit, where such a promise was made. The closest they come is in arguing that "the government explicitly represented that process of sorting out the evidence responsive to the warrant from that which was not could take 'weeks or months.' " (Id. at 12). The "weeks or months" statement in the affidavit, however, was far from a promise that there would be a sorting process isolated from the trial team. Paragraph 42 of the affidavit, which contained the cited phrase, reads in pertinent part:

> 42. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media

13

> often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:
>
> > a.   The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.
>
> > b.   The volume of evidence.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

(Def. Br. at 28-29).

Paragraph 42 did not contain a promise to do anything. It merely advised the magistrate judge of the practical

14

constraints on an officer's ability to conduct an examination of seized data. The possible length of time that the off-site sorting process would take—"weeks or months"—was given to explain why the officer would not be able to conduct that process all by himself and all while occupying the search premises. See United States v. Hill, 459 F.3d 966, 976 (9th Cir. 2006) (requiring an "affidavit giving a reasonable explanation" of why officers must seize entire computers and review them off-site). Nothing in this part of the affidavit— or any other part of it—contained a promise that the sorting process would begin and end before investigation, that the process would be distinct from investigation, or that the same agents who performed the sorting would not also participate in the investigation.

Finally, the defendants attempt to argue that the government's conduct violated recommendations in a Department of Justice manual, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* (3d ed. 2009).[4] That manual also does not recommend that such a process be done by an isolated review team divorced from investigation. In

---

[4] The manual, the relevant section of which was authored by Senior Counsel Josh Goldfoot, who is the co-author of this brief, is available at: http://www.cybercrime.gov/ssmanual/ssmanual2009.pdf.

15

fact, the manual specifically advises, based on case law, that "neither the search warrant application nor the affidavit need contain special restrictions on how agents search for the things described in the warrant." Id. at 80.[5]

II. The Defendants Fail to Demonstrate Grounds for an Evidentiary Hearing

This Court should additionally deny the defendants' request for an evidentiary hearing.

"Under our precedents, 'an evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir. 2008) (quoting United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005)). Writing specifically of outrageous conduct Due Process motions, the Second Circuit held that "[w]here, as here, there are no

---

[5] It should also be noted that even if this were not the case, it is incorrect to say that manual represents Department of Justice policy. As the manual's very first page reads, "The contents of this book provide internal suggestions to Department of Justice attorneys. Nothing in it is intended to create any substantive or procedural rights, privileges, or benefits enforceable in any administrative, civil, or criminal matter by any prospective or actual witnesses or parties. See United States v. Caceres, 440 U.S. 741 (1979)." Id. at i.

16

material facts in dispute related to the alleged government misconduct, no hearing is necessary." United States v. Al Kassar, 660 F.3d 108, 122 (2d Cir. 2011); see also United States v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994).

The defendants' argument is that the government took evidence from Soundview and then reviewed it off-site in a manner that did not include an initial "sorting process" that was distinct in time (and personnel) from investigation. There is no dispute as to any of those facts; thus, there is no factual dispute to resolve with an evidentiary hearing. The dispute between the defendants and the government is not over what happened, but over whether the defendants have been denied their Due Process rights. Evidentiary hearings are unnecessary when the dispute between the parties is purely over the application of law to undisputed facts. See Watson, 404 F.3d at 163 ("In this case, defendant failed to show that he could challenge the search under the Fourth Amendment, even assuming we credited the facts asserted in his counsel's affirmation.").

The defendants make much of the "out of sight" nature of the government's off-site examination of data taken from Soundview, (Def. Br. at 16), arguing that because the sorting process "takes place in the privacy of the government's office,"

17

there "generally would be no witnesses if the government just lied and actually 'seized' and used items that were not responsive to the warrant." (Def. Br. at 5). This is no reason to have a hearing. It will almost always be the case, with any search of a premises, that the defendants will not be able to personally observe every officer's action. When officers search homes, officers are also often out of sight: Residents are often not permitted to roam about, for fear that they may endanger officers or destroy evidence. Thus, the Supreme Court has endorsed the "routine detention of residents of a house while it was being searched for contraband." Michigan v. Summers, 452 U.S. 692, 705 n.21 (1981). The defendants have identified no government assertions in this case which they maintain are lies: To the contrary, the government was forthcoming when it discovered a problem with attorney-client privilege taint team review. Consequently, an evidentiary hearing is unnecessary.

CONCLUSION

For the foregoing reasons, the defendants' motions should be denied, and the Court should not hold an evidentiary hearing.

Dated:     Brooklyn, New York
           February 13, 2012

                          LORETTA E. LYNCH
                          United States Attorney
                          Eastern District of New York


By:     _____/s/_____
       Carolyn Pokorny
       Roger Burlingame
       Todd Kaminsky
       Assistant U.S. Attorneys
       (718) 254-7000

       Josh Goldfoot
       Senior Counsel
       Computer Crime & Intellectual
          Property Section
       Criminal Division
       U.S. Department of Justice
       (202) 514-1026