# HAFETZ NECHELES & ROCCO

ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, N.Y. 10110
TELEPHONE: (212) 997-7595
TELECOPIER: (212) 997-7646
E-MAIL: INFO@HNRLAWOFFICES.COM

February 16, 2012

VIA ECF

Hon. Frederic Block
United States District Court
Brooklyn Federal Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Pedro Espada, Jr. et al.*
              <u>Criminal Docket No. 10-985 (FB)</u>

Dear Judge Block,

      I write in response to the February 7, 2012 letter from the government alleging "several significant conflicts of interest" with respect to my representation of Pedro Espada, Jr., my former representation of Soundview in other matters, and my interactions with Soundview employees who may be witnesses for the government in its case against Mr. Espada. The government requests that this Court: (1) obtain Soundview's consent to my representation of Mr. Espada; (2) appoint independent counsel to advise Mr. Espada with respect to the alleged conflicts; (3) hold *ex parte* hearings to identify the information I learned during joint dense meetings with Norma Ortiz and Ken Brennan and then conduct a *Curcio* hearing on this issue if necessary; and, (4) preclude me and Mr. Gioiella, counsel for Mr. Espada's son, Pedro Gautier Espada, from using any information that I allegedly learned during joint defense meetings when cross-examining those potential witnesses.

      As I set forth in more detail below, this Court should deny each of the government's requests.

      First, Soundview need not consent to my representation of Mr. Espada because my former representation of Soundview in an earlier matter was concurrent with my representation

1

of Mr. Espada in that same matter, and Soundview would know that I gained no confidential information while representing it that was not shared with Mr. Espada.

Second, my former representation of Soundview, which ended over a year ago, does not give rise to a conflict in my current representation of Mr. Espada. Mr. Espada's interests in this case are not adverse to Soundview's, and the government has offered no facts that would suggest to the contrary, only implausible surmise and speculation. Soundview is not a defendant in this case; it has not been charged with wrongdoing and is not suspected of wrongdoing. The notion that, in the circumstances of this case where Soundview is the alleged victim, Mr. Espada could escape conviction by somehow shifting blame to Soundview is nonsensical.

Finally, with respect to the government's claimed "sworn" and "unsworn witness" problems, a *Curcio* hearing is unwarranted because the government has not established, through an adequate proffer of the testimony that it expects to adduce at trial, either that I should be called to testify on Mr. Espada's behalf or that I have real time knowledge of material events that would prohibit me from cross-examining witnesses called at trial.

### A. Soundview's Consent To My Representation of Mr. Espada Is Not Required

I have represented Pedro Espada, Jr. for approximately 13 years. Prior to this commencement of this case, I also represented Soundview in connection with document subpoenas and investigations. In particular, I represented both Mr. Espada and Soundview in 2009 and 2010 with respect to investigations by the New York Attorney General ("NYAG") and the Eastern District of New York. These representations of Soundview were concurrent and in connection with my representation of Mr. Espada in the same matters. On the basis of my former representations of Soundview, the government argues that Soundview must give its consent for me to represent Mr. Espada in this case.

Rule 1.9(a) of the New York Rules of Professional Conduct, "Duties to Former Clients," provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." The government asserts that the matter in which I represented Soundview and the instant criminal case against Mr. Espada are "substantially related" because they concern the same underlying conduct.

But under the law in this Circuit the touchstone of the substantial relationship analysis is not common facts; it is the use of confidences gained from the former client in the course of representing that client in an earlier matter. In *Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977), the Court of Appeals upheld the District Court's decision denying the trustee's motion to disqualify attorneys representing certain corporate parties in a bankruptcy proceeding. The attorneys for the corporate parties had previously jointly represented both the bankrupt and the corporate clients. The Court of Appeals held that in such a case - involving joint representation -

2

the bankrupt necessarily knew that any information that he provided to counsel would be conveyed to counsel's primary clients, the corporations. Therefore, no disqualification was warranted because "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *See also Kapsis v. Independence Party State Committee of the State of New York*, No. 09-cv-1028, 2010 WL 4481452, at *2–3 (E.D.N.Y. Nov. 1, 2010) (applying *Allegaert*); *Simply Fit of North America v. Poyner*, 579 F.Supp.2d 371, 385–86 (E.D.N.Y. 2008) (same); *Ello v. Singh*, No. 05-cv-9625, 2006 WL 2270871, at *5 (S.D.N.Y. Aug. 7, 2006) (same); *Rocchigiani v. World Boxing Counsel*, 82 F.Supp.2d 182, 187–88 (S.D.N.Y. 2000) (same).

In language that applies to the instant case, the Court of Appeals explained that critical to its decision was that counsel for the corporations (Weil Gotshal and Leva Hawes) had continuous and unbroken legal relationships with their primary clients and had never switched from representation of one client to representation of the other:

> Integral to our conclusion that Weil, Gotshal and Leva, Hawes were not positioned to receive information intended to be withheld from DGF is the law firms' continuous and unbroken legal relationship with their primary clients. In contrast with our earlier cases, the attorneys sought to be disqualified here have not changed sides from a former client to a current, adverse client. In Emle, plaintiff's counsel had previously represented a part owner of the defendant corporation in substantially related litigation at a time when he was not plaintiff's counsel: in other words, he was changing from the defendant's side to the plaintiff's. We also found a switchover of representation in NCK. There, house counsel to the plaintiff corporation became personal counsel to the president after both had been terminated. The former house counsel represented the former president in a suit against the corporation on an employment contract which house counsel had prepared for his corporation. And in Hull, a former attorney of Celanese Corporation who had participated in the defense of a Title VII suit switched sides to become an additional client of the plaintiff's attorney in the very same litigation. It was the new client/former attorney who might have received confidences while serving as a defense counsel which we found to infect the plaintiff's counsel. Emle, Hull, and NCK do not control this disqualification motion because at all times Weil, Gotshal and Leva, Hawes represented the Perot interests. Any representation of Walston was done with Walston's knowledge that the firms were still representing the Perot interests and would continue to do so. Weil, Gotshal and Leva, Hawes never changed sides.

565 F.2d at 251.

Just as counsel in *Allegaert* never changed sides, neither have I. I have represented Espada for 13 years. In the Attorney General's investigation and the investigation by the Eastern District of New York, I always represented both Espada and Soundview. Soundview could not reasonably have expected that any confidences it imparted to me in the course of the joint representation would be withheld from Mr. Espada. Under the law in this Circuit, Rule 1.9(a) does not apply in these circumstances and Soundview's consent to my representing Mr. Espada is not necessary.

Even if my joint representation of Mr. Espada and Soundview did not moot the application of Rule 1.9(a) – and it does – the government fails to allege any facts that would establish that Mr. Espada's interests in this case are "materially adverse" to Soundview's interests. In the typical Rule 1.9 challenge, a former client is seeking disqualification of the opposing party's counsel. In those situations, material adversity is clear because the former client and the current client are on opposite sides of the litigation. *See ABA/BNA Lawyers' Manual on Professional Conduct* § 51:220 (2002); *see also Simon's New York Rules of Professional Conduct Annotated* at 420 (2012) (primary test for material adversity is the "v" test – "a lawyer is 'materially adverse' to a former client if the lawyer's current client and the lawyer's former client are on the opposite side of the 'v' in the caption of the case"). Where, as here, the former client is not directly involved in the litigation, the court must undertake a fact-specific inquiry to determine whether the representation of the current client "may result in legal, financial, or other identifiable detriment" to the former client. *ABA/BNA Lawyers' Manual* at § 51:220.

In point of fact, the result in this case will have no adverse effect on Soundview. As an initial matter, if Mr. Espada is acquitted of wrongdoing, and Soundview somehow still feels aggrieved by his conduct, the acquittal would not bar a subsequent civil action by Soundview to redress any wrong. Soundview is not a party to this litigation and, even if it were, the different evidentiary standards between civil and criminal litigation would not bar a subsequent civil claim on *res judicata* or collateral estoppel grounds. The government attempts to ignore these obvious shortfalls in its manufactured claim of material adversity by suggesting that Soundview has a right to be free of the influences of corruption in its operations or even might be able to avoid an obligation to pay Mr. Espada severance if he were convicted of wrongdoing. Once again, if Soundview feels that Mr. Espada is a bad influence or wants to avoid a contractual obligation, it is free to pursue a civil remedy – or not – as it sees fit and the result in this case will have no impact on those remedies or Soundview's ability to pursue those remedies.

In these circumstances, Rule 1.9(a) does not apply and Soundview's consent is not necessary for my representation of Mr. Espada in this case.

### B. My Prior Representation Of Soundview Does Not Give Rise To A Potential Conflict That Could Compromise My Defense Of Mr. Espada; Nor Would I Be Required To Compromise The Confidences Of, Or My Continuing Duty of Loyalty To, Soundview

The government also argues that my continuing duty of loyalty to Soundview may give rise to a conflict of interest that could affect my representation and prejudice Mr. Espada. It relies on *United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994), a narcotics case involving defense attorney Ivan Fisher, to support its claim. But *Levy* is inapposite for a number of reasons. To begin with, Fisher labored under a number of actual, not potential, conflicts of interest that impaired his ability to defend Levy: in addition to representing Levy, Fisher had represented, and continued to represent, Levy's alleged accomplice, who was a fugitive; Fisher himself was under criminal charges by the same prosecutor's office and was under investigation by that office in connection with the flight of Levy's accomplice, both of which created the real and substantial risk that Fisher would compromise his defense of Levy in order to curry favor with the very prosecutors who had charged him with crimes and were investigating his involvement in still other crimes. In these circumstances, the Court of Appeals held that, among other actual conflicts, Fisher's continuing obligations to his former client created a conflict because "Levy's most likely defense was to shift blame" to the other client. *Id.*

The government attempts to apply *Levy* here, arguing that my continuing obligations to Soundview give rise to a conflict because it may be in Mr. Espada's interest to argue at trial that the Soundview Board of Directors approved the acts which the government alleges constitute embezzlement. The government argues that were I to make such an argument on Mr. Espada's behalf, I would be prejudicing the Board of Directors with respect to the NYAG's civil lawsuit, thus acting against the interest of my former client.

The government's analogy to *Levy* is untenable on its face for the simple reason that, although Soundview is my former client, I do not and never have represented the Soundview Board of Directors or any member of the Board of Directors. Were I to make an argument on Mr. Espada's behalf "blaming" the Board of Directors, I would not be accusing a former client of wrongdoing.[1] Even more to the point, unlike the strategy that was eschewed by the conflict-laden defense lawyer in *Levy*, there is no basis for "shifting blame" to another client in this case. Soundview is not Mr. Espada's accomplice or suspected accomplice, it is the alleged victim of Mr. Espada's alleged crimes and a defense by Mr. Espada that Soundview authorized his taking of money would not "blame" Soundview or suggest it was involved in any wrongdoing. Nor would the use of such a defense on Mr. Espada's behalf harm Soundview or its Board of Directors or their respective interests: Mr. Espada's defense is not binding on Soundview. Soundview and its Board of Directors are not parties to this proceeding and could not be bound

---

[1] Furthermore, as set forth above, the Board of Directors itself is not even a defendant in the NYAG civil action; the defendants are the individual members of the Board, none of whom I ever represented.

5

by a general verdict in Mr. Espada's favor from defending themselves in a subsequent litigation on the ground that they did not authorize Mr. Espada's actions. Either Soundview or its Board would be free to defend itself, as it sees fit, in any action brought against it by the Attorney General's Office, or, for that matter, anyone else.

Thus, there is no need for a *Curcio* hearing regarding whether my prior representation of Soundview gives rise to a conflict concerning my representation of Mr. Espada in this case.

### C. The Government Has Failed To Identify A Sworn Or Unsworn Witness Issue

The government asserts that due to my interactions with Soundview employees Philip Valdez, Norma Ortiz, and Ken Brennan, if these individuals were to testify at trial, my conversations with them might put me in a position to be a witness at trial or otherwise limit my ability vigorously to cross-examine them. The government requests that this Court appoint independent counsel to advise Mr. Espada with respect to these potential conflicts, and that the Court then conduct a *Curcio* hearing. Although Mr. Espada does not object to securing the advice of independent counsel on any of these issues, for the reasons I discuss below, following the proscriptions of *Curcio* on the basis of the government's uncertain representations and elliptical allegations is premature and would represent an unnecessary imposition both on the Court's time and Mr. Espada's limited financial resources and constitute a diversion from the final stages of trial preparation as well.

    *(i)*     *Philip Valdez*

There is no advocate-witness issue with respect to Mr. Valdez, because if the government calls Mr. Valdez as a witness, his opinion of whether Soundview acquired CEDC in 2005 - the alleged topic of his conversation with me - would not be admissible at trial. Mr. Valdez did not join Soundview until after 2007. The government alleges that Soundview acquired CEDC in 2005. So, Mr. Valdez has no first-hand information regarding the transaction and any testimony he might offer on direct examination would be inadmissible hearsay or inadmissible opinion evidence.

Mr. Valdez can testify about Soundview's records and what those records show as to whether Soundview owns CEDC, but any conversations I had with him regarding his opinion as to whether Soundview acquired CEDC in the 2005–2007 time period would be inadmissible. For this reason, my cross-examination of Mr. Valdez regarding CEDC necessarily would be limited to the underlying documents concerning the Soundview/CEDC relationship, and would not concern what he said to me in conversations. The evils associated with the unsworn witness proscription described in *United States v. Locasio*, 6 F.3d 924, 934 (2d Cir. 1993), and relied on by the government here, would not implicated.

Nor would I be a prospective sworn witness for Mr. Espada were Mr. Valdez permitted to testify to the matters that he discussed with me. Other people were present during my

6

conversations with Mr. Valdez, so even if I were to cross examine him about our conversations and he were to deny prior statements that he may have made to me, it would not be necessary for me to be available to be called by Mr. Espada as witness as to his statements in those conversations. This situation is no different than the standard practice where prosecutors interview witnesses in the presence of third parties to avoid the advocate-witness problem. *See American Bar Association Standards of Criminal Justice Relating to Prosecution Function*, Standard 3-3.1(g) ("Unless a prosecutor is prepared to forgo impeachment of a witness by the prosecutor's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present the impeaching testimony, a prosecutor should avoid interviewing a prospective witness except in the presence of a third person.").

(ii)  *Norma Ortiz*

The government claims that Ms. Ortiz "presumably" discussed the circumstances of her conviction with me at joint defense meetings. I certainly have no recollection of a joint defense agreement with Ms Ortiz; indeed the government conceded at the February 10, 2012 appearance before the Court that even Ms. Ortiz does not believe that there was a joint defense agreement. More importantly, it is not clear from the government's letter how the circumstances surrounding Ms. Ortiz's conviction have anything to do with the issues in this case or how I could be put in a position where I would be forced to consider testifying on Mr. Espada's behalf. Plainly, on the face of it, Ms. Ortiz's reason for pleading guilty in 2005 is a collateral matter with respect to this case. Even if I had acquired information about the circumstances attending Ms. Ortiz's plea at a joint defense meeting, I would not be able to testify about such a collateral matter, so I could not be a witness for Mr. Espada on the issue.[2]

Thus, the issue of Ms. Ortiz's guilty plea is irrelevant to this case and there is no need for a *Curcio* hearing with respect to Ms. Ortiz.

(iii)  *Ken Brennan*

The government's sworn and unsworn witness claims with respect to Ken Brennan are equally vague and elliptical. Certainly, Mr. Brennan is free to discuss with the government anything he wants and certainly can discuss with the government anything he may have told me in the course of a joint defense meeting. The government, once again, has the wherewithal to describe with particularity the facts that it suggests would result in my compromising a "confidence" or somehow give rise to a sworn or unsworn witness problem, but, for reasons of its own, fails to provide any of those facts to the Court in connection with its current application. Nothing in the government's present submission would suggest that Mr. Brennan disclosed any confidences to me pursuant to a joint defense agreement, assuming there was one, or that would

---

[2] The only reason that Ms. Ortiz's guilty plea might be relevant here is if she were to testify that Mr. Espada coerced her into wrongfully pleading guilty. I do not understand that Ms. Ortiz will so testify, but if the government plans to elicit such testimony, it should say so.

7

HAFETZ NECHELES & ROCCO

prohibit me from vigorously cross examining him at trial or require that I make myself available to Mr. Espada as a potential witness on his behalf.

Even if there was a joint defense agreement and assuming that I had learned material information from Mr. Brennan pursuant to such an agreement, Mr. Brennan has waived his right to protect those confidences by becoming a witness for the government against Mr. Espada absent a specific agreement that the joint defense protections survive his decision to withdraw from the agreement. *See United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 WL 3806300 at *12 (E.D.N.Y. Nov. 13, 2009) ("If . . . a member of a joint defense agreement withdraws from the agreement and takes a litigation position directly adverse to the other members of the agreement, he may forfeit the agreement's protections."); *see also United States v. Almeida*, 341 F. 3d 1318, 1322–23 (11th Cir. 2003) (cooperating defendant waived rights under joint defense agreement by testifying against fellow members of the agreement).

Thus, the government's request that I be precluded from cross-examining Mr. Brennan using information obtained at joint defense meetings is moot. Contrary to the government's suggestion, there is no need for a conference before Your Honor to inquire into the extent of information revealed at my meetings with Mr. Brennan.

\* \* \*

For the foregoing reasons, this Court should deny the government's requests concerning the alleged conflicts of interest.

Respectfully submitted,

s/Susan R. Necheles
Susan R. Necheles

cc: All Counsel (*via ECF*)