

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*

*Brooklyn, New York 11201*

February 17, 2012

The Honorable Frederic Block
United States District Court
Brooklyn Federal Courthouse
225 Cadman Plaza, East
Brooklyn, New York 11201

        Re:   United States v. Espada et al.
              Cr. No. 10-985 (S-1)(FB)

Dear Judge Block:

     The government submits this motion <u>in limine</u> to admit certain evidence at trial of uncharged crimes and other acts committed by the defendants. As set forth below, the evidence is admissible as direct proof of the crimes charged and as "other crimes, wrongs or acts" under Rule 404(b) of the Federal Rules of Evidence.

    A.   <u>Background</u>

     As the Court is aware, the defendants are charged with (i) conspiring to steal and stealing money from the Soundview Healthcare Network ("Soundview"), a federally funded, not-for-profit healthcare facility, (ii) lying to the government in connection with the theft, and (iii) filing false tax returns to cover up the proceeds of the theft.

     For the purposes of this motion, a number of the criminal schemes the defendants used to steal money from Soundview and one of the tax charges merit further review.

    A.   <u>Theft Schemes</u>

    1.   <u>The CEDC Scheme</u>

     Community Expansion Development Corporation ("CEDC") was a for-profit janitorial services company incorporated and owned by the defendant Pedro Espada, Jr. ("Espada"). From approximately 1994 until 2003, Soundview paid CEDC to clean its facilities. In 2003, the Health Resources and Services Administration ("HRSA"), a subagency of the United States Department of Health and Human Services that administered the

federal grant that Soundview received each year, expressed concern about the conflict of interest this arrangement posed for Espada. HRSA told Soundview that if the arrangement was not altered, Soundview would be in jeopardy of losing its federal funding.

Shortly thereafter, Espada "sold" 51% of CEDC to Soundview for $1. Following this transaction, in February 2005, Soundview entered into a new contract with CEDC — this time its subsidiary — to clean its facilities. Approximately one year later, Espada donated his remaining 49-percent interest in CEDC, making the janitorial outfit Soundview's wholly-owned subsidiary. During the period CEDC was Soundview's subsidiary, Soundview paid CEDC more than $900,000 to perform its janitorial services.

Although CEDC was Soundview's subsidiary – meaning that any profits were to accrue to Soundview, not Espada — the defendants nevertheless treated CEDC as a slush fund, liberally using CEDC's money to pay for personal expenditures without approval. For example, the defendants used CEDC checks to pay for lavish parties for family members, to repair the heating and air-conditioning units in Espada's home in Mamaroneck, New York, and to pay rent for Espada's campaign headquarters. In addition, the defendants wrote CEDC checks to themselves, indicating on the checks that the payments were either "consulting" expenses, "gifts" or "loans," among other things. The defendants were able to carry out this fraud on Soundview undetected because they maintained exclusive control over CEDC's finances, including its checks, books and financial records. Between 2005 and 2008, the defendant looted more than $150,000 from Soundview in this manner.

2. The Rent Payment Scheme

With the aim of diverting additional dollars into CEDC's bank accounts — over which the defendants had exclusive control — the defendants improperly collected rent from subtenants leasing space inside of Soundview's facilities by instructing subtenants to make their rent checks payable to CEDC. As the leaseholder of these properties and the entity that paid rent to the owners of the properties, Soundview, not CEDC, should have collected these subtenant-rents.

In January 2008, Soundview entered into a maintenance-services contract with Soundview Management Enterprises ("SME"), a for-profit corporation founded and owned by Espada. As they had done with CEDC, in 2008 and 2009, the defendants required subtenants to make monthly payments to SME instead of Soundview.

In total, from 2005 to 2009, the defendants stole more than $200,000 from Soundview in this manner.

### 3. The Bid Rigging Scheme

The indictment alleges that the defendant carried out a scheme to ensure that SME, Espada's private janitorial company, would succeed CEDC, Soundview's wholly owned subsidiary, as the recipient of Soundview's lucrative maintenance contract. Specifically, in or about July 2007, the defendant Pedro Gautier Espada ("Gautier Espada") began soliciting bids for the Soundview maintenance contract from outside vendors. In soliciting the bids, Gautier Espada falsely informed the bidders that (a) more janitors were required to clean Soundview's facilities than actually were required, and (b) Soundview's facilities needed to be cleaned more frequently than actually was required. Based on the false information provided by Gautier Espada, the janitorial service companies competing for the contract submitted bids that were in excess of what they would have been had they known of the true work specifications. SME was then awarded the contract without submitting a bid and set its price slightly lower than that of the cheapest bid.

In awarding the contract to SME, Soundview's Board of Directors (the "Soundview Board" or the "Board") was deceived into thinking that (i) SME submitted a bid, and (ii) SME's price was appropriately set based on bids submitted for the true work specifications. Based on these falsehoods, in December 2007, Soundview's Board voted to award its janitorial contract to SME at the falsely inflated price. Through this scheme SME stole over $100,000 a year from Soundview.

### 4. The AMEX Scheme

The indictment alleges that Espada also stole money from Soundview by using his Soundview American Express card to pay for personal items such as family meals, spa treatments for his wife and family birthday parties, and then claimed that the items were not personal in nature, but business expenses. Espada has claimed in the press that he is entitled to such meals and that they were paid for with "his money."[1]

---

[1] See, e.g., interview of Espada on the April 24, 2010 edition of CBS Eye On New York.

3

B. <u>The CEDC Tax Charges</u>

The defendants are also charged with substantive tax fraud and tax fraud conspiracy relating to their falsification of CEDC's tax returns. As detailed above, the defendants treated CEDC's bank accounts as if they were their own, and used CEDC checks to pay for personal expenditures or to simply generate cash for themselves. When it came time to explain these expenditures to their accountants, the defendants lied and passed the expenditures off as legitimate, deductible expenses made in furtherance of CEDC's maintenance business. As a result, CEDC's corporate tax returns contain a number of false deductions that resulted in CEDC paying less tax than it was required to pay.

The defendants perpetrated this fraud by providing their accountants with false or misleading explanations of the underlying expenses. For example, Espada used CEDC funds to purchase a bank check that he used to rent a vacation villa in Puerto Rico. Because neither the bank statements nor the check itself provided the accountants with any insight into the nature of the expense, they asked for further clarification. In response, the accountants received a photocopy of the cancelled check, next to which Gautier Espada had written "legal fees." As a result, the multi-thousand dollar expense was deducted as a legal expense on the 2004 CEDC tax return.

There are a host of other, similar examples, including several where Espada lied to his accountants about the nature of CEDC's expenses. One example involves a birthday party held for an Espada family member that Espada paid for with CEDC funds. Specifically, Espada used a CEDC check to, among other things, pay a woman to videotape the party. When the accountants inquired into the nature of the expense so that they could determine whether it was deductible, they received a photocopy of the cancelled check, next to which Espada had written "consultant service."

II. <u>The Evidence Sought to Be Offered</u>

A. <u>Witness Tampering</u>

1. <u>Facts</u>

The government expects that a former Soundview Board member ("Board Member #1") will testify, among other things, about conversations she had with Espada concerning the Bid Rigging and AMEX Schemes. Board Member #1, who will testify

4

pursuant to a non-prosecution agreement, is expected to testify as follows.

Board Member #1 is a young mother who has worked at Soundview the vast majority of her adult life. She currently serves as Soundview's Chief Operating Officer. During a short period in 2007 and 2008 in which she served on the Soundview Board of Directors, the Board approved awarding the janitorial services contract to SME, Espada's private company.

In late 2010, while serving as an employee at Soundview, Board Member #1 received a subpoena to testify before the grand jury investigating this case. Just prior to her appearance, Espada summoned her to meet with him. During the meeting, Espada informed Board Member #1 of the questions he believed she would be asked in the grand jury and of the "correct" answers to those questions. Among the "correct" answers, Espada told her that (i) there were three bidders for the contract that SME won, (ii) SME submitted the cheapest bid, and (iii) Espada received a stipend in his contract with Soundview. Espada also showed her a provision in his contract that he said provided for the stipend.

Board Member #1 felt uncomfortable at the meeting because she believed that Espada — her boss and a respected authority figure in her life — was attempting to influence her grand jury testimony. Shortly thereafter, she appeared before the grand jury and falsely testified that she remembered that the Soundview Board had been told that there were bidders for the Soundview janitorial services contract and that Espada's company, SME, submitted the cheapest bid. Board Member #1 so testified because she felt that she could rely on the information Espada provided her and she wanted to protect him, Soundview and the Soundview Board.

2.  Espada's Statements to Board Member #1 Are Properly Admitted as Direct Evidence of the Bid Rigging and AMEX Schemes

Espada's conversation with Board Member #1 prior to her grand jury testimony is direct evidence of both the Bid Rigging and AMEX Schemes.

Bid Rigging Scheme

First, Espada's statements that Soundview solicited three bids and that SME's bid was the cheapest is evidence that (i) Espada was aware that the bids which form the basis of the

5

Bid Rigging Scheme were, indeed, solicited, (ii) Espada was aware that Soundview needed to bid out the janitorial services — *i.e.*, he cannot claim he was unaware of the requirement to do so as a federally funded clinic — and that the contract was supposed to go to the lowest bidder, and (iii) Espada demonstrated knowledge of his guilt by lying and telling Board Member #1 that SME submitted the cheapest bid when, in fact, no such bid was submitted. For all these reasons, Espada's statements to Board Member #1 are direct, relevant evidence of the crimes charged.

Second, Board Member #1 perceived her exchange with Espada to be an improper attempt by Espada to influence her testimony before the grand jury. Such an attempt is direct evidence of the underlying charges because it demonstrates consciousness of guilt. *E.g.*, <u>United States v. Gordon</u>, 987 F.2d 902, 907 (2d Cir. 1993) ("A defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence. . . . Such circumstantial evidence may include acts that exhibit a consciousness of guilt, such as . . . attempts the influence the testimony of a witness."). Here, where Espada provided Board Member #1 with false information — that his company submitted the cheapest bid — his attempt influence her grand jury testimony is particularly strong evidence of his guilty knowledge concerning that scheme.

### AMEX Scheme

As above, Espada's statement to Board Member #1 that his contract provided for a stipend is direct evidence of the AMEX Scheme. Espada has stated publicly that he was entitled to the meals and other expenses he charged to Soundview, which form the basis of the AMEX Scheme. Such statements are admissible. Contrary to what he informed Board Member #1, his employment contract never provided him with any stipend to cover such expenses. Espada's false exculpatory statement to Board Member #1 is thus strong evidence of his knowledge of guilt.

Espada's false exculpatory statements concerning the stipend are also properly admitted as direct evidence of his attempt to manipulate Board Member #1's testimony, showing consciousness of guilt. Under the cases cited above, such evidence is properly admitted.

>       3.   Even If Espada's Statements Were Not Admissible As
>            Direct Evidence – Which They Are — They Would Be
>            <u>Properly Admitted Pursuant to Rule 404(b)</u>

In addition to being direct evidence of Espada's guilt in the ways outlined above, the evidence concerning Espada's conversation with Board Member #1 would nevertheless be admissible pursuant to Rule 404(b) because it would be highly probative of Espada's knowledge of the criminal schemes with which he is charged. <u>See</u> <u>United States v. Smith</u>, 2010 WL 4746257 at *1 (5th Cir. Nov. 23, 2010) ("Smith's efforts to influence witnesses . . . [was] probative of his consciousness of guilty . . . . Because the evidence was probative of an issues other than Smith's character, it was admissible under Rule 404(b).

>  B.   <u>CEDC 2002 Tax Return</u>

The defendants are charged with falsifying the 2004 and 2005 corporate tax returns of CEDC to conceal their theft from Soundview.  The defendants lied on these tax returns by casting personal expenditures as tax-deductible business expenses.  In 2002, the IRS audited CEDC and penalized it for claiming business expense deductions on its 2002 tax return that CEDC could not justify.  The IRS subsequently alerted Espada to its finding.

The 2002 IRS audit and penalty constitutes important evidence concerning Espada's understanding of corporate tax returns and knowledge of business expense deductions.  Those issues are highly relevant at trial, because knowledge and willfulness are elements of subscribing to a materially false tax return, in violation of 26 U.S.C. § 7206(1).  Therefore, evidence that Espada was previously put on notice as to the IRS rules concerning business expense deductions, as well as the adverse consequences associated with not being able to justify such deductions, are direct evidence of Esapda's knowledge that his actions in this case were not a mistake or the product of negligence.  The 2002 IRS ruling is thus important evidence that Espada acted willfully, in direct and knowing contravention of IRS rules.  The Second Circuit has unequivocally stated that such evidence is admissible pursuant to Rule 404(b).  <u>See</u> <u>United States v. Bok</u>, 156 F.3d 157, 154 (2d Cir. 1998) ("As we have often explained, a defendant's past taxpaying record is admissible to prove willfulness circumstantially."); <u>United States v. Ebner</u>, 782 F.2d 1120, 1126 n.7 (2d Cir. 1986) ("The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years.").  As a result, the IRS's ruling concerning CEDC's 2002 tax return should be admitted into evidence to show that Espada

knew exactly what he was doing when he falsely claimed the business expense deductions at issue.

Further, the 2002 IRS finding speaks to the issue of Espada's knowledge and intent in a different way. The fact that Espada previously attempted to claim businesses expense deductions that the IRS disallowed reveals that the mischaracterization of business expenses was a method that Espada employed to improperly lower CEDC's taxable income. As such, the 2002 IRS penalty constitutes "similar act" evidence and is highly probative of Espada's knowledge and intent with respect to the deductions at issue, as well as the absence of any mistake. See United States v. Turoff, 853 F.2d 1037, 1046 (2d Cir. 1988) (upholding admission of evidence, pursuant to Rule 404(b), of uncharged corporate tax fraud in case concerning defendant's fraud with respect to personal tax returns). "Rule 404(b) authorizes the use of proof of previous crimes to show intent to commit the charged offense. . . . "). Because of the highly probative nature of this evidence, it should be admitted pursuant to Rule 404(b).

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney

By:     /s/
        Carolyn Pokorny
        Roger Burlingame
        Todd Kaminsky
        Assistant U.S. Attorneys
        (718) 254-7000

cc: Defense counsel (by ECF)