

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TK:RB:CP                                    *271 Cadman Plaza East*

*Brooklyn, New York 11201*


September 18, 2012

**To Be Filed Under Seal**

The Honorable Frederic Block
United States District Court
Brooklyn Federal Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Pedro Espada, Jr.
>      Cr. No. 10-985 (S-1)(FB)

Dear Judge Block:

      The government writes to inform Your Honor of certain facts it has recently uncovered suggesting that the defendant Pedro Espada, Jr. has, in recent months, continued to improperly siphon funds from the Soundview Healthcare Network ("Soundview") and play a role in governing its affairs.  While the government will continue to investigate these matters, the evidence developed to date shows that the defendant has violated the conditions of his Pretrial Supervised Release under 18 U.S.C. § 3142©.  Specifically, there is clear and convincing evidence that the defendant has violated a condition of release, to wit: the condition that he not participate in Soundview's affairs. Accordingly, the government moves for the revocation of the defendant's bail and remand, pursuant to 18 U.S.C. § 3148.

I.   **Statement of Facts**

   A.   Background

      Approximately four months ago, on May 14, 2012, the defendant was found guilty, following a jury trial, of four counts of stealing money from Soundview, in violation of 18 U.S.C. § 666.  On June 5, 2012, Your Honor modified the defendant's bail conditions to include a new condition: that he not be involved in Soundview's affairs.

      In early 2012, the defendant's son, Alejandro Espada ("Alejandro"), was named Soundview's Executive Vice President and

took over for the defendant as Soundview's chief executive in the defendant's absence.

B.  The Sale of Soundview

In the past few weeks, the government has learned the following.

In June 2012, Soundview sold its remaining assets to the Institute for Family Health ("IFH"), a nonprofit healthcare network that is working to open a medical clinic at 731 White Plains Road, the location where the now-defunct Soundview formerly treated patients.  According to records that IFH has provided, IFH entered into an agreement with Soundview to purchase Soundview's medical equipment and the right to assume its lease at 731 White Plains Road for $600,000.

Bank and other records show that on June 28, 2012, IFH provided Soundview with a check for $600,000.  That amount represented Soundview's last remaining assets, as its main bank accounts currently show a negative balance.  Immediately thereafter, the defendant and members of his family drained most of the $600,000 from Soundview's account.

C.  The Espada Family Drains Soundview's Last Assets

Bank records show that on June 29, 2012, one day after Soundview deposited the $600,000 from IFH, Alejandro obtained cashier's checks and distributed over $350,000 of that money to the following individuals and entities:

| Individual/Company | Amount |
| --- | --- |
| Soundview Management Enterprises ("SME") | $104,000 |
| Pedro Espada, Jr. | $40,000 |
| Soundview Medical Group | $81,500 |
| Pedro Gautier Espada | $42,045 |
| Alejandro Espada | $38,000 |
| Hafetz, Necheles & Rocco | $50,000 |

The remaining portion of the funds was distributed in much smaller increments to various former Soundview employees.

Notably, Soundview owes at least $2 million to innocent creditors, such as medical supply companies, and approximately $1 million to the Internal Revenue Service in payroll taxes. However, no such creditors received any of the $600,000.

A further explanation of the circumstances surrounding several of the above-mentioned payments are set forth below.

1. $104,000 Check to SME

SME was the defendant's private janitorial company that Soundview paid hundreds of thousands of dollars to clean its facilities from 2008 to 2010 and from which the defendant profited handsomely. At trial, the government presented evidence demonstrating that SME charged Soundview well over $100,000 more than it cost SME to clean Soundview's facilities and pay its employees. Notably, SME's last contract with Soundview ended in 2010. Thus, SME has had no business with Soundview for approximately two years.

After Soundview issued the $104,000 check to SME on June 29, 2012, the defendant took several steps to convert it to cash. First, on July 5, 2012, the defendant withdrew $50,000 in cash from SME's account. Second, on the same day, the defendant used $45,000 from SME's bank account to purchase a cashier's check made out to his wife. Third, the next day, the defendant's wife deposited the cashier's check into her own bank account and withdrew the same amount in cash.

These transactions appear to be designed to accomplish several illicit goals. First, the transactions show that the defendant is seeking to defeat any future forfeiture and restitution orders by preventing the government from attaching assets in a known bank account.[1]

Second, the transactions appear designed to hide the defendant's assets from the Court, Pretrial Services and the Department of Probation, so that these entities are prevented from having an accurate picture of the defendant's finances. Notably, on July 9, 2012 – within days of these transactions – the defendant's CJA-appointed counsel in the Southern District of New York reported, during a status conference before the Hon. William H. Pauley, the U.S. District Judge overseeing the defendant's criminal case in that district, that the defendant

---

[1] At present, records show that the defendant has no more than a few thousand dollars maintained in any single bank account.

was unable to find an attorney whose fee he could afford. At the same court appearance, Judge Pauley ordered the defendant to disclose his finances to Pretrial Services. Notably, when the defendant made financial disclosure to Pretrial Services in the Southern District of New York on July 9, 2012, it appears that he did not disclose that he recently had received this $104,000 check or the cash he generated from it.[2]

Further, the fact that Soundview paid SME ahead of its myriad other creditors reflects the defendant's continuing role in directing Soundview's affairs, in violation of his bail conditions. Of the scores of entities and individuals to whom Soundview owes money, it is no coincidence that years after SME performed any service for Soundview, SME got paid first. In addition, an independent charity divorced from the defendant's influence would not pay a large portion of its remaining assets to the very individual who had just been convicted of stealing from it.

2.   $40,000 Check to Pedro Espada, Jr.

In May 2012, a jury in this District found the defendant guilty of stealing from Soundview in the years 2005, 2006, 2007 and 2008. The government has conservatively estimated, based on the evidence presented at trial, that the defendant stole in excess of $480,000 from Soundview. Logic dictates that the defendant owes money to Soundview, not the other way around. The fact that Soundview issued him a $40,000 check after the jury's verdict, rather than seeking to recoup the money he stole, is further proof that the defendant has been directing Soundview's affairs.

3.   $81,500 Check to Soundview Medical Group

Despite the fact that Alejandro issued the $81,500 check to an entity called "Soundview Medical Group," he deposited it into the bank account of an entity with a different name - Soundview Health Group ("SHG"). According to SHG's incorporation documents, Alejandro created the company in January 2012. This was shortly before the defendant's trial commenced in this district, and near the time when Alejandro ostensibly took control of Soundview.

---

[2] By separate letter, we are bringing these issues to Judge Pauley's attention. A copy of our letter to Judge Pauley is enclosed, and will be filed with Judge Pauley once this letter is unsealed.

4

Alejandro endorsed the $81,500 check and deposited it into SHG's account on August 13, 2012, the same day the account was opened. The government is trying to ascertain whether SHG performed any services for Soundview meriting payment. Several documents that Alejandro provided to the bank when he opened the account reflect that SHG purported to be in the business of providing consulting services. However, it is difficult to comprehend why Alejandro, Soundview's Senior Vice President, would receive remuneration for consulting Soundview.

The payment's legitimacy is further brought into question by the fact that SHG apparently lay dormant from the date Alejandro founded it until the date he opened its bank account and deposited $81,500 of Soundview's money into it. Further, even though Alejandro was responsible both for issuing and endorsing this check, he issued the check to Soundview *Medical* Group but deposited into an account in the name of SHG – Soundview *Health* Group — a fact underlining that Alejandro had little to do with the company. The government is continuing to investigate this transaction.

Notably, the $81,500 check deposited into the SHG account that Alejandro controlled was on top of a $38,000 check that Alejandro caused Soundview to issue to himself.

### 4. The $42,045 Check to Pedro Gautier Espada

This check was issued on June 29, 2012, but Pedro Gautier Espada ("Gautier Espada") did not negotiate it until July 18, 2012. Notably, on July 9, 2012, Gautier Espada swore before the Honorable Judge Pauley to the truth of the attestations contained in a financial affidavit made in furtherance of Gautier Espada's claim that he could not afford to retain an attorney.

### 5. The $50,000 Check to Hafetz, Necheles & Rocco

The $50,000 check to Hafetz, Necheles & Rocco, the law firm that represented the defendant in the above-captioned matter, further shows the defendant's ongoing role in directing Soundview's affairs. While it is not unheard of for a company to pay the legal fees of an employee during the period in which the employee is fighting a criminal case, it is difficult to comprehend why a company — let alone a nonprofit — would continue to pay the legal fees of an employee after the employee was convicted of stealing from it. Yet, that is precisely what happened here. On July 10, 2012, more than six weeks after the defendant's conviction for stealing from Soundview, Soundview issued a $50,000 check to Hafetz, Necheles & Rocco.

5

It is inconceivable that, absent the defendant's continued involvement in Soundview's affairs, the victim of his theft would turn over a significant portion of its final resources to pay the legal fees of the perpetrator of the crime against it.  Indeed, an independent Soundview would not only have refrained from paying these fees, but taken steps to seek reimbursement for the money that it previously paid for the defendant's attorneys.

In sum, it is clear that the defendant directed a payment to his criminal defense lawyer that Soundview had no interest in making and certainly had no interest in making in lieu of payments to other, innocent creditors.[3]

## II. **The Legal Standard**

Title 18, U.S.C., § 3148 provides, in pertinent part that:

> (A) **Available sanctions.**– A person who has been released under section 3142 of this title, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court.
>
> (b) **Revocation of release**. . . . The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer –
>
>    (1) finds that there is –
>       (A) probable cause to believe that the person has committed a Federal, State, or local crime on release; or
>       (B) clear and convincing evidence that the person has violated any other condition of release; and
>    (2) finds that –
>       (A) . . . . there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or

---

[3] In addition, $5,200 of the overall $600,000 went to pay Bienvenido Toribio, one of the bodyguards who escorted the defendant to court on a daily basis during the trial.  That Soundview would pay for this cost is again difficult to explain absent the defendant's guiding hand.

6

```
                    the community; or
               (B)  the person is unlikely to abide by any
                    condition or combination of conditions
                    of release.
```

18 U.S.C. § 3148.

III.   **Argument**

The above transactions show the defendant's role in directing the allocation of Soundview's final $600,000. Sadly, it is unsurprising that of all of the individuals and entities to whom Soundview owes money, the defendant and his immediate family received the majority of Soundview's last funds and apparently did so without having to justify their claims to it. In light of the fact that the defendant himself, his janitorial company, his defense attorney and his bodyguard together received one-third of Soundview's final $600,000, it simply is not reasonable to think that the defendant did not communicate with his son, Alejandro, about how the money was to be allocated.

Further, as noted, not only are the payments highly suspicious because they enured to the defendant's benefit, but also because Soundview would have no reason to want to make such payments in the absence of the defendant's influence. As such, the government submits that there exists "clear and convincing evidence that the [defendant] has violated any other condition of release" (18 U.S.C. § 3148(b)(1)(B)), to wit: the Court's order that he not be involved in Soundview's affairs.

Despite the Court's efforts to keep the defendant away from the charity he victimized, the very person who stole from Soundview has personally pocketed at least $144,000 of Soundview's last remaining funds.

In addition, the defendant's actions show that he is attempting to defeat restitution and forfeiture orders the Court is likely to impose in the future since every dollar the defendant spends now is one that he will not pay back later. As such, the government requests that the Court to play an active role in recouping Soundview's assets and preventing the defendant or his family members from further dissipating Soundview's funds by (1) ordering that the defendant account for the money he recently was paid but which is no longer maintained in bank accounts, and (2) ordering that these funds be held in receivership until such time as the defendant is sentenced and appropriate forfeiture and restitution orders are put in place. The government has also attached to this letter a seizure warrant

7

and affidavit in support thereof for the SHG bank account referenced above, the only account remaining in which Soundview's funds have not been substantially liquidated.

The transactions discussed above also reflect a continuation of the very conduct that the Court observed during the defendant's trial: The defendant taking Soundview's money for his own and his family's benefit.  That this should occur <u>following</u> the jury's verdict is not only galling, but it speaks to the defendant's utter lack of remorse or acceptance of responsibility for his crimes as he awaits sentencing, and of his lack of respect for this Court's bail modification order.

The defendant has demonstrated that he cannot be trusted to follow the Court's rulings, and, as a result, the Court should revoke the defendant's bail and remand him into custody.[4]  Further, the government respectfully submits that the Court move forward with sentencing as expeditiously as possible, and notes that it is perfectly appropriate to sentence the defendant now for his counts of conviction despite the remaining open counts.

## IV. **Conclusion**

Based on the foregoing, the government moves for the revocation of the defendant's bail and remand, pursuant to 18 U.S.C. § 3148.

The Court should also order that the defendant account for the money he was recently paid but which is no longer maintained in bank accounts, and order that these funds be held in receivership until such time as the defendant is sentenced and appropriate forfeiture and restitution orders are put in place. The Court should also sign the attached seizure warrant for the funds held in the account of SHG.  We also ask that the Court proceed to sentencing as expeditiously as possible.

---

[4] It should also be noted that the government has received bank records showing that on July 17, 2012, Connie Espada received a check for $98,708 that was issued by Placer Title Company on July 13, 2012.  This check represented the proceeds of the refinancing of the defendant's home in Mamaroneck, New York.  That home currently secures his bond.  We bring this to the Court's attention because it appears that the defendant's did not reveal to Pretrial on July 9, 2012 that he was in the process of refinancing his home, despite the fact that he reported the mortgage balance of that property.

8

Finally, we ask that the Court keep this letter and the attached seizure warrant and affidavit in support thereof temporarily under seal until such time as the government can serve the warrant on the bank identified therein. Should this letter become public prior to the seizure of the identified funds, such disclosure would risk the dissipation of those funds.

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney

By:     /s/
    Carolyn Pokorny
    Roger Burlingame
    Todd Kaminsky
    Assistant U.S. Attorneys

cc: Defense counsel (by ECF, following unsealing)