

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

JG:CP:TK
F.#2010R00420

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 7, 2013

By ECF and Fax

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Espada, et. al.
          Criminal Docket No. 10 Cr. 985 (FB)

Dear Judge Block:

      The defendant Pedro Espada, Jr. ("Espada"), is scheduled to be sentenced on June 14, 2013. On May 14, 2012, following a six-week trial, a jury found the defendant guilty of four counts of embezzling money from the Soundview Healthcare Network, a not-for-profit institution that received federal funds, in violation of 18 U.S.C. § 666. On October 12, 2012, pursuant to a plea agreement, the defendant pleaded guilty to a superseding information charging him with one count of subscribing to a false and fraudulent tax return for the year 2005, in violation of 26 U.S.C. § 7206(1).

      The Presentence Investigation Report ("PSR") takes into consideration both convictions and yields a Guidelines calculation results in a total adjusted offense level of 32 and a criminal history category of I, with a corresponding range of imprisonment of 121 to 151 months. PSR ¶ 128. The Government respectfully submits that it is prepared to prove a loss amount and the sentencing enhancements referenced in the parties' plea agreement, which estimated Espada's Guidelines range to be 70 to 87 months. As a result, the Government asks that the Court find that Espada's applicable Guidelines sentencing range is 70 to 87 months. The Probation Department recommends a sentence of 84 months' imprisonment. The government submits that a Guidelines sentence is

called for in this case, and that at sentence of at least what Probation recommends - 84 months' imprisonment - is warranted.[1]

Additionally, in the plea agreement Espada agreed that the criminal forfeiture amount with respect to his conviction on the embezzlement charges would be decided by the Court in an amount equal to the amount of the defendant's ill-gotten gains. See Plea Agreement at ¶ 2(g); PSR at ¶ 135. As set forth below, the Court should order Espada to pay forfeiture and restitution, each in the amount of $368,088. Further, the Court should order Espada to pay $118,531 in restitution to the IRS for taxes owed.

## I.   Factual Background

At trial, the government demonstrated that between 2005 and 2009, Espada used his position as the President and Chief Executive Officer of the Soundview Healthcare Network ("Soundview"), a series of federally-funded healthcare clinics located in the Bronx, New York, PSR ¶ 7, to execute a variety of schemes to steal hundreds of thousands of dollars. Further, in order to hide his crimes and keep more of his ill-gotten gains, Espada failed to report the income he earned through these schemes on his personal federal tax returns.

### A.   Soundview

In 1978, Espada founded Soundview as a charitable, not-for-profit organization under § 501(c)(3) of the Internal Revenue Code, and served as its President and Chief Executive Officer during the relevant period of 2005 through 2009. Soundview, whose mission was to provide healthcare services to served low-income patients, received millions of dollars in federal funding through grants administered by the Health Resources and Services Administration ("HRSA"), and also received reimbursement payments from Medicare and Medicaid to cover the cost of the medical services it provided. PSR ¶¶ 8, 11-12.

Notwithstanding the large amount of federal money that Soundview received each year, it often faced financial difficulties and had trouble providing its patients with basic services and proper care. The clinics lacked standard equipment that would normally be found in primary treatment facilities such as x-ray, bone density, and sonogram machines. See Trial transcript from

---

[1] The parties' plea agreement does not prohibit the government from taking a position as to where Espada is sentenced within the Guidelines range determined by the Court.

United States v. Espada, et. al, 10 CR 985 (FB) ("Tr.") at 2718-19, 2923-24, 2938.  The clinics also often ran low on medical supplies such as syringes, and at times Soundview could not pay basic bills such as the phone and alarm system bills, and could not meet its payroll obligations on occasion. See Tr. at 482, 2317, 4235-36. The evidence at trial showed that despite Soundview's dire financial circumstances, Espada nevertheless diverted hundreds of thousands of dollars of its precious funds so that he could enjoy lavish meals, extravagant parties and luxury automobiles, among other things.

      B.     Espada's Theft Schemes

Evidence at trial demonstrated that Espada engaged in a number of schemes that enabled him to steal from Soundview from at least 2005 through 2009.[2]  These schemes included (1) the Rent Scheme, (2) the American Express Scheme, (3) the Miscellaneous Theft Scheme, and (4) the CEDC Scheme.

      1.     The Rent Scheme: Loss of $254,820

Evidence at trial demonstrated that Espada orchestrated an elaborate scheme to divert rental payments from Soundview's subtenants.  Rather than having the subtenants make their monthly rental payments to Soundview — which paid the landlord to occupy Soundview's main building and thus should have collected such payments — Espada demanded that subtenants make those payments to janitorial companies he controlled, Community Expansion Development Corp. ("CEDC") and later Soundview Management Enterprises ("SME"). Espada then withdrew the money from the bank accounts of these companies to purchase luxury items and gifts for himself and his family.

To make these payments appear as something other than a naked theft, Espada sometimes requested that the subtenants indicate on their checks that the payments were "maintenance fees" that they purportedly paid to CEDC and SME to have their spaces cleaned.  However, testimony at trial established that these payments were actually nothing more than rental payments.  First, the subtenants testified that they considered the payments to be

---

[2] The four theft counts for which Espada was convicted pertained to the years 2005 through 2008.  The jury did not return a verdict for the theft count pertaining to 2009.  However, as explained below, the government proved such conduct by a preponderance of evidence and the Court should consider Espada's 2009 conduct when determining the loss amount.

rental payments.  See, e.g., Tr. at 2806.  Second, the monthly "maintenance fees" grossly exceeded any reasonable estimate of janitorial costs for the spaces in question.  See, e.g., Tr. at 2812-13, 2846.  For example, Dinesh Desai, who operated a pharmacy on the first floor of Soundview, testified that Espada required him to pay $2,010 per month to CEDC for "maintenance" and $1,690 per month in rent to Soundview.  Tr. at 2793, 2804.  Desai testified that this arrangement resulted in him paying $132 an hour to clean a space the size of the Court's jury box and to take out the garbage.  See Tr. at 2808, 2815, 2846.  Further, when Desai's payments to both Soundview and CEDC/SME over a period of five years were tallied, Desai actually paid more for maintenance than for rent - an absurd proposition.  See Gx 53.[3]  Third, evidence at trial also showed that subtenants' payments to CEDC and SME were not really to cover maintenance expenses because the janitors employed by those companies had to clean the subtenants' spaces as part of their normal cleaning routine.  Tr. at 3113-17.

The evidence also showed that Espada was directly involved in negotiating the rental arrangements with the subtenants, see, e.g., Tr. at 2722-23, 2794-2800, 4827, and asked Norma Ortiz, his personal assistant, and Maria Cruz, Soundview's Human Resources Director, to collect the payments on a regular basis.  Tr. at 924, 2408-11.

Overall, nine such subtenants testified at trial and a summary agent testified for the government that between 2005 and 2009, $254,820 was diverted from Soundview to the janitorial companies Espada controlled.  PSR ¶¶ 34, 47.  Evidence also demonstrated that Espada then took money from these companies to purchase luxury goods, take vacations and throw parties for family members, among other things.  See, e.g., Gx 20(q), 100(f), 100(c), 115,124, 216,217, 448; Tr. at 2703, 1673-87, 1811-15.  While Espada now wishes the Court to believe that his tenure at Soundview reflects an overall record of achievement notwithstanding the criminal conduct at issue here, this scheme shows that Espada's first priority was not Soundview, but himself.  Given the choice of ensuring that Soundview obtained much-needed funds from subtenants or taking those funds himself, he consistently chose the latter.

2.    The American Express Scheme: Loss of $141,241

Espada also stole from Soundview by using his company credit card to pay for personal expenses and subsequently deceiving Soundview into believing that the expenses were not

_____

[3] "Gx" refers to the government's trial exhibits.

personal in nature.   Espada received a Soundview corporate American Express Card that, according to the terms of his employment contract, he was permitted to use for personal expenses provided that he reimbursed Soundview.   Tr. at 4228-29.   Any charges that Espada did not specifically mark "personal" on the monthly bill were considered legitimate business expenses for which Espada was not requited to reimburse Soundview.   Tr. at 4232.   Espada intentionally failed to identify as personal a large number of expenses that were in fact personal in nature.   He even sometimes affirmatively indicated that an expense was business-related when he knew it was a personal expense.   See, e.g., Gx 15; Tr. at 2703.

Jarringly, evidence revealed that Espada frequently used his Soundview American Express card to pay for lavish meals, often on weekends, at restaurants near his home in Mamaroneck.   Evidence showed that when Espada used the card to pay for such meals, he spared no expense.   For example, Espada spent tens of thousands of dollars on sushi, lobster and shellfish, among other things.   See Tr. at 2396-99, 3481-84, 3496-99, 4237, 4265, 4289, 4289-90, 4306, 4308, 4310, 4311, 3493-94, 4501, 4599, 4949, 4975.   Tellingly, in one instance, Espada spent over $100 on a lobster dinner delivered to his home in Mamaroneck that included an $18 charge to have the shell removed, because, apparently, Espada did not want to endure that burden himself.   Tr. at 3496, 3498.   Overall, between 2005 and 2009, Soundview paid $103,090.71 for Espada's personal meals. See Gx 20(a), attached hereto as Exhibit A.

Espada's preference for using Soundview money to pay for personal luxuries did not stop with expensive meals.   Rather, Espada caused Soundview to pay for spa treatments for family members as well as home improvements to his Mamaroneck home.   For example, Espada charged over $500 on the Soundview American Express card to pay for a spa gift certificate for his wife.   See Gx 15.   When presented with the bill containing this charge, rather than note that the charge was a personal expense, Espada wrote "staff gift certificate" next the entry.   Tr. at 2703. Further, the card was used to pay for new custom window shades, a new front door, paver stones for a front walkway, a new picket fence, a new garage door and a new light post for Espada's home in Mamaroneck, all of which totaled $11,755.99.   Gx 2-7, 20(a); Tr. at 4000-08, 4963-66.

According to evidence introduced at trial, summarized by FBI Special Agent Mark Person, the total amount Espada stole from Soundview through the American Express Scheme was $141,241.94.   Gx 20(a); Tr. at 4983; PSR ¶¶ 22, 47.

6

3.    The Miscellaneous Theft Scheme: Loss of $51,170

The evidence at trial additionally showed that Espada stole from Soundview in a variety of other ways.  For example, Espada submitted restaurant receipts for reimbursement to Soundview's accounting department under the guise that he incurred the expenses while conducting official business.  In fact, many such costs were personal in nature.  These receipts were often compiled in expense reports that Espada signed, which provided false descriptions of the purported business reasons associated with them.  For instance, a Friday evening dinner at a restaurant near his Mamaroneck home was labeled "Cabinet Meeting," when no such meeting took place.[4]  Tr. at 1563.

Espada also used his authority over Soundview's finances to pay for various personal expenses that he passed off as legitimate business expenses.  For example, Espada paid an individual to videotape his acceptance speech after his state senate primary election victory.  Instead of paying for this service with personal or campaign funds, Espada had the individual send the invoice to Soundview.  Tr. at 2377-82.  Other personal expenses encompassed within this scheme included Espada's issuing a $750 Soundview check to pay for his niece's college tuition, Tr. 4296-97, and the diversion of $4,179.50 of Soundview funds to purchase flowers that were displayed at Espada family parties, among other things.  See Gx 20(b); Tr. at 2355, 2363-64, 4966-68, 5183.

According to summary witness Special Agent Mark Person, these miscellaneous thefts from Soundview totaled $51,170.83.  Gx 20(a); Tr. at 4984-88; PSR ¶¶ 32, 35-36, 47.

4.    The CEDC Scheme: Loss of $170,448

Espada used CEDC, his janitorial company, to extract hundreds of thousands of dollars from Soundview that he then spent on extravagant purchases to maintain his lavish lifestyle.  From approximately 1994 until 2003, CEDC was Espada's privately-owned company that Soundview hired to clean its facilities.  PSR ¶ 14.  Rather than simply maintain a janitorial staff so that Soundview

---

[4]  In addition, Espada submitted numerous receipts for reimbursement to which he was not entitled because Espada had paid for the expense with Soundview's American Express card.  This meant that Soundview, not Espada, had incurred the initial cost.  Tr. at 4301-12.  Nevertheless, Espada "double dipped" in this fashion in an amount totaling $6,460.17.  PSR ¶ 36.

would pay no more than it cost to clean its facilities, Espada had Soundview enter into a contract with his own company that allowed him to earn profits of tens of thousands of dollars each year. In 2003, HRSA, the federal agency overseeing Soundview, expressed concern about Soundview's contract with CEDC because of the conflict of interest this arrangement posed and because of the high price associated with it. Gx 293. HRSA told Soundview that if the arrangement was not altered, Soundview would be in jeopardy of losing its federal funding. Id. Shortly thereafter, Soundview cancelled its contract with CEDC and brought CEDC's janitors onto Soundview's payroll. Gx 409.

According to minutes from a meeting of Soundview's Board of Directors, in January 2005, Espada sold 51 percent of CEDC to Soundview for one dollar. Gx 411; Tr. at 5313-14. Following this transaction, Soundview entered into a new contract with CEDC - ostensibly now its subsidiary - to clean its facilities. Gx 403. Espada subsequently stated that Soundview owned CEDC numerous times under penalty of perjury, Gx 206, and he asked an accountant to prepare an amended 2006 personal tax return reflecting the loss of his initial capital investment in CEDC in light of the sale to Soundview. His filed 2007 tax return reflects this loss. Gx 207, 208; Tr. at 3843-44. During the period CEDC was ostensibly Soundview's subsidiary, CEDC earned hundreds of thousands of dollars from its contract with Soundview. Despite telling the Soundview Board, the IRS and others that CEDC belonged to Soundview, Espada continued to spend hundreds of thousands of dollars of CEDC's money for personal expenditures. Since CEDC charged Soundview far more than it cost to provide janitorial services, there was ample capital for Espada to spend. All the while Espada told the Board that CEDC was Soundview's company, he used CEDC checks to pay for lavish parties for family members, a ghostwriter to pen his political memoirs, his niece's school tuition, repairs to the heating and air conditioning units in his Mamaroneck home, and rent for his campaign headquarters, among other things. Gx 105, 109, 110, 121, 123(a)-(c); Tr. at 905-09, 1714-16, 1732, 1752-53, 1777-80, 4831-33.

In sum, Espada told regulators and Soundview's Board of Directors that CEDC was no longer his company in case HRSA had wanted to review the maintenance contract as they had done in 2003. In reality, however, he still maintained control of the company and its profits as he had done previously. His deception allowed him to continue to earn profits from the janitorial contract as he had done prior to HRSA's warning in 2003, without having his name on paper as a beneficiary of the contract.

Toward the conclusion of trial, the Court ruled that Espada never legally transferred ownership of CEDC to Soundview and therefore his use of CEDC funds could not constitute a theft from Soundview.  Tr. at 5483-95.  Following this ruling, the jury was instructed that the use of CEDC funds could not form a basis to find Espada guilty of the substantive theft counts under 18 U.S.C. § 666.  Tr. at 6266-67.  At the same time, the Court ruled that, while Espada may have defrauded Soundview by telling its Board that CEDC was their company when he knew it was not — causing them to enter into a contract with what they believed to be Soundview's subsidiary when, in reality, they were paying Espada — the government did not charge fraud in the indictment and was prohibited from arguing this theory to the jury.  Tr. at 5489-90.  Notwithstanding these rulings, it is important to recognize that, under any theory, Espada took Soundview money to which he was not entitled by using CEDC as a conduit.  Either he stole money from a company he did not own or, if he did own it, he lied about CEDC's ownership to induce the Board into continuing to pay CEDC hundreds of thousands of dollars per year.

Accordingly, the CEDC scheme is "relevant conduct" that the Court should consider in fashioning its sentencing because (1) it was part of Espada's overall goal of stealing from Soundview, (2) the acts occurred during the period of Espada's offense of conviction, and (3) it was intertwined with Espada's various other theft schemes (for example, Espada had subtenants make rent payments to CEDC).  See United States v. Burnett, 968 F.2d 278, 280 (2d Cir. 1992) (Relevant conduct includes "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.").

Evidence produced at trial, summarized by IRS Special Agent Yves Hunziker, demonstrated that the thefts from the CEDC Scheme totaled $170,448.37.  Gx 20(a); Tr. at 4834.  This total should be included in the Court's calculation of Espada's loss amount.

C.    Tax Crimes: Loss of $118,531

Espada lied on his personal tax returns for the years 2005 through 2008 by failing to report the income he earned from CEDC and the money he illegally earned as a result of the other schemes mentioned above.  Evidence at trial showed that both Soundview and Soundview subtenants made regular monthly payments to CEDC.  See, e.g., Gx 20(r)(1), 20(q).  Espada in turn used this money to pay for personal expenditures and he additionally wrote numerous CEDC checks to himself totaling tens of thousands of dollars.  See, e.g., Gx 105, 216, 450; Tr. at 1714-16.  However,

Espada did not report a single dollar of CEDC income on his personal tax returns for the years 2005 through 2008. In addition, through both the American Express and Miscellaneous Thefts Schemes, Espada earned income that he did not report to the IRS.

Espada's 2005 tax return is also fraudulent because Espada falsely claimed that a rental property he sold in the Bronx was his primary residence for which he was entitled to a special deduction for the sale of one's primary home. PSR ¶ 38. In fact, that house was not Espada's primary residence but was a rental property, and thus, he was not entitled to the deduction.

As stated in the PSR, the total tax loss is $118,531. PSR ¶¶ 37, 46, 50 and 68.

D.    Espada's Post-Trial Conduct: Loss of $144,000

Even after Espada had sat through a six-week trial where over sixty witnesses recounted his venal and devious acts, and after having been convicted by a jury of his peers, Espada was not finished taking from Soundview what was not rightfully his. By June 2012, Alejandro Espada, Espada's son, was named the Soundview Executive Vice President. Id. During that month, the Institute for Family Health entered into an agreement to purchase Soundview for $600,000. Id. When Soundview was sold, it owed $2,000,000 to creditors for unpaid medical bills and real goods, and $1,000,000 to the IRS for unpaid payroll taxes. Id.

The day after the money from the sale was deposited, Espada's family members began withdrawing the money. PSR ¶ 42. In particular, Alejandro Espada issued a $40,000 check to Espada and issued a $104,000 check to SME, Espada's for-profit janitorial company. PSR ¶¶ 42-43. In other words, Soundview paid $144,000 to the very person convicted of stealing from it just weeks earlier. Espada subsequently withdrew $50,000 in cash and $45,000 in cashier's checks from the SME account. Espada then failed to disclose these new funds in a report to the Pretrial Services Office for the Southern District of New York when they asked him to state his financial assets. PSR ¶ 44.

Espada's post-trial conduct is galling. Rather than attempt to reimburse Soundview for the money he stole, he operated under the deluded belief that Soundview owed him money. This speaks volumes about Espada's lack of remorse and demonstrates his belief that he did not commit the theft crimes of which he was

10

convicted.[5]  Of course, it is Espada who owes Soundview $368,088 in restitution.  Further, the fact that Soundview paid SME and Espada ahead of its other creditors reflected Espada's continuing role in directing Soundview's affairs.  Of the scores of entities and individuals to whom Soundview owes money, it is no coincidence that years after SME performed any service for Soundview, SME was paid first.  In addition, an independent charity divorced from Espada's influence would not pay a large portion of its remaining assets to the very individual who had just been convicted of stealing from it.  Although this Court ultimately ruled that these payments did not violate Espada's bail conditions, the government has proved Espada's improper taking in this regard by a preponderance of the evidence and it should be considered by the Court.  In fact, when the Court first learned about this conduct, Your Honor observed that it "had an odor to it."  See September 21, 2012 Status Hearing Transcript at 34.

As a result, the $144,000 Espada improperly took should be included in the calculation of his base-offense level.  PSR ¶¶ 44, 47. Further, the conduct clearly demonstrates Espada's lack of remorse.

## II.    Guidelines Calculation

A.    A 14 Level Enhancement is Warranted Because Espada's <u>Theft Resulted in a Loss of Over $400,000</u>

Espada's crimes warrant a 14 level enhancement under § 2b1.1(b)(1)(H)  because  a  "reasonable  estimate"  of  the  loss associated  with  his  crimes  exceeds  $400,000.    See  U.S.S.G.  § 2b1.1, application note 3(c) (Court need only make a reasonable estimate  of  the  loss  amount  based  on  available  information). Indeed, Probation calculates a loss of $765,653. PSR ¶¶ 47, 60.

The  documentation  introduced  at  trial  –  including receipts,  credit  card  statements,  checks,  and  ledgers  –  and  the testimony  supporting  the  documentation,  was  extensive  and summarized in a chart, Government Exhibit 20(a).  Special Agents Person and Hunziker explained the chart by reviewing the documents and testimony that supported the exhibit and confirmed that the dates,  dollar  amounts,  merchants,  and  other  information  were correct.   Tr.  at  4768-69,  4926.   They  then  provided  extensive

---

[5] Espada's  post-trial  conduct  bears  on  the  3553(a)  factors because  it  shows  his  lack  of  remorse.    See  18  U.S.C.  § 3553(a)(2)(A); <u>United States v. Stewart</u>, 686 F.3d 156, 167-70 (2d Cir. 2012); <u>United States v. Martinucci</u>, 561 F.3d 533, 535 (2d Cir. 2009).

testimony explaining how they sifted through the documentation and confirmed each total dollar amount.  Tr at 4767-4841, 4925-88.  For example, Agent Person explained that he included in the loss amount a reimbursement request for a $270.20 meal marked "manager's meeting," because the meal was clearly a personal expense — it took place on a Saturday at 10:17 PM in Rye, New York.  Tr. at 4974.

Specifically, Special Agent Person explained at trial that the top section of Gx 20(a) represented the dollar amounts for food purchases, home improvements, Edible Arrangements, miscellaneous and travel for the years 2005 through 2009.  Tr. at 4983.  These entries represent the thefts from the American Express Scheme and total $141,241.94.  Gx 20(a).  He also explained that the dollar amounts in the section below represent the amount stolen through the Miscellaneous Thefts Scheme and total $51,170.83; Tr. at 4984-88.  Further, Special Agent Hunziker testified that Government Exhibit 20(x) represents the dollar amounts stolen through the Rent Scheme, which totaled $254,820, and that stolen the CEDC Scheme, which totaled $170,448.37.  Gx 20(a); Tr. at 4834.

It should be noted that these totals include transactions that Espada made in 2009, a year for which the jury did not reach a verdict as to whether he had violated 18 U.S.C. § 666.  However, Espada's 2009 transactions should be treated by the Court as relevant conduct and included in the Court's loss calculation, because the government proved the conduct by a preponderance of the evidence.  After all, the American Express, Rent and Miscellaneous Theft Schemes remained materially unchanged in the manner in which Espada carried them out from 2005 through 2009, and there is no reason why his conduct in 2009 was any less blameworthy than it was in the prior years for which his conduct was found by the jury to have been illegal.  In similar cases, sentencing courts have included such conduct — not found by a jury to have been illegal but part-in-parcel with the conduct found to be illegal — in its loss calculation.  See United States v. Burnett, 968 F.2d 278, 280 (2d Cir. 1992) ("Relevant conduct" for purposes of sentencing includes "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction") (internal citation omitted); United States v. Weisberg, 2008 WL 2323376 at * 3 (W.D.N.Y. June 2, 2008) ("The Court also could consider the tax loss for years not charged in the Indictment (here 1995-99) and the year the jury did not reach a verdict upon (2002) as relevant conduct under U.S.S.G.

12

1B1.3(a)(2).").[6]

Thus, the trial evidence, summarized by Agents Person and Hunziker, and as represented in Government Exhibit 20(a), proves by a preponderance of the evidence an actual loss finding of $617,681.14 (plus $144,000 taken after trial, totaling $761,681.14), easily above the $400,000 threshold required under § 2b1.1(b)(1)(H). Thus, 761,681.14, as displayed in the chart below, should be used to calculate Espada's base offense level.

| SCHEME | LOSS |
|---|---|
| Rent | $254,820 |
| AMEX | $141,241.94 |
| Miscellaneous theft, including SME, double-dipping and false invoices | $51,170.83 |
| CEDC | $170,448.37[7] |
| Post-Trial Taking | $144,000 |

B.    Espada's Tax Crimes Resulted in a Loss of Over $80,000

Espada's base offense level for his tax crimes is 16 because a "reasonable estimate" of the tax loss from Espada's fraudulent tax filings in 2005, 2006, 2007 and 2008 exceeds $80,000. See PSR ¶¶ 37, 68; U.S.S.G. § 2T4.1(F). Although Espada only pleaded guilty to filing a fraudulent return in 2005, the returns for all four years are relevant conduct and should be considered for loss calculation. See U.S.S.G. § 2T1.1, application note 2; United States v. Bove, 155 F.3d 44, 46-47 (2d Cir. 1998) (where defendant failed to report personal expenses paid from corporate accounts on his 1992 through 1994 personal returns, the court included unreported income for all three years in determining loss calculation even though defendant only pleaded

---

[6] As Gx 20(a) makes clear, even if the 2009 conduct is not considered, Espada's loss amount is still $711,481.73, well above the $400,000 threshold.

[7] Probation attributes $125,431 in CEDC loss to Espada, because it excludes $44,576 in CEDC checks that his son, Pedro Gautier Espada ("Gautier Espada"), issued for his personal benefit. The government submits that the Gautier Espada checks are properly attributable to Espada's loss calculation, because they were co-conspirators and Espada controlled the CEDC account. However, even using the lower Probation figure does not alter the Guidelines range, restitution or forfeiture.

guilty to filing a false tax return in 1993).

The unreported income that makes up Espada's tax fraud falls into four categories: (1) personal credit card charges from the American Express Scheme; (2) personal expenses from the CEDC Scheme; (3) spending encompassed in the Miscellaneous Theft Scheme; and (4) unreported gains from realty.

Espada's unreported income in his 2005-2008 returns totals $602,481. Special Agent Person testified to the American Express personal charges and miscellaneous thefts, which are summarized in Government Exhibit 20(a); together these thefts total $112,844. IRS Special Agent Hunziker testified about Espada's personal expenses under the CEDC Scheme, which total $125,431.68. Finally, the unreported gains on the sale of business property at 572 Leland Avenue in 2005 was $317,898.

IRS revenue agents, using the provisions of the tax code, calculated the total tax due and owing on Espada's $602,481 of unreported income as $118,531.[8] PSR ¶ 46. Thus, the Government has proven by a preponderance of the evidence that the tax loss from Espada's offense exceeds the $80,000 threshold required under § 2T4.1(F). While Espada's theft convictions drive the base offense level, the $118,531 figure is also important because it represents the amount in taxes owed that the Court should require Espada to repay the IRS, as discussed below.

C.    Espada's Theft from Soundview Warrants a Two Level Sentencing Enhancement Because it Constituted an "Abuse of Trust" Under § 3B1.3 (PSR ¶ 64)

Espada's theft from Soundview warrants a two level sentencing enhancement because he abused a position of public or private trust in a manner that significantly facilitated the commission and concealment of his offense. See PSR ¶ 64; U.S.S.G. § 3B1.3. The defense does not challenge this enhancement.

---

[8]    The tax loss is generally calculated as 28% of the unreported gross income plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made. U.S.S.G. § 2T1.1. The Court need only make a reasonable loss estimate given the available information. U.S.S.G. § 2F1.1, application note 8.

D.    Espada's Theft Warrants a Three Level Enhancement Because He Occupied a Managerial Role (PSR ¶ 65)

Espada's theft from Soundview warrants a three level enhancement because he was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive.  See PSR ¶ 65; U.S.S.G. § 3B1.1.  It appears that the defendant does not challenge this enhancement.  See Def. PSR Obj.  at 15 ("The 4 level enhancement for leadership role under USSG § 3B1.1(a) should not apply . . . . However, we note that the parties did agree to a only a 3 level enhancement under this provision.")[9]

E.    Espada's Offense Warrants a Two Level Enhancement Because He Used "Sophisticated Means" (PSR ¶ 62)

Espada's theft from Soundview warrants a two-level enhancement because the offense involved "sophisticated means." See PSR ¶ 62; U.S.S.G. § 2B1.1(b)(10)(c).  The Sentencing Commission defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

The Rent Scheme alone warrants a "sophisticated means" enhancement under § 2B1.1(10)(c).  Rather than simply telling tenants that they needed to pay him personally if they wished to rent space at Soundview, Espada created an elaborate process, as well as a cover scheme, to divert subtenant payments into his pocket.  First, Espada utilized his two janitorial companies - SME and CEDC - to serve a conduits for the rental payments by disguising the payments as maintenance fees.  See, e.g., Tr. at 2733-36, 3387-88.  It is also worth noting that Espada named "Soundview Management Enterprises" (SME) and "Community Expansion Development Corp." (CEDC) in such a way as to confuse subtenants so that when they wrote checks to those entities, some believed they were actually paying Soundview, also known as Comprehensive Community Development Corp.  Espada then failed to disclose to the Soundview Board the nature and extent of his misconduct, Tr. at 3523, and did not tell CEDC accountants about this particular source of income.  See, e.g., Gx 230, 242; Tr. at 1931, 1933. Altogether, Espada perpetrated this scheme on nine different subtenants over a period of five years, netting him a total of $254,820.  Gx 20(x); Tr. at 4834-35.

---

[9] The Government is not advocating for the PSR's suggested 4 level role adjustment.  The parties' plea agreement estimated only a 3 level increase.

In addition, this enhancement is supported by the multiple other schemes Espada employed. Espada's improper use of Soundview's American Express card and his fraudulent reimbursement requests deceived Soundview into paying for tens of thousands of dollars of personal expenses. Espada added layers of complexity to what should have been a straightforward corporate-expensing process by (1) mischaracterizing the nature of these expenses in certain instances, (2) intentionally losing American Express statements and filling out multiple copies of the same statement, see Tr. at 4239-40, and (3) using the American Express card to pay for an expense and then turning in the receipt for that same expense for reimbursement. In addition, the American Express and Miscellaneous Theft Schemes were complex because they occurred repeatedly over an extended period of time. See United States v. Regensberg, 381 F. App'x 60, 62 (2d Cir. 2010) (finding that defendant's conduct warranted a sophisticated means enhancement because "he perpetuated [the conduct] for three years, [and] was the sort of repetitive conduct . . . [that] demonstrates that more than routine planning was involved") (internal citations and quotations omitted).[10]

Thus, Espada's use of multiple schemes, repeatedly and over an extended period of time to both conceal and perpetrate his crimes, clearly constitutes the basis for a "sophisticated means" enhancement. See United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996) (holding, in tax case, that sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return."). Further, courts have found that much less sophisticated conduct warranted the application of the enhancement. See, e.g., United States v. Ojemen, 465 F. App'x 69, 72 (2d Cir. 2012)(finding enhancement where defendant lied about his income to various government entities to get low-income housing).[11]

---

[10]   The CEDC Scheme was also sophisticated. Espada intentionally clouded the ownership of CEDC and lied on numerous forms so that he could claim to the Board and HRSA that the company was really Soundview's (and thus did not result in a conflict of interest and receive scrutiny).

[11]   The government is not advocating that the Court apply the PSR's suggested sentencing enhancements for (1) obstruction of justice under 3C1.1, and (2) misrepresentations on behalf of a charitable organization under 2B1.1(b)(9).   PSR ¶¶ 65,66.   The government is not in a position to prove by a preponderance of the evidence an obstruction of justice enhancement.   With respect to an

16

In sum, the Court should find that Espada's offense level is 27, as set forth below:

Base offense level                    6
(U.S.S.G. § 2B1.1(a)(2))

Plus:  Loss of over $400,000   +14
(U.S.S.G. § 2B1.1(b)(1)(H))

Plus:  Abuse of trust          +2
(U.S.S.G. § 3B1.3)

Plus:  Managerial role         +3
(U.S.S.G. § 3B1.1(b))

Plus:  Sophisticated means     +2
(U.S.S.G. § 2B1.1(b)(10))

Total Adjusted Offense Level: 27

III.  Espada Owes Forfeiture and Restitution

It is well established that forfeiture and restitution are separate, mandatory obligations of a defendant at sentencing. See United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012) (upholding an order for forfeiture and restitution because each serves a different purpose: forfeiture is meant to interfere with criminal activity and provide an economic deterrence to crime, while restitution is meant to compensate victims); United States v. Kalish, 626 F.3d 165, 169 (2d Cir. 2010)(there was "no infirmity in the District Court's imposition of both a forfeiture remedy and a restitution remedy.  These remedies are authorized by separate statues, and their simultaneous imposition offends no constitutional provision").  Espada is liable for both obligations as a result of his crimes.

A.    Forfeiture

Espada should be ordered to pay $368,088 in forfeiture. For the reasons explained in the government's letter, dated August 10, 2012 (Dkt. # 196) at pp. 8-9, the  $368,088 Forfeiture Money

_____

enhancement for a misrepresentation on behalf of a charitable organization, the facts pertaining to this offense do not represent circumstances where this enhancement is typically applied and the authority supporting application in this context is sparse and not controlling in this jurisdiction.

17

Judgment amount has been calculated from Gx 20(a), as follows: $618,699, minus $170,488 (CEDC monies), minus $79,585 (Year 2009 monies), minus $988 ("PGE Double Dip," as this concerns Pedro Gautier Espada, not the defendant), plus $440 (CEDC 2009 monies that should not be deducted twice). See Gx 20(a). This amount represents what Espada unlawfully obtained as a result of the conduct underlying his convictions.

Furthermore, this forfeiture money judgment amount is a conservative figure as it does not include the thefts from the CEDC Scheme, the thefts that took place in 2009, or the amount attributable to co-defendant Gautier Espada. Id. While the CEDC Scheme and the 2009 thefts are properly considered as "relevant conduct" for the loss amount, the government does not consider it appropriate to pursue these funds for forfeiture because Espada was not convicted for his conduct in connection with those particular schemes. See United States v. Treacy, 639 F.3d 32, 47-48 (2d Cir. 2011)(stating that district court's forfeiture calculations may be based on "reasonable estimate" in light of "available information").

Moreover, notwithstanding Espada's apparent inability to pay, see PSR at ¶¶ 116-126, a forfeiture money judgment should be imposed against Espada. See United States v. Awad, 598 F.3d 76 (2d Cir. 2010)(holding that a forfeiture money judgment can be imposed on a defendant who possesses no assets at the time of sentencing).

Accordingly, the government respectfully submits that an Order of Forfeiture holding Espada liable to pay the amount of $368,088 should be entered against him as part of this Court's sentence. (A proposed Order of Forfeiture is attached).

B.    Restitution

The Mandatory Victims Restitution Act, codified in 18 U.S.C. § 3663A, requires the imposition of restitution to victims of certain crimes. The Court must order restitution in the "full amount of each victims' loss without regard to the defendant's economic circumstance." Pescatore, 637 F.3d 128, 138 (2d Cir. 2011); 18 U.S.C. § 3664(f)(1)(A).

Here, the Court should also find that Espada's illegal conduct resulted in losses of $368,088 to Soundview, and order Espada to repay that amount. PSR ¶¶ 133-134. While this amount does not include Espada's 2009 conduct, the CEDC scheme or the money he improperly took post-trial, courts have held that a restitution order can only be based on those offenses for which

the defendant was convicted.  See United States v. Bengis, 2007 WL 1450381 at *2-4, n.4 (S.D.N.Y. May 17, 2007) (holding that 18 U.S.C. § 3663A "authorizes an award of restitution only for the loss caused by the specific conduct that is the basis of the offense conviction.").

However, because Espada's plea agreement permits the implementation of restitution for taxes owed beyond just 2005 – the tax year for which he pled guilty — the Court may order restitution to the IRS in the amount of $118,531.  Bengis, at *3. In sum, the Court should issue restitution orders specifying that Espada pay $368,088 to the Clerk of the Court and $118,531 to the IRS.  See PSR ¶¶ 133-134.

IV.   A Guidelines Sentence Is Appropriate

Pursuant to 18 U.S.C. § 3553(a), a Guidelines sentence is warranted, and a term of imprisonment of at least 84 months - what Probation recommends - is called-for.  Four Section 3553(a) factors are particularly relevant in this case: (1) the need for the sentence imposed to reflect the seriousness of Espada's offense and to promote respect for the law; (2) the need for the sentence to afford adequate general deterrence to criminal conduct; (3) the need to protect the public from further crimes of the defendant; and (4) the history and characteristics of the defendant, in particular his utter lack of remorse and refusal to accept responsibility for his profound betrayal of public trust.

A Guidelines sentence of at least 84 months is necessary to reflect the gravity of Espada's offense and to promote respect for the law.  Espada's actions shock the conscience.  He was entrusted with public funds for the vital mission of providing healthcare to impoverished residents of New York City.  Espada abused that trust.  He turned Soundview into his fiefdom and treated its funds as his personal piggy bank.

Even though Espada earned a generous salary of hundreds of thousands of dollars annually, his greed drove him to steal from Soundview to support his luxurious lifestyle.  Further, Espada's actions were not the result of an impetuous decision, but, to the contrary, were planned, carried out over the course of years, and cynically designed to deceive regulators.  He also appointed unqualified friends and family members to Soundview's Board of Directors so his actions would not be challenged.

It was also blatantly obvious to Espada that his actions were criminal.  This is evidenced by his myriad cover-ups, which included: (1) his repeated lies to accountants concerning the

nature of his CEDC spending (he said it was business related); (2) his routine lies to Soundview's accounting department concerning his personal use of Soundview's American Express card (which he claimed were business related); (3) his many lies to HRSA concerning the profit he earned through his janitorial contracts (which he under-reported by tens of thousands of dollars); and (4) his lies to the IRS about his income (he under-reported income in four consecutive tax returns).

Further, when regulators or government agencies – including the Bronx County District Attorney's Office and the New York State Attorney General's Office — began to suspect wrongdoing, rather than treat these occurrences as wake-up calls or chances to reform, Espada reinvented ways to siphon money from Soundview and hide his thefts. For example, all of the offense conduct discussed above took place <u>after</u> the New York State Attorney General's Office conducted a grand jury investigation concerning misconduct at Soundview that resulted in the convictions of five of Soundview's high-ranking employees. Apparently, these criminal probes only emboldened Espada and left him with the mistaken impression that he could get away with it.

Thus, Espada's criminal conduct cannot be excused as the product of desperation, momentary lack of judgement, lack of knowledge or notice of the law. Unfortunately, he knew what he was doing and the consequences of his actions — for both himself and Soundview and people it was meant to serve — and pursued his fraudulent schemes anyway. Because the goal of protecting the public's money, especially that designated for healthcare for the poor, is so important and because Espada's actions are so blameworthy, the seriousness of the offense is apparent and the need to deter similar conduct acute.

Espada's past "good deeds" also do not counsel for a non-Guidelines sentence. While it is true that Espada founded Soundview, there is little point to crediting someone with starting an institution that he abused for self-enrichment. It must be considered that the citizens of the New York City would have been better off had another individual or group been placed in charge of providing healthcare to that section of the Bronx (as is happening currently). Lamentably, if Espada had been more devoted to Soundview and less self-interested, Soundview could have helped many more people and provided better care to the patients it treated. If just a fraction of the money Espada stole had been  used legitimately, Soundview might have, for example, leased an x-ray or sonogram machine, just two small examples of how Soundview could have put that money to good use. And, of course, no one could count the ways Soundview might have been

20

improved had Espada dedicated the time he spent figuring out how to plunder Soundview to instead making it a stronger and more effective institution.

Espada is the unapologetic poster child of charity abuse. The sentence should serve as a deterrence to others who would abuse their positions of public trust, and steal from publicly-funded charities. Moreover, while it is reprehensible for the president of any non-profit to steal, such theft is particularly outrageous when that president is the former New York State Senate Majority Leader. The sentence should demonstrate that those who flout the law and feel their actions are above its reach because they are in positions of power will be punished.

Further, Espada's lack of remorse warrants a stiff sentence. Espada is unrepentant and, even after having pleaded guilty, blames everyone but himself for his predicament. This is evidenced by his Rule 33 Motion filed on June 3, 2013 wherein he made baseless allegations of jury tampering. Further, at a recent press conference held in front of the courthouse, he stated, "Also, the issue of the 2005 tax evasion charge, the question there was did I do it? And my answer was no and there was no deception to that answer.. . . I urge you to read the [polygraph] report and the last issue has to do with theft, which was the mainstay of the charges. And no deception was indicated when I responded that I have never, never in my public or private life betrayed my trust or stolen any money." Courts have routinely imposed the maximum term under the Guidelines range on the basis of a defendant's lack of remorse. See e.g., United States v. Kwong, 877 F. Supp. 96, 103 (E.D.N.Y. 1995) (Dearie, J.) (imposition of maximum term of imprisonment allowable under Guidelines range was justified by defendant's lack of remorse and by gravity of offense); United States v. Watkins, 667 F.3d 254, 260 (2d Cir. 2012) (upholding a district court's "high range sentence" based upon, among other things, the defendant's "lack of remorse"). In fact, the Second Circuit recognizes that a defendant's lack of remorse is a proper basis for an upward departure. United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (upholding an upward departure justified by "the seriousness of the offense and the great harm inflicted on the victim, the defendant's recidivism, and his lack of remorse"). Here too, the Court should consider the defendant's total lack of remorse when fashioning its sentence.

Finally, the public must be protected from Espada. It is obvious that, if given the chance, Espada would lie, cheat and steal all over again. Espada's post-trial conduct is nothing short of outrageous. Rather than attempt to reimburse Soundview

for the hundreds of thousands of dollars he stole, he diverted Soundview's last remaining money to himself and his family.  The Court agreed that this "had an odor to it" - to put it mildly. See September 21, 2012 Status Hearing Transcript at 34.  Despite his guilty plea and pledge not to challenge his trial conviction, he has insisted upon holding press conferences and interviews proclaiming his alleged innocence and claiming he was the victim of government witch hunts on both the state and federal levels. He personally questioned jurors in a misguided attempt to have his conviction overturned - as best we can tell, an unprecedented act in this Circuit.  The Court should fashion a sentence that teaches Espada that his actions were wrong and deters him from engaging in future criminal schemes.

V.    Conclusion

         For these reasons, the Government respectfully submits that the Court should impose a Guidelines sentence, and at the very least impose the Probation Department's recommended sentence of 84 months' imprisonment.  In addition, the Court should hold Espada accountable for $368,088 in forfeiture, $368,088 in restitution and $118,531 in restitution to the IRS.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

By:      _____
                              Carolyn Pokorny
                              Todd Kaminsky
                              Assistant U.S. Attorneys
                              718/254-6291/6367

cc: Defense Counsel (via ECF)